**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

13 CV 9244

| | |
|---|---|
| UNITED FOOD AND COMMERCIAL WORKERS LOCAL 1776 & PARTICIPATING EMPLOYERS HEALTH AND WELFARE FUND, Individually And On Behalf Of All Others Similarly Situated,<br><br>*Plaintiff,*<br><br>v.<br><br>TAKEDA PHARMACEUTICAL CO. LTD., TAKEDA AMERICA HOLDINGS, INC., TAKEDA PHARMACEUTICALS, U.S.A., INC., TAKEDA DEVELOPMENT CENTER AMERICAS, INC., MYLAN, INC., MYLAN PHARMACEUTICALS INC., ACTAVIS PLC f/k/a ACTAVIS, INC., WATSON LABORATORIES, INC., RANBAXY LABORATORIES, LTD., RANBAXY, INC., RANBAXY PHARMACEUTICALS, INC., TEVA PHARMACEUTICAL INDUSTRIES, LTD., AND TEVA PHARMACEUTICALS USA, INC.,<br><br>*Defendants.* | Civil Action Number<br><br>CLASS ACTION<br><br>JURY TRIAL DEMANDED<br><br>RECEIVED<br>DEC 3 1 2013<br>U.S.D.C. S.D. N.Y.<br>CASHIERS |

**COMPLAINT**

1.    Plaintiff United Food and Commercial Workers Local 1776 & Participating Employers Health and Welfare Fund ("Plaintiff"), on behalf of itself and all others similarly situated, files this Class Action Complaint ("Complaint") against Defendants Takeda Pharmaceutical Company Limited, Takeda America Holdings, Inc., Takeda Pharmaceuticals U.S.A., Inc., and Takeda Development Center Americas, Inc. (collectively, "Takeda"), Mylan

Inc. and Mylan Pharmaceuticals, Inc., (collectively, "Mylan"), Actavis plc f/k/a Actavis, Inc., and Watson Laboratories, Inc. (collectively, "Actavis"), Ranbaxy Laboratories, Ltd., Ranbaxy, Inc., and Ranbaxy Pharmaceuticals, Inc., (collectively, Ranbaxy), Teva Pharmaceutical Industries, Ltd. and Teva Pharmaceuticals USA, Inc. (collectively, "Teva"). Defendants Mylan, Actavis, Ranbaxy, and Teva will collectively be referred to as the "Generic Defendants." Takeda and the Generic Defendants will collectively be referred to as the "Defendants." Based upon personal knowledge as to facts pertaining to it, and upon information and belief as to all other matters, Plaintiff alleges as follows:

## I.    NATURE OF THE ACTION

2.    This action arises out of Defendants' overarching anticompetitive scheme to allocate, and unreasonably delay competition in, the market for pioglitazone hydrochloride tablets which Takeda sells under the brand name ACTOS, and further anticompetitive agreements between Takeda and each of Mylan and Teva to allocate, and unreasonably delay competition in, the market for the fixed dose combination product containing both pioglitazone hydrochloride and metformin (biguanide) which Takeda sells under the brand name ACTO*plus* met. Doctors prescribe ACTOS for the improvement of glycemic control in patients with Type 2 diabetes, either as a monotherapy treatment or as a combination therapy consisting of two separate drugs—pioglitazone hydrochloride together with sulfonylurea, metformin, or insulin. Doctors prescribe ACTO*plus* met as a fixed dose combination of pioglitazone hydrochloride and metformin to improve blood sugar control in adults with Type 2 diabetes who are already either taking ACTOS and metformin separately or taking metformin alone and it is not controlling blood glucose at normal levels.

2

3.    ACTOS became one of Takeda's biggest selling products.  Together, ACTOS and ACTO*plus* met generated over $3 billion in annual sales for Takeda.  Takeda knew, however, that the products were vulnerable to a rapid and near-complete loss of sales once less expensive generic versions entered the market.

4.    In order to delay the onset of generic competition and squeeze more multi-billion-dollar years out of these products, Takeda devised a multi-part scheme which Takeda enticed its would-be generic competitors to join.

5.    **First**, Takeda improperly listed two patents in the Food and Drug Administration's (the "FDA") publication *Approved Drug Products With Therapeutic Equivalence Evaluations* (the "Orange Book") with respect to ACTOS.  Takeda asserted in listing the two patents—United States Patent Nos. 5,965,584 (the "'584 Patent") and 6,329,404 (the "'404 Patent")—that they claim the ACTOS drug product.  Those patents plainly and unambiguously do not claim the ACTOS drug product, however, because the '584 Patent claims a drug product consisting of pioglitazone hydrochloride *and* a biguanide.  Similarly, the '404 Patent claims a drug product consisting of pioglitazone hydrochloride *and* an insulin secretion enhancer.

6.    The ACTOS drug product contains neither biguanide nor an insulin secretion enhancer, and thus neither the '584 Patent nor the '404 Patent claim the ACTOS drug product.  Indeed, Takeda has listed the '584 Patent in the Orange Book as claiming the drug product ACTO*plus* met, which does contain both pioglitazone hydrochloride and a biguanide, and has listed the '404 Patent in the Orange Book as claiming the drug product Duetact, which does contain both pioglitazone hydrochloride and an insulin secretion enhancer.

3

7.     Among other intended anticompetitive effects, Takeda's false listing of the '584 Patent and '404 Patent in the Orange Book for ACTOS permitted the first generic manufacturer that filed an Abbreviated New Drug Application ("ANDA") with a Paragraph IV Certification, 21 U.S.C. § 355(j)(2)(A)(vii)(IV), for ACTOS to claim the 180-day exclusivity provided by the Hatch-Waxman Act. That exclusivity prevents the FDA from approving any other generic ACTOS product to enter the market until 180 days after the first-filer enters. The exclusivity thus created the opportunity for Takeda to impose a "bottleneck" on FDA approval of *any* generic ACTOS products by paying the generic first-filer to delay entering the market. Paying the first-filer to delay entry would automatically delay entry by later-filing generic manufacturers, because those later filers would be subject to the first-filer's 180-day exclusivity.

8.     **Second**, having prepared the groundwork with the false patent listings for ACTOS, Takeda brought the plan to fruition by in fact paying the generic first-filers to delay entry and thereby create a bottleneck that impeded entry by later-filing generic manufacturers.

9.     Generic competition for ACTOS was likely to begin immediately after ACOTOS's drug substance patent—U.S. Patent No. 4,687,777 (the "'777 Patent")—expired on January 17, 2011. Without regard to whether the lawsuits had legal merit, Takeda sued every manufacturer that sought FDA approval to sell generic ACTOS. Defendants Mylan, Ranbaxy, and Actavis were entitled to "shared" 180-day exclusivity for ACTOS. Those Defendants had all submitted Paragraph IV Certifications with respect to the '584 Patent and the '404 Patent, and they had obtained a trial date of June 2010 for their allegations that Takeda's patents allegedly covering ACTOS were invalid, unenforceable, or would not be infringed by their generic products. That trial date would have permitted Mylan, Ranbaxy, and Actavis to successfully conclude the patent litigation and enter the market on or about January 17, 2011.

4

10.    Takeda knew that there was a substantial risk that its infringement claims would not prevail in the litigation. Therefore, as the trial date approached, Takeda simply paid Actavis, Mylan, and Ranbaxy to withdraw their challenges to the patents and delay entry into the market. In exchange for these Exclusion Payments—in exchange for a share of the supracompetitive profits that the absence of generic competition made possible—Mylan, Ranbaxy, and Actavis agreed to delay entering the market until August 17, 2012. As planned, this delayed entry by the first-filers had the intended effect of imposing a "bottleneck" on FDA approval of many additional generic manufacturers, all of whom were prevented from entering the market until 180 days after August 17, 2012.

11.    **Third**, Takeda repeated this same Exclusion-Payment ploy with respect to ACTO*plus* met. Takeda had listed the '584 Patent as a drug product patent claiming ACTO*plus* met, and had listed various other patents as applicable method-of-use patents. Without regard to whether the lawsuits had legal merit, Takeda sued every manufacturer that sought FDA approval to sell generic ACTO*plus* met. Defendant Mylan submitted the first ANDA with a Paragraph IV Certification with respect to ACTO*plus* met and was thus eligible for the Hatch-Waxman Act 180-day exclusivity.

12.    Takeda knew that there was a substantial risk that its infringement claims under these patents would not prevail in the litigation. Therefore, as the Hatch-Waxman Act 30-month stay against Mylan (21 U.S.C. § 355(j)(5)(B)(iii)) was ready to expire, Takeda simply paid Mylan to withdraw its challenge to the patents and delay entry into the market. In exchange for these Exclusion Payments—in exchange for a share of the supracompetitive profits that the absence of generic competition made possible—Mylan agreed to delay entering the market until 2012. As planned, this delayed entry by the first-filer had the intended effect of imposing a

5

"bottleneck" on FDA approval of many additional generic manufacturers, all of whom were prevented from entering the market until 180 days after Mylan entered.

13.    **Fourth**, Takeda and Mylan, Ranbaxy, and Actavis took additional anticompetitive measures to ensure that Defendant Teva did not unravel the anticompetitive schemes that they had concocted. Teva had refused to submit a Paragraph IV Certification with respect to the '584 Patent and '404 Patent regarding ACTOS, on the ground that Takeda had improperly listed them in the Orange Book. Instead, Teva filed what is known as a "Section viii Statement" (*see* 21 U.S.C. §355(b)(2)(B) & 21 U.S.C. §355(j)(2)(A)(viii)), attesting that Teva did not seek FDA approval for a use that was covered by the patents that Takeda had listed in the Orange Book.

14.    Without regard to whether the lawsuits had legal merit, Takeda sued Teva for infringement of the patents allegedly covering ACTOS and ACTO*plus* met. Had Teva prevailed in that lawsuit, it could have entered the market with generic ACTOS upon the expiration of the '777 Patent on January 17, 2011. Under the Hatch-Waxman Act, and pursuant to the relief that Teva sought in its counterclaims against Takeda, Teva would not have been subject to the 180-day exclusivity bottleneck that Takeda, Mylan, Ranbaxy, and Actavis had constructed through their Exclusion Payment Agreements.

15.    Teva had secured a trial date of June 2010, which gave it time to obtain a favorable ruling before January 17, 2011. Rather than risk the unraveling of its anticompetitive agreements with Mylan, Ranbaxy, and Actavis, Takeda simply paid Teva to withdraw its challenge to the patents, stop contesting Takeda's improper listing of the '584 Patent and '404 Patent for ACTOS, and delay entry into the market. In exchange for these Exclusion Payments—in exchange for a share of the supracompetitive profits that the absence of generic

competition made possible—Teva agreed to delay entering the market with generic ACTOS until August 17, 2012, and to delay entering the market with generic ACTO*plus* met until Mylan entered in 2012.

16.    Defendants' unlawful schemes and Exclusion Payment Agreements were designed to and did in fact: (a) delay the entry of less expensive generic versions of ACTOS in the United States; (b) fix, raise, maintain, or stabilize the price of ACTOS and its generic equivalents; (c) permit Takada to maintain a monopoly in the United States for ACTOS and its generic equivalents; (d) allocate 100% of the United States market for ACTOS and its generic equivalents to Takeda; (e) delay the entry of less expensive generic versions of ACTO*plus* met in the United States; and (f) fix, raise, maintain, or stabilize the price of ACTO*plus* met and its generic equivalents.

17.    Plaintiff brings this action as class actions on behalf of all consumers and third-party payors (collectively "End-Payors") in certain States and the District of Columbia and Puerto Rico who purchased or paid for branded and/or generic ACTOS and/or ACTO*plus* met products, other than for re-sale, since January 17, 2011 with respect to ACTOS and since February 25, 2011 with respect to ACTO*plus* met (see Class Definitions below).

18.    Plaintiff asserts claims for compensatory and/or treble damages for violations of the State laws enumerated below.

## II.    PARTIES

### A.    Plaintiff

19.    Plaintiff United Food and Commercial Workers Local 1776 & Participating Employers Health and Welfare Fund is an employee health and welfare benefit plan that maintains its principal place of business at 3031-A Walton Road, Plymouth Meeting,

Pennsylvania 19462.    Plaintiff purchased and/or provided reimbursement for ACTOS and ACTO*plus* met other than for re-sale, and purchased the generic versions of ACTOS and ACTO*plus* met other than for re-sale once they became available, at supracompetitive prices during the Class Periods, and has thereby been injured.

### B.    Defendants

20.    Defendant Takeda Pharmaceutical Company Limited is a Japanese company with its principal place of business at 1-1, Doshomachi 4-chome, Chuo-ku, Osaka 540-8645.

21.    Defendant Takeda America Holdings, Inc. is a wholly-owned subsidiary of Defendant Takeda Pharmaceutical Company Limited and the United States parent corporation of Defendants Takeda Pharmaceuticals U.S.A., Inc. and Takeda Development Center Americas, Inc.  Defendant Takeda America Holdings, Inc. is a corporation organized under the law of the State of New York with its principal place of business at 767 Third Avenue, New York, New York 10017.

22.    Defendant Takeda Pharmaceuticals U.S.A., Inc., formerly known as Takeda Pharmaceuticals North America, Inc., is a corporation organized under the laws of the State of Delaware with its principal place of business at One Takeda Parkway, Deerfield, Illinois 60015.

23.    Defendant Takeda Development Center Americas, Inc., formerly known as Takeda Global Research and Development Center, Inc., is a corporation organized under the laws of the State of Delaware with its principal place of business at One Takeda Parkway, Deerfield, Illinois 60015.

24.    The foregoing Defendants will collectively be referred to as "Takeda."

25.     Defendant Mylan, Inc., formerly known as Mylan Laboratories, Inc., is a corporation organized under the laws of the Commonwealth of Pennsylvania with its principal place of business at 1500 Corporate Drive, Canonsburg, Pennsylvania 15317.

26.     Defendant Mylan Pharmaceuticals, Inc. is a corporation organized under the laws of the State of West Virginia with its principal place of business at 781 Chestnut Ridge Road, Morgantown, West Virginia 26505.

27.     The foregoing "Mylan" Defendants will together be referred to as "Mylan."

28.     Defendant Actavis plc is incorporated under the laws of Ireland, with its principal place of business at 1 Grand Canal Square, Docklands Dublin 2, Ireland and a place of business in Morris Corporate Center III 400 Interpace Parkway Parsippany, New Jersey 07054.  Watson Pharmaceuticals, Inc changed its name to Actavis Inc. as a result of Watson Pharmaceuticals, Inc's acquisition of Swiss-based Actavis Group in or around October 2012.  On or about October 1, 2013, Actavis Inc. changed its name to Actavis plc.

29.     Defendant Watson Laboratories, Inc. was a Nevada corporation, having its principal place of business at 311 Bonnie Circle, Corona, California. Defendant Watson Laboratories, Inc. was a wholly-owned subsidiary of Watson Pharmaceuticals, Inc.

30.     The foregoing "Actavis" Defendants will together be referred to as "Actavis."

31.     Defendant Ranbaxy Laboratories, Ltd. is an international pharmaceutical company headquartered in Gurgaon, Haryana, India.  Ranbaxy is a member of the Daiichi Sankyo Group, which is headquartered in Tokyo, Japan.  Defendant Ranbaxy Laboratories, Ltd.'s principal place of business in the United States is at 600 College Road East, Suite 2100, Princeton, New Jersey 08540.

32.    Defendant Ranbaxy, Inc. is a wholly owned subsidiary and the North American commercial arm of Defendant Ranbaxy Laboratories, Ltd. and the United States parent corporation of Defendant Ranbaxy Pharmaceuticals, Inc.    Defendant Ranbaxy, Inc. is a corporation organized under the laws of the State of Delaware with its principal place of business at 600 College Road East, Suite 2100, Princeton, New Jersey 08540.

33.    Defendant Ranbaxy Pharmaceuticals, Inc. is a wholly-owned subsidiary of Defendant Ranbaxy, Inc.  Defendant Ranbaxy Pharmaceuticals, Inc. is a corporation organized under the laws of the State of Delaware with its principal place of business at 600 College Road East, Suite 2100, Princeton, New Jersey 08540.

34.    The foregoing "Ranbaxy" Defendants will collectively be referred to as "Ranbaxy."

35.    Defendant Teva Pharmaceutical Industries, Ltd., one of the largest pharmaceutical companies in the world, is headquartered in Petah Tikva, Israel.

36.    Defendant Teva Pharmaceuticals USA, Inc. is an indirect, wholly-owned subsidiary of Teva Pharmaceutical Industries, Ltd.  Defendant Teva Pharmaceuticals USA, Inc. is a corporation organized under the laws of the State of Delaware with its principal place of business at 1090 Horsham Road, North Wales, Pennsylvania 19454.

37.    The foregoing "Teva" Defendants will together be referred to as "Teva."

38.    All of Defendants' wrongful actions described in this Complaint are part of, and in furtherance of, the anticompetitive scheme and anticompetitive agreements (as further described below), and were authorized, ordered, and/or executed by Defendants' various officers, agents, employees, and/or other representatives while actively engaged in the management of Defendants' affairs (or that of their predecessors-in-interest) within the course

and scope of their duties and employment, and/or with Defendants' actual, apparent, and/or ostensible authority.

### III.    JURISDICTION AND VENUE

39.    This Court has jurisdiction over this matter under 28 U.S.C. § 1332(d) because this action is a class action in which the aggregate amount in controversy for each of the proposed classes exceeds $5,000,000, and at least one member of each of the putative classes is a citizen of a state different from that of one of the Defendants.

40.    Venue is appropriate in this district under 28 U.S.C. §1391(b) and (c) because Defendants transact business within this district and the interstate trade and commerce described herein is carried out, in substantial part, in this district.

### IV.    INDUSTRY BACKGROUND

#### A.    Characteristics of the Prescription Pharmaceutical Marketplace

41.    The marketplace for the sale of prescription pharmaceutical products in the United States suffers from a significant imperfection that branded drug manufacturers can exploit in order to obtain or maintain substantial market power in the sale of a particular pharmaceutical composition. Markets function best when the person responsible for paying for a product is also the person who chooses which product to purchase. When the same person has both the product choice and payment obligation, the price of the product plays an appropriate role in the person's choice and, consequently, manufacturers have an appropriate incentive to lower the prices of their products.

42.    The pharmaceutical marketplace, however, is characterized by a "disconnect" between product selection and the payment obligation. State laws prohibit pharmacists from dispensing many pharmaceutical products, including ACTOS and ACTO*plus* met, to patients

11

without a prescription written by a doctor. The prohibition on dispensing certain products without a prescription creates the price disconnect. The patient's doctor chooses which product the patient will buy while the patient (and in most cases his or her insurer) has the obligation to pay for the pharmaceutical product.

43.     Takeda and other brand manufacturers exploit this price disconnect by employing large sales forces who visit doctors' offices and persuade them to prescribe the brand manufacturers' products. These sales representatives do not advise doctors of the cost of the branded products. Moreover, studies show that doctors typically are not aware of the relative costs of brand pharmaceuticals and, even when they are aware of the relative costs, they are insensitive to price differences because they do not pay for the products. The result is a marketplace in which price plays a comparatively unimportant role in product selection.

44.     The relative unimportance of price in the pharmaceutical marketplace reduces what economists call the price elasticity of demand—the extent to which unit sales go down when price goes up. This reduced price elasticity, in turn, gives brand manufacturers the ability to raise prices substantially above marginal cost without losing so many sales as to make the price increase unprofitable. The ability to profitably raise prices substantially above marginal costs is what economists and antitrust courts refer to as monopoly power. The result of these pharmaceutical market imperfections and marketing practices is brand manufacturers gaining and maintaining market power and/or monopoly power with respect to many branded prescription pharmaceuticals.

B.   **The Regulatory Structure for Approval of Generic Drugs, Listing Patent Information in the Orange Book, and the Substitution of Generic Drugs for Brand Name Drugs**

45.   Under the Federal Food, Drug, and Cosmetic Act ("FDCA"), branded drug manufacturers must obtain FDA approval to sell a new drug product by filing a New Drug Application ("NDA"). 21 U.S.C. §§ 301–392. An NDA must include specific data concerning the safety and effectiveness of the drug, as well as any information on applicable patents. 21 U.S.C. § 355(a), (b).

46.   When the FDA approves a brand manufacturer's NDA, the manufacturer may list in the Orange Book any patents the manufacturer believes could reasonably be asserted against a generic manufacturer that makes, uses, or sells a generic version of the brand drug before the expiration of the listed patents. The manufacturer may also list in the Orange Book any patents issued after the FDA approved the NDA within thirty days of their issuance. 21 U.S.C. § 355(b)(1) & (c)(2).

47.   The FDA relies completely on a brand manufacturer's truthfulness about patent validity and applicability, because the FDA does not have the resources or authority to verify the manufacturer's patents and patent listings for accuracy or trustworthiness. In listing patents and use codes in the Orange Book, the FDA merely performs a ministerial act.

### 1.   The Hatch-Waxman Amendments

48.   The Hatch-Waxman Act, enacted in 1984, simplified the regulatory hurdles for prospective generic drug manufacturers by eliminating the need to file lengthy and costly NDAs. *See* Drug Price Competition and Patent Term Restoration Act, Pub. L. No. 98-417, 98 Stat. 1585 (1984). A manufacturer seeking approval to sell a generic version of a brand drug may instead file an ANDA. An ANDA relies on the scientific findings of safety and effectiveness included in

the brand manufacturer's original NDA, but must further show that the generic drug (i) contains the same active ingredient(s), dosage form, route of administration, and strength as the brand drug, and (ii) is absorbed at the same rate and to the same extent as the brand drug—that is, that the generic drug is pharmaceutically equivalent and bioequivalent (together, "therapeutically equivalent") to the brand drug. The FDA assigns an "AB" rating to generic drugs that are therapeutically equivalent to their brand-name counterparts.

49. The FDCA and Hatch-Waxman Act operate on the presumption that bioequivalent drug products containing identical amounts of the same active ingredients, having the same route of administration and dosage form, and meeting applicable standards of strength, quality, purity and identity, are therapeutically equivalent and may be substituted for one another. Bioequivalence means the active ingredient of the proposed generic drug would be present in the blood of a patient to the same extent and for the same amount of time as its branded counterpart. 21 U.S.C. § 355(j)(8)(B).

50. Congress enacted the Hatch-Waxman Act to expedite the entry of legitimate (non-infringing) generic competitors, thereby reducing healthcare expenses nationwide. Congress also sought to protect pharmaceutical manufacturers' incentives to create new and innovative products.

51. The Hatch-Waxman Amendments achieved both goals, advancing substantially the rate of generic product launches and ushering in an era of historic high profit margins for brand manufacturers. In 1983, before the Hatch-Waxman Act, only 35% of the top-selling brand drugs with expired patents had generic alternatives; by 1998, nearly all did. In 1984, prescription drug revenue for branded and generic drugs totaled $21.6 billion; by 2009 total prescription drug revenue had soared to $300 billion.

### 2.    Requirements for Listing Patents in the Orange Book

52.    Part of the regulatory structure created by the Hatch-Waxman Act involves a process for identifying and addressing patents that arguably apply to brand and generic drug products and can be reasonably asserted against potential infringers in patent litigation. This regulatory structure requires the holder of an NDA to submit information concerning certain patents to the FDA, which incorporates the information into the Orange Book. Patent information is organized in the Orange Book by being listed for one or more specific NDAs. When a company seeks to file an ANDA, it must submit certain patent certifications or statements, described more fully below, to each patent listed in the Orange Book for the NDA that is the reference listed drug for the ANDA.

53.    Under the Hatch-Waxman Act, after the FDA approves an NDA the NDA holder must submit certain required information concerning "any patent which claims the drug for which the application was submitted or which claims a method of using such drug and with respect to which a claim of patent infringement could reasonably be asserted if a person not licensed by the owner engaged in the manufacture, use, or sale of the drug." 21 U.S.C. § 355(b)(1)(G).

54.    At the relevant time when Takeda listed the '584 Patent and '404 Patent in the Orange Book for ACTOS—1999 and 2003, respectively—the relevant statute provided that the NDA applicant must list "any patent which claims the drug for which the applicant submitted the application or which claims a method of using such drug and with respect to which a claim of patent infringement could reasonably be asserted if a person not licensed by the owner engaged in the manufacture, use, or sale of the drug." 21 U.S.C.A. § 355(b)(1) (1999) & (2002).

55.    The then-applicable regulations provided that three types of patents were properly listable: "drug substance (ingredient) patents, drug product (formulation and composition)

15

patents, and method of use patents." 21 C.F.R. § 314.53(b) (1999) & (2002). The regulations further provided that "[f]or patents that claim a drug substance or drug product, the [NDA] applicant shall submit information only on those patents that *claim a drug product that is the subject of a pending or approved application*, or that claim a drug substance that is a component of such a product." *Id.* (emphasis added). Furthermore, the NDA holder can properly list a patent regarding a drug product only "with respect to which a claim of patent infringement could reasonably be asserted if a person not licensed by the owner of the patent engaged in the manufacture, use, or sale *of the drug product*." *Id.* (emphasis added). In short, to be properly listed as a drug product patent, the patent had to claim the drug product that was the subject of the NDA; the patent's drug product claim could not just claim *some* drug product—it had to claim the *relevant* drug product, i.e., the drug product as to which the NDA applicant listed the patent.

56.    The NDA applicants were on their honor to properly list the "Type of patent, i.e., drug, drug product, or method of use." 21 C.F.R. § 314.53(c)(2)(ii) (1999) & (2002). The FDA expressly refused to police the proper listing of patents, noting that it "does not have the resources or the expertise to review patent information for its accuracy and relevance to an NDA," and that it "believes that the declaration requirements under § 314.53(c) (requiring the applicant to declare "that Patent No. _____ covers the formulation, composition, and/or method of use of (name of drug product)"), as well as an applicant's potential liability if it submits an untrue statement of material fact, will help ensure that accurate patent information is submitted." *Abbreviated New Drug Application Regulations: Patent and Exclusivity Provisions*, 59 Fed. Reg. 50338, 50345 (Oct. 3, 1994).

57.    Important regulatory and competitive consequences flow from the distinction between those patents listed in the Orange Book as containing drug product claims, and those listed as containing method-of-use claims.  If the patentee lists the patent as containing a drug product claim, an ANDA applicant that wishes to market its generic product before the patent expires must file a Paragraph IV Certification, certifying that the patent is invalid, unenforceable, or would not be infringed by the generic product. 21 U.S.C.□§ 355(j)(2)(A)(vii)(IV); 21 C.F.R. § 314.94(a)(12)(i)(A)(4).  The patentee and/or NDA holder then has the opportunity to obtain an automatic 30-month stay on generic competition by filing a patent infringement lawsuit against the ANDA applicant. In addition, and of particular importance here, the FDA is prohibited from approving a subsequent applicant's ANDA until 180 days after the first-filer has entered the market.  21 U.S.C. § 355(j)(5)(B)(iv).  As discussed in detail below, this "180-day exclusivity" creates an opportunity for the patentee to craft a "bottleneck" to delay *all* generic competition by paying the first-filer to delay its entry into the market.

58.    By contrast, if the patentee lists the patent on the basis of method-of-use claims, in certain circumstances an ANDA applicant can submit what is known as a "Section viii Statement." 21 U.S.C. § 355(j)(2)(A)(viii); 21 C.F.R. § 314.94(a)(12)(iii). In a Section viii Statement, the ANDA applicant states it is not seeking approval for the particular use covered by the method-of-use patent.  Then the patentee or NDA holder *cannot* obtain an automatic 30-month stay on generic competition by suing the ANDA applicant for patent infringement. Further, the FDA can approve an ANDA that contains only a Section viii Statement *without regard* to whether any other ANDA applicant is otherwise entitled to a 180-day exclusivity period.

17

59.    In short, listing a patent as containing a drug product claim gives the patentee two key competitive advantages—an automatic 30-month stay on generic competition, and an ability to create a bottleneck delaying all generic competition by paying the first generic filer to delay entry into the market.

### 3.    Paragraph IV Certifications

60.    Where the NDA holder has listed any patent claiming a drug substance or drug product in the Orange Book, an ANDA applicant must certify that the generic drug will not infringe the patents listed in the Orange Book.  Under the Hatch-Waxman Act, a generic manufacturer's ANDA must contain one of four certifications:

  i.    that no patent for the brand drug has been filed with the FDA (a "Paragraph I certification");

  ii.    that the patent for the brand drug has expired (a "Paragraph II certification");

  iii.    that the patent for the brand drug will expire on a particular date and the manufacturer does not seek to market its generic product before that date (a "Paragraph III certification"); or

  iv.    that the patent for the brand drug is invalid or will not be infringed by the generic manufacturer's proposed product (a "Paragraph IV certification").

61.    If a generic manufacturer files a Paragraph IV Certification, a brand manufacturer can delay FDA approval of the ANDA simply by suing the ANDA applicant for patent infringement.  If the brand manufacturer initiates a patent infringement action against the generic filer within forty-five days of receiving notification of the Paragraph IV certification ("Paragraph IV Litigation"), the FDA will not grant final approval to the ANDA until the earlier of (a) the

18

passage of 30 months, or (b) the issuance of a decision by a court that the patent is invalid or not infringed by the generic manufacturer's ANDA. Until one of those conditions occurs, the FDA may grant "tentative approval," but cannot authorize the generic manufacturer to market its product. FDA may grant an ANDA tentative approval when it determines that the ANDA would otherwise be ready for final approval but for the 30-month stay.

62.    As an incentive to spur manufacturers to seek approval of generic alternatives to branded drugs, the first generic manufacturer to file an ANDA containing a Paragraph IV Certification typically receives a period of protection from competition from other generic versions of the drug. For Paragraph IV Certifications made before December 8, 2003, the first generic applicants received 180 days of market exclusivity, which could not be forfeited and was triggered only by commercial marketing of the generic product. For Paragraph IV Certifications made after December 8, 2003, the first generic applicant receives 180 days of market exclusivity (unless some forfeiture event, like that discussed below, occurs). This means the first approved generic is the only available generic for at least six months.

63.    Brand manufacturers can "game the system" by listing patents in the Orange Book (even if such patents are not eligible for listing) and suing any generic competitor filing an ANDA with a Paragraph IV Certification (even if the competitor's product does not actually infringe the listed patents) in order to delay final FDA approval of an ANDA for up to 30 months. That brand manufacturers often sue generics under Hatch-Waxman simply to delay generic competition—as opposed to enforcing a valid patent that is actually infringed by the generic—is demonstrated by the fact that generic firms have prevailed in Paragraph IV Litigation in cases involving 73% of the drug products studied—either by obtaining a judgment of invalidity or non-infringement or by the patent holder's voluntary dismissal of the suit.

64.    For Paragraph IV Certifications made before December 8, 2003, the first generic applicant could help a brand manufacturer "game the system" by delaying not only its own market entry, but also the market entry of all other generic manufacturers. The first generic applicant, by agreeing not begin marketing its generic drug, thereby could delay the start of the 180-day period of generic market exclusivity, a tactic called exclusivity "parking." This tactic created a "bottleneck" because later generic applicants could not enter the market until the first generic applicant's 180-day exclusivity had elapsed or was forfeited.

65.    On December 8, 2003, Congress enacted the Medicare Prescription Drug Improvement and Modernization Act of 2003 ("MMA") in order to make it more difficult for brand and generic manufacturers to conspire to delay the start of the first-filer's 180-day period of generic market exclusivity.  The MMA outlines a number of conditions under which an ANDA applicant forfeits its eligibility for 180-day exclusivity, making way for other ANDA filers to launch their generic products.  For example, forfeiture occurs if the first ANDA applicant fails to obtain tentative approval within 30 months from filing, unless the failure is caused by a change in, or review of, the approval requirements.

66.    Under the "failure to market" provision, a first ANDA applicant forfeits 180-day exclusivity if it fails to market its generic drug by the later of: (a) the earlier of the date that is (i) 75 days after receiving final FDA approval; or (ii) 30 months after the date it submitted its ANDA; or (b) the date that is 75 days after the date as of which, as to each of the patents qualifying the first applicant for exclusivity (*i.e.*, as to each patent for which the first applicant submitted a Paragraph IV Certification), at least one of the following has occurred: (i) a final decision of invalidity or non-infringement; (ii) a settlement order entering final judgment

including a finding the patent is invalid or not infringed; or (iii) the NDA holder delists the patent from the FDA Orange Book.

67.      Brand manufacturers and first-filing generics can structure their settlements in order to intentionally skirt the failure-to-market provisions and keep the 180-day exclusivity bottleneck in place by, for example, settling their litigation before a final judgment of invalidity or non-infringement can be entered with respect to each of the patents for which the first applicant submitted a Paragraph IV Certification, or seeking a consent judgment that does not include a finding that all of the patents for which the first applicant submitted a Paragraph IV Certification were invalid or not infringed. When that happens, in order to trigger forfeiture and gain access to the market, subsequent ANDA applicants are forced to obtain a judgment that all patents for which the first filing generic manufacturer filed Paragraph IV Certifications are invalid or not infringed. This may require the subsequent ANDA applicant to initiate a declaratory judgment action concerning patents that the brand manufacturer did not assert against it in a Paragraph IV Litigation.

### C.      The Benefits of Generic Drugs

68.      Generic versions of brand name drugs contain the same active ingredient, and are determined by the FDA to be just as safe and effective as their brand name counterparts. The only material difference between generic and brand name drugs is their price: generics are usually at least 25% less expensive than their brand name counterparts when there is a single generic competitor.  The discount typically increases to 50% to 80% (or more) when there are multiple generic competitors on the market for a given brand.  The launch of a generic drug thus usually brings huge cost savings for all drug purchasers. The Federal Trade Commission ("FTC") estimates that about one year after market entry, the generic version takes over 90% of

the brand's unit sales at 15% of the price of the brand name product. As a result, competition from generic drugs is viewed by brand name drug companies, such as Takeda, as a grave threat to their bottom lines.

69.    Due to the price differentials between brand and generic drugs, and other institutional features of the pharmaceutical industry, pharmacists liberally and substantially substitute the generic version when presented with a prescription for the brand-name counterpart. Since passage of the Hatch-Waxman Act, every state has adopted substitution laws that either require or permit pharmacies to substitute generic equivalents for branded prescriptions (unless the prescribing physician has specifically ordered otherwise by writing "dispense as written" or similar language on the prescription).

70.    There is an incentive to choose the less expensive generic equivalent in every link in the prescription drug chain. As a result of federal reimbursement rules and the industry pricing structure, pharmacies typically earn a higher markup on generics than on brands. Private health insurers similarly offer direct incentives to pharmacies to substitute cheaper generic products for more expensive branded ones. Health insurers are contractually obligated to pay for the bulk of their members' prescriptions, whether filled with branded or generic drugs, so they offer their members lower copays for generic drugs in order to encourage the use of generics.

71.    Generic competition enables all members of the proposed Class to (a) purchase generic versions of the drug at substantially lower prices; and/or (b) purchase the brand drug at a reduced price.

72.    Until a generic version of the brand drug enters the market, however, there is no bioequivalent generic drug to substitute for, and compete with, the brand drug, and, therefore, the brand manufacturer can continue to profitably charge supracompetitive prices. As a result, brand

manufacturers, who are well aware of generics' rapid erosion of their brand sales, have a strong incentive to delay the introduction of generic competition into the market, including by using tactics such as the improper patent listing and Exclusion Payment Agreements at issue here.

### D.    The Impact of Authorized Generics

73.    The 180-day marketing exclusivity to which first-filer generics may be entitled does not prevent a brand manufacturer from marketing its own generic alternative to the brand drug during that 180-day period.  Such an "authorized generic" is chemically identical to the brand drug, but is sold as a generic product through either the brand manufacturer's subsidiary (if it has one) or through a third-party generic manufacturer.  Competition from an authorized generic during the 180-day exclusivity period substantially reduces the first-filer's revenue, and substantially reduces drug prices for consumers.

74.    In its recent study, *Authorized Generic Drugs: Short-term Effects and Long-Term Impact* (August 2011) (the "FTC Study"), the FTC found that authorized generics capture a significant portion of sales, reducing the first-filer generic's revenues by approximately half on average during the 180-day exclusivity period.   The first-filing generic makes significantly less money when it faces competition from an authorized generic because (1) the authorized generic takes a large share of unit sales away from the first filer; and (2) the presence of an additional generic in the market causes prices to decrease.

75.    Although first-filing generic manufacturers make significantly less money when they must compete with an authorized generic during the first 180 days, consumers and other drug purchasers such as Plaintiff and the End-Payor Classes benefit from the lower prices caused by competition between the authorized generic and the first-filing generic.

76.     Given the significant negative impact of an authorized generic on the first-filing generic's revenues, a brand manufacturer's agreement not to launch an authorized generic has tremendous value to the generic manufacturer.  Brand manufacturers have used such agreements as a way to pay the first-filer to delay entering the market.  Such non-competition agreements deprive consumers and other drug purchasers such as Plaintiff and the End-Payor Classes of the lower prices resulting from two forms of competition: (1) between the branded and the generic products; and (2) between the generic products.

## V.     DEFENDANTS' ANTICOMPETITIVE CONDUCT

### A.     Takeda Improperly Lists the '584 Patent and '404 Patent.

77.     On January 15, 1999, Takeda submitted NDA 21-073 seeking the FDA's approval to market ACTOS, which contains the active ingredient pioglitazone hydrochloride, and is used to improve glycemic control in adults with Type 2 diabetes when diet and exercise are not sufficient.  On July 15, 1999, the FDA approved Takeda's NDA for the use of ACTOS to improve glycemic control in adults with Type 2 diabetes either as monotherapy or in combination with a sulfonylurea, metformin, or insulin.

78.     Pursuant to the FDA's requirements, Takeda submitted the '777 Patent, entitled "Thiazolidinedione Derivatives, Useful As Antidiabetic Agents," for listing in the Orange Book as a drug substance patent covering ACTOS. The '777 Patent claims the active ingredient for ACTOS, pioglitazone hydrochloride, and was issued to inventors Kanji Meguro and Takeshi Fujita on August 18, 1987 and assigned to Takeda.  The '777 Patent purports to claim the novel compound commonly known under the nonproprietary name "pioglitazone" and its pharmacologically acceptable salts.  ACTOS and ACTO*plus* met are both covered by the '777 Patent, which expired on January 17, 2011.

24

79.   As stated previously, Takeda knew that its blockbuster drug would suffer from generic competition upon the expiration of its '777 Patent.   In order to extend its patent monopoly beyond January 17, 2011, Takeda obtained and listed ten additional patents in the Orange Book with respect to ACTOS.

80.   The '584 Patent, entitled "Pharmaceutical Composition," purports to claim a pharmaceutical composition comprising pioglitazone or salts thereof *in combination with* a biguanide (e.g., metformin) and methods for treating diabetes which comprise administering a therapeutically effective amount of pioglitazone or salts thereof in combination with a biguanide (e.g., metformin).   Takeda is the owner, by assignment, of the '584 Patent. ACTO*plus* met, not ACTOS, is the purported commercial embodiment of the '584 Patent, which expires on June 19, 2016. Nevertheless, Takeda submitted the '584 Patent to the FDA for listing in the Orange Book as a drug product patent and a method-of-use patent *with respect to ACTOS*.

81.   The '404 Patent, entitled "Pharmaceutical Composition," purports to claim a pharmaceutical composition comprising pioglitazone or salts thereof *in combination with* an insulin secretion enhancer (e.g., a sulfonylurea, such as glimepiride) and methods for treating diabetes which comprise administering a therapeutically effective amount of pioglitazone or salts thereof in combination with an insulin secretion enhancer.   Takeda is the owner, by assignment, of the '404 Patent.   Duetact, not ACTOS, is the purported commercial embodiment of the '404 Patent, which expires on June 19, 2016.   Nevertheless, Takeda submitted the '404 Patent to the FDA for listing in the Orange Book as a drug product patent and a method-of-use patent *with respect to ACTOS*.

82.   In addition to submitting the '777 Patent, the '584 Patent, and the '404 Patent to the FDA for listing in the Orange Book, Takeda also submitted eight more patents.   These

25

patents (the "Method-of-Use Patents") claimed various methods of using ACTOS in combination with other drug products (such as biguanide or an insulin secretion enhancer) to treat various conditions or to reduce various side effects. Takeda listed the Method-of-Use Patents in the Orange Book as method of use patents, not drug substance or drug product patents.

83.    Under both the Hatch-Waxman Act and the FDA's implementing regulations, the drug product claims for the '584 Patent and the '404 Patent do not form a permissible basis for listing those patents in the Orange Book in relation to the ACTOS NDA.

84.    First, the drug product claims in those patents could properly be listed in the Orange Book for the ACTOS NDA only if those patents in fact claimed the ACTOS drug product. The patents unequivocally do not do so. The active ingredient in ACTOS is *only* pioglitazone hydrochloride. By contrast, the drug product claims in the '584 Patent and the '404 Patent claim drug products that contain *both* pioglitazone *and* certain additional active ingredients—biguanide or an insulin secretion enhancer, respectively. Neither patent claims a drug product that contains pioglitazone as its sole active ingredient. Therefore, those patents do not claim the ACTOS drug product as a matter of law.

85.    Second, Takeda could not reasonably assert the drug product claims of the '584 Patent or the '404 Patent against generic manufacturers seeking to market ACTOS. Those patents claimed only drugs *other* than the ACTOS drug product. In fact, as noted in further detail below, although Takeda originally asserted those drug product claims against generic manufacturers of ACTOS, Takeda withdrew those infringement claims before a court could rule on them—but only after the generic manufacturers had made their paragraph IV certifications against those two patents.

86.   Nevertheless, on or about November 5, 1999, Takeda directed the FDA to list the '584 Patent in the Orange Book as claiming both the "drug product" ACTOS and its "method of use." Similarly, on or about January 3, 2003, Takeda directed the FDA to list the '404 Patent in the Orange Book as claiming both the "Drug Product" ACTOS and its "Method of Use."

87.   In response to a Citizens Petition submitted to the FDA by another generic drug manufacturer, Defendant Teva asserted that Takeda had improperly caused the FDA to list the '584 Patent and '404 Patent in the Orange Book as drug product patents for ACTOS. In its Comment to the Citizens Petition, dated January 22, 2010, Takeda "confirm[ed] for FDA the listing of [the '584 Patent and '404 Patent] under the terms described in Takeda's original patent submissions." Takeda further acknowledged that it "characterized them for FDA in the appropriate patent declarations as containing both 'Drug product' and 'Method of use' claims," and that "[s]ince the original submission of these patents to FDA, Takeda has continued to certify to the applicability of the patents to ACTOS under the original declarations...."

88.   In a ruling on the Citizens Petition dated March 15, 2010, the FDA confirmed that Takeda's original demands for patent listing had indeed "stated that the patents claimed both the drug product and a method of use." FDA further concluded that "[i]n keeping with our practice of relying solely on the NDA sponsor's patent declaration describing relevant patent claims in Orange Book-listed patents, FDA will rely on Takeda's patent declarations submitted to FDA." FDA specifically noted that Takeda's January 22, 2010 Comment to the Citizens Petition had "reconfirm[ed]" the original listing. Moreover, "FDA's role in listing patents and patent information in the Orange Book is ministerial," and "FDA relies on the NDA sponsors to provide an accurate patent submission." Accordingly, the FDA concluded that, because Takeda had submitted the '584 Patent and '404 Patent as claiming the ACTOS drug product, all ANDA filers

27

seeking approval to market generic ACTOS before the expiration of those patents were required to submit Paragraph IV Certifications, rather than Section viii Statements, with respect to them.

89.     But for Takeda's improper listing of the '584 Patent and '404 Patent in the Orange Book, and its subsequent reaffirmation of those listings in its January 22, 2010 Comment to the Citizens Petition, no ANDA filer would or could have submitted a Paragraph IV Certification for ACTOS with respect to the '584 Patent and '404 Patent. Consequently, no ANDA filer would have been entitled to claim the 180-day exclusivity with respect to generic ACTOS.

90.     Absent a claim to the 180-day exclusivity, the incentive of the generic manufacturers that were the first to file ANDAs for generic ACTOS—Defendants Mylan, Ranbaxy, and Actavis—would have been to enter the market as soon as the '777 Patent expired on January 17, 2011. Moreover, absent the first-filers' claim to the 180-day exclusivity—a claim that existed because Takeda improperly listed the '584 Patent and '404 Patent in the Orange Book as claiming the ACTOS drug product—many more additional generic manufacturers would have also entered the market on or about January 17, 2011 because they would not have been subject to any 180-day exclusivity.

91.     In short, absent Takeda's improper listing of the '584 Patent and '404 Patent in the Orange Book as claiming the ACTOS drug product, massive generic entry, by 10 or more manufacturers of generic ACTOS, would have occurred on or about January 17, 2011. Entry by that number of generics would have very quickly driven the price of ACTOS and its generic equivalents to down near marginal cost, delivering more than $2 billion in cost savings to American consumers.

**B.**     **Takeda Delays the Entry of Generic ACTOS.**

    **1.**     **Takeda Files Paragraph IV Litigation Against Mylan, Ranbaxy, and Actavis**

92.     Generic manufacturers were eager to apply for FDA approval to market generic versions of ACTOS.  On July 15, 2003, three generic manufacturers, Mylan, Ranbaxy, and Actavis, each filed an ANDA seeking FDA approval to manufacture generic ACTOS. (Alphapharm was also a first ANDA filer for generic Actos, but Mylan acquired Alphapharm before generic Actos was launched).  The FDA ultimately concluded that Mylan, Ranbaxy, and Actavis were entitled to "shared" 180-day exclusivity with respect to generic ACTOS.

93.     On or about September 8, 2003, Mylan notified Takeda that it had filed ANDA No. 76-801 seeking to market a generic version of ACTOS.  As relevant here, Mylan's notice letter included a Paragraph IV Certification as to the '584 and '404 Patents, and Section viii Statements as to the Method-of-Use Patents.

94.     On September 9, 2003, Actavis notified Takeda that it had filed ANDA 76-798 seeking to market a generic version of ACTOS.  As relevant here, Actavis's notice letter contained a Paragraph IV Certification as to the '584 and '404 Patents, and Section viii Statements as to the Method-of-Use Patents.

95.     On September 18, 2003, Ranbaxy notified Takeda that it had filed ANDA 76-800 seeking to market a generic version of ACTOS.  As relevant here, Ranbaxy's notice letter contained a Paragraph IV Certification as to the '584 and '404 Patents, and Section viii Statements as to the Method-of-Use Patents.

96.     On October 17, 2003, Takeda filed three separate suits in the United States District Court for the Southern District of New York.  As relevant here, Takeda alleged that Mylan's, Ranbaxy's, and Actavis's generic ACTOS products would infringe the drug product

claims of '584 and '404 Patents, pursuant to 35 USC § 271(e)(2)(a); and induce infringement of the method-of-use claims of the '584 and '404 Patents and certain of the Method-of-Use Patents pursuant to 35 USC § 271(b).

97.   Takeda filed the patent infringement cases against Mylan, Actavis, and Ranbaxy without regard to the merits of the case.  During the litigation, Mylan, Actavis, and Ranbaxy secured substantial evidence via discovery supporting a host of defenses focusing on the (1) enforceability of the '584 and '404 Patents; (2) validity of the '585 and '404 Patents; and (3) strength of Takeda's infringement allegations regarding those patents and the Method-of-Use Patents.  Indeed, before trial, Takeda withdrew all of the drug product infringement claims that it had asserted against the generic manufacturers under both the '584 and '404 Patents.

98.   In view of the looming expiration of the '777 Patent in January 2011, the district court set a trial date for April 2010 (subsequently moved to June 2010), to determine whether these Generic Defendants' generic ACTOS products would infringe the '584 or '404 Patents and/or induce infringement of '584 Patent, the'404 Patent, or the Method-of-Use Patents.

99.   To prevent generic entry using just the strength of its patents, Takeda would have had to defeat each of Mylan's, Ranbaxy's, and Actavis's arguments regarding direct and indirect infringement. Takeda instead decided to protect its monopoly by paying Mylan, Ranbaxy, and Actavis to withdraw their defenses to the patents and delay introducing their generic ACTOS products.

### 2.   Takeda and Mylan, Ranbaxy, and Actavis Execute Exclusion Payment Agreements to Delay Generic ACTOS.

100.   On or about March 15, 2010, Takeda entered into an Exclusion Payment Agreement with each of Mylan, Actavis, and Ranbaxy. The Exclusion Payment Agreements required Takeda to immediately dismiss its indirect patent infringement litigation against Mylan,