**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| IN RE ACTOS END-PAYOR ANTITRUST LITIGATION<br><br>THIS DOCUMENT RELATES TO:<br><br>ALL ACTIONS | Master File No. 1:13-cv-09244-RA-RLE |

## CONSOLIDATED AMENDED COMPLAINT

**TABLE OF CONTENTS**

I.    INTRODUCTION ............................................................................................... 1

II.    NATURE OF THE ACTION ............................................................................. 1

III.   JURISDICTION AND VENUE ........................................................................ 7

IV.   PARTIES ............................................................................................................ 7

    A.    Plaintiffs ................................................................................................. 7

    B.    Defendants ............................................................................................ 11

V.    INDUSTRY BACKGROUND ........................................................................ 14

    A.    Characteristics of the Prescription Pharmaceutical Marketplace........................ 14

    B.    The Regulatory Structure for Approval of Generic Drugs, Listing Patent Information in the Orange Book, and the Substitution of Generic Drugs for Brand Name Drugs ......................................................................... 15

        1.    The Hatch-Waxman Amendments ............................................ 16

        2.    Requirements for Listing Patents in the Orange Book ............. 17

        3.    Paragraph IV Certifications ...................................................... 20

    C.    The Benefits of Generic Drugs .......................................................... 24

    D.    The Impact of Authorized Generics ................................................... 25

VI.   DEFENDANTS' ANTICOMPETITIVE CONDUCT ..................................... 27

    A.    Takeda Improperly Lists the '584 Patent and '404 Patent................... 27

    B.    Takeda Delays the Entry of Generic ACTOS.................................... 32

        1.    Takeda Files Paragraph IV Litigation Against Mylan, Ranbaxy, and Actavis ................................................................ 32

        2.    Takeda and Mylan, Ranbaxy, and Actavis Execute Exclusion Payment Agreements to Delay Generic ACTOS................... 34

        3.    The Bottleneck Delays Other Potential Generic Competitors. ................. 35

    C.    Takeda Delays the Entry of Generic ACTO*plus* met. .......................... 37

        1.    Takeda Files Paragraph IV Litigation Against Mylan. ............ 37

        2.    Takeda And Mylan Enter Into an Exclusion Payment Agreement to Delay Generic ACTO*plus* met. .......................... 38

        3.    The Bottleneck Delays Entry by Other Potential Generic Competitors. .. 40

    D.    Defendants Neutralize the Threat Teva Posed to Unravel the Anticompetitive Agreements. ....................................................... 41

        1.    Teva Files Only Section viii Statements as to ACTOS. ........................ 41

        2.    Takeda and Teva Execute an Exclusion Payment Agreement to Delay Generic ACTOS and Generic ACTO*plus* met........................... 45

VII.  ANTICOMPETITIVE EFFECTS OF THE SCHEME AND AGREEMENTS ............... 47

i

VIII.  CLASS ACTION ALLEGATIONS................................................................................. 48
IX.   INTERSTATE AND INTRASTATE COMMERCE......................................................... 53
X.    MONOPOLY POWER AND MARKET DEFINITION REGARDING ACTOS ............ 54
XI.   MARKET POWER AND MARKET DEFINITION REGARDING ACTO*plus* MET .... 57
XII.  MARKET EFFECTS AND DAMAGES TO THE CLASSES......................................... 60
XIII. ANTITRUST IMPACT.................................................................................................... 62
XIV.  CLAIMS FOR RELIEF.................................................................................................. 63
XV.   DEMAND FOR JUDGMENT ...................................................................................... 102
XVI.  JURY DEMAND .......................................................................................................... 103

## I.    INTRODUCTION

1.    End-Payor Plaintiffs, United Food and Commercial Workers Local 1776 & Participating Employers Health and Welfare Fund, Crosby Tugs, LLC, Fraternal Order of Police, Fort Lauderdale Lodge 31, Insurance Trust Fund, International Union of Operating Engineers Local 132 Health and Welfare Fund, NECA-IBEW Welfare Trust Fund, City of Providence, Rhode Island, Painters District Council No. 30 Health and Welfare Fund, Minnesota and North Dakota Bricklayers and Allied Craftworkers Health Fund, New England Electrical Workers Benefits Fund and MAN-U Service Contract Trust Fund, on behalf of themselves and all others similarly situated, file this Consolidated Amended Class Action Complaint ("Consolidated Amended Complaint") against Defendants Takeda Pharmaceutical Company Limited, Takeda America Holdings, Inc., Takeda Pharmaceuticals U.S.A., Inc., and Takeda Development Center Americas, Inc. (collectively, "Takeda"), Mylan Inc. and Mylan Pharmaceuticals, Inc., (together, "Mylan"), Actavis plc f/k/a Actavis, Inc. and Watson Laboratories, Inc. (together, "Actavis"), Ranbaxy Laboratories, Ltd., Ranbaxy, Inc., and Ranbaxy Pharmaceuticals, Inc., (collectively, "Ranbaxy"), and Teva Pharmaceutical Industries, Ltd. and Teva Pharmaceuticals USA, Inc. (together, "Teva").  Defendants Mylan, Actavis, Ranbaxy, and Teva will collectively be referred to as the "Generic Defendants."  Takeda and the Generic Defendants will collectively be referred to as the "Defendants."  Based upon personal knowledge as to facts pertaining to them, and upon information and belief as to all other matters, the End-Payor Plaintiffs allege as follows:

## II.    NATURE OF THE ACTION

2.    This action arises out of Defendants' overarching anticompetitive scheme to allocate, and unreasonably delay competition in, the market for pioglitazone hydrochloride tablets, which Takeda sells under the brand name ACTOS, and further anticompetitive

agreements Takeda entered into with Mylan and Teva to allocate, and unreasonably delay competition in, the market for the fixed dose combination product containing both pioglitazone hydrochloride and metformin (biguanide), which Takeda sells under the brand name ACTO*plus* met. Doctors prescribe ACTOS for the improvement of glycemic control in patients with Type 2 diabetes, either as a monotherapy treatment or as a combination therapy consisting of two separate drugs—pioglitazone hydrochloride together with sulfonylurea, metformin, or insulin. Doctors prescribe ACTO*plus* met as a fixed dose combination of pioglitazone hydrochloride and metformin to improve blood sugar control in adults with Type 2 diabetes who are already taking ACTOS and metformin separately, or taking metformin alone and it is not controlling blood glucose at normal levels.

3.      ACTOS became one of Takeda's biggest selling products. By 2011, ACTOS and ACTO*plus* met together generated over $3 billion in annual sales. Takeda knew, however, that the products were vulnerable to a rapid and near-complete loss of sales once less expensive generic versions entered the market.

4.      In order to delay the onset of generic competition and squeeze more multi-billion-dollar years out of these products, Takeda devised a multi-part scheme which it enticed its would-be generic competitors to join.

5.      **First**, Takeda improperly listed two patents in the Food and Drug Administration's (the "FDA") publication *Approved Drug Products With Therapeutic Equivalence Evaluations* (the "Orange Book") with respect to ACTOS. Takeda asserted in listing the two patents—United States Patent Nos. 5,965,584 (the "'584 Patent") and 6,329,404 (the "'404 Patent")—that they claim the ACTOS drug product. These patents plainly and unambiguously do not claim the ACTOS drug product, however, because the '584 Patent claims

a drug product consisting of pioglitazone hydrochloride *and* a biguanide.  Similarly, the '404 Patent claims a drug product consisting of pioglitazone hydrochloride *and* an insulin secretion enhancer.

6.      The ACTOS drug product contains neither biguanide nor an insulin secretion enhancer, and thus neither the '584 Patent nor the '404 Patent claims the ACTOS drug product. Indeed, Takeda has listed the '584 Patent in the Orange Book as claiming the drug product ACTO*plus* met, which does contain both pioglitazone hydrochloride and a biguanide, and has listed the '404 Patent in the Orange Book as claiming the drug product Duetact, which does contain both pioglitazone hydrochloride and an insulin secretion enhancer.

7.      Among other intended anticompetitive effects, Takeda's false listing of the '584 Patent and '404 Patent in the Orange Book for ACTOS permitted the first generic manufacturer that filed an Abbreviated New Drug Application ("ANDA") with a Paragraph IV Certification, 21 U.S.C. § 355(j)(2)(A)(vii)(IV), to claim the 180-day exclusivity provided by the Hatch-Waxman Act. That exclusivity prevented the FDA from approving any other generic ACTOS products from entering the market until 180 days after the first-filers entered.  The exclusivity thus created the opportunity for Takeda to impose a "bottleneck" on FDA approval of *any* generic ACTOS products by paying the first generic filers to delay entering the market.  Paying the first-filers to delay entry automatically delayed entry of any later-filing generic manufacturers because the later filers would be subject to the first-filers' 180-day exclusivity.

8.      **Second**, having prepared the groundwork with the false patent listings for ACTOS, Takeda brought the plan to fruition by in fact paying the generic first-filers to delay entry, thereby creating a bottleneck that impeded entry by later-filing generic manufacturers.

3

9.    Generic competition for ACTOS was likely to begin immediately after ACTOS's drug substance patent—U.S. Patent No. 4,687,777 (the "'777 Patent")—expired on January 17, 2011.  Without regard to whether the lawsuits had legal merit, Takeda sued every manufacturer that sought FDA approval to sell generic ACTOS.  Defendants Mylan, Ranbaxy, and Actavis were entitled to "shared" 180-day exclusivity for ACTOS.  These Defendants had all submitted Paragraph IV Certifications with respect to the '584 Patent and the '404 Patent, and obtained a June 2010 trial date for their allegations that Takeda's patents allegedly covering ACTOS were invalid, unenforceable, or would not be infringed by their generic products.  That trial date would have permitted Mylan, Ranbaxy, and Actavis to successfully conclude the patent litigation and enter the market on or about January 17, 2011.

10.    Takeda knew there was a substantial risk that its infringement claims would not prevail in the litigation. Therefore, as the trial date approached, Takeda made large, unjustified payments to Mylan, Ranbaxy, and Actavis to withdraw their challenges to the patents and delay entry into the market. In exchange for these Exclusion Payments—*i.e.,* a share of the supracompetitive profits made possible by the absence of generic competition—Mylan, Ranbaxy, and Actavis agreed to delay entering the market until August 17, 2012.  As planned, this delayed entry by the first-filers had the intended effect of imposing a "bottleneck" on FDA approval of many additional generic manufacturers, all of which were prevented from entering the market until 180 days after August 17, 2012.

11.    **Third**, Takeda repeated this same Exclusion-Payment ploy with respect to ACTO*plus* met.  Takeda had listed the '584 Patent as a drug product patent claiming ACTO*plus* met, and had listed various other patents as applicable method-of-use patents.  Without regard to whether the lawsuits had legal merit, Takeda sued every manufacturer that sought FDA approval

4

to sell generic ACTO*plus* met. Defendant Mylan submitted the first ANDA with a Paragraph IV Certification with respect to ACTO*plus* met and was thus eligible for the Hatch-Waxman Act 180-day exclusivity.

12.    Takeda knew there was a substantial risk that its infringement claims under these patents would not prevail in the litigation. Therefore, as Mylan's Hatch-Waxman Act 30-month stay (21 U.S.C. § 355(j)(5)(B)(iii)) was set to expire, Takeda made large, unjustified payments to Mylan to withdraw its challenge to the patents and delay entry into the market. In exchange for these Exclusion Payments—*i.e.*, a share of the supracompetitive profits made possible by the absence of generic competition—Mylan agreed to delay entering the market until 2012. As planned, this delayed entry by the first-filer had the intended effect of imposing a "bottleneck" on FDA approval of many additional generic manufacturers, all of which were prevented from entering the market until 180 days after Mylan entered.

13.    **Fourth**, Takeda and Mylan, Ranbaxy, and Actavis took additional anticompetitive measures to ensure that Defendant Teva did not unravel the anticompetitive schemes they had concocted. Teva had refused to submit a Paragraph IV Certification with respect to the '584 Patent and '404 Patent regarding ACTOS on the ground that Takeda had improperly listed them in the Orange Book. Instead, Teva filed what is known as a "Section viii Statement" (*see* 21 U.S.C. § 355(b)(2)(B) & 21 U.S.C. § 355(j)(2)(A)(viii)), attesting that Teva did not seek FDA approval for a use covered by the patents that Takeda had listed in the Orange Book.

14.    Without regard to whether the lawsuits had legal merit, Takeda sued Teva for infringement of the patents allegedly covering ACTOS and ACTO*plus* met. Had Teva prevailed in that lawsuit, it could have entered the market with generic ACTOS upon the expiration of the

'777 Patent on January 17, 2011. Under the Hatch-Waxman Act, and pursuant to the relief that Teva sought in its counterclaims against Takeda, Teva would not have been subject to the 180-day exclusivity bottleneck that Takeda, Mylan, Ranbaxy, and Actavis had constructed through their Exclusion Payment Agreements.

15.      Teva secured a June 2010 trial date, which gave it time to obtain a favorable ruling before January 17, 2011. Rather than risk the unraveling of its anticompetitive agreements with Mylan, Ranbaxy, and Actavis, Takeda made large, unjustified payments to Teva to withdraw its challenge to the patents, stop contesting Takeda's improper listing of the '584 Patent and '404 Patent for ACTOS, and delay entry into the market. In exchange for these Exclusion Payments—i.e., a share of the supracompetitive profits made possible by the absence of generic competition—Teva agreed to delay entering the market with generic ACTOS until August 17, 2012, and to delay entering the market with generic ACTO*plus* met until Mylan entered in 2012.

16.      Defendants' unlawful schemes and Exclusion Payment Agreements were designed to and did in fact: (a) delay the entry of less expensive generic versions of ACTOS in the United States; (b) fix, raise, maintain, or stabilize the price of ACTOS and its generic equivalents; (c) permit Takeda to maintain a monopoly in the United States for ACTOS and its generic equivalents; (d) allocate 100% of the United States market for ACTOS and its generic equivalents to Takeda; (e) delay the entry of less expensive generic versions of ACTO*plus* met in the United States; and (f) fix, raise, maintain, or stabilize the price of ACTO*plus* met and its generic equivalents.

17.      Plaintiffs bring this action as a class action on behalf of all consumers and third-party payors (collectively, "End-Payors") in certain States, the District of Columbia, and Puerto

Rico who indirectly purchased, paid and/or provided reimbursement for branded and/or generic ACTOS and/or ACTO*plus* met products, other than for re-sale, since January 17, 2011 with respect to ACTOS and since February 25, 2011 with respect to ACTO*plus* met (*see* Class Definitions below).

18.    Plaintiffs assert claims for compensatory and/or treble damages for violations of the State laws enumerated below.

### III.    JURISDICTION AND VENUE

19.    This Court has jurisdiction over this matter under 28 U.S.C. § 1332(d) because this action is a class action in which the aggregate amount in controversy for each of the proposed classes exceeds $5,000,000, and at least one member of each of the putative classes is a citizen of a state different from that of one of the Defendants.

20.    Venue is appropriate in this district under 28 U.S.C. §1391(b) and (c) because Defendants transact business within this district, and the interstate trade and commerce described herein is carried out, in substantial part, in this district.

### IV.    PARTIES

#### A.    Plaintiffs

21.    Plaintiff United Food and Commercial Workers Local 1776 & Participating Employers Health and Welfare Fund ("UFCW Local 1776") is an employee health and welfare benefit plan with its principal place of business at 3031-A Walton Road, Plymouth Meeting, Pennsylvania 19462. Plaintiff UFCW Local 1776 indirectly purchased, paid and/or provided reimbursement for ACTOS and/or ACTO*plus* met in Arizona, Colorado, Delaware, Florida, New Jersey, Pennsylvania, South Carolina and Virginia other than for resale, and indirectly purchased, paid and/or provided reimbursement for the generic versions of ACTOS and/or ACTO*plus* met

other than for re-sale once they became available, at supracompetitive prices during the Class Periods, and was thereby injured.

22.    Plaintiff Crosby Tugs, LLC ("Crosby Tugs") is a Louisiana limited liability company with its principal place of business in Galliano, Louisiana.  Plaintiff Crosby Tugs indirectly purchased, paid and/or provided reimbursement for ACTOS and/or ACTO*plus* met in Louisiana, Maryland, Mississippi and Texas other than for resale, and indirectly purchased, paid and/or provided reimbursement for the generic versions of ACTOS and/or ACTO*plus* met other than for re-sale once they became available, at supracompetitive prices during the Class Periods, and was thereby injured.

23.    Plaintiff Fraternal Order of Police, Fort Lauderdale Lodge 31, Insurance Trust Fund ("FOP") is an employee health and benefit fund with its principal place of business in Fort Lauderdale, Florida. Plaintiff FOP indirectly purchased, paid and/or provided reimbursement for ACTOS and/or ACTO*plus* met in Florida, New Jersey and Nevada other than for re-sale, and indirectly purchased and/or provided reimbursement the generic versions of ACTOS and/or ACTO*plus* met other than for re-sale once they became available, at supracompetitive prices during the Class Periods, and was thereby injured.

24.    Plaintiff International Union of Operating Engineers Local 132 Health and Welfare Fund ("IUOE Local 132") is an employee welfare benefit plan with its primary office in Huntington, West Virginia. Plaintiff IUEO Local 132 indirectly purchased, paid and/or provided reimbursement for ACTOS and/or ACTO*plus* met in Illinois, North Carolina, Ohio, Pennsylvania, Texas and West Virginia other than for resale, and indirectly purchased, paid and/or provided reimbursement for the generic versions of ACTOS and/or ACTO*plus* met other

than for re-sale once they became available, at supracompetitive prices during the Class Periods, and was thereby injured.

25.     Plaintiff NECA-IBEW Welfare Trust Fund ("NECA-IBEW") is an employee welfare benefit plan with its primary office in Decatur, Illinois.  Plaintiff NECA-IBEW indirectly purchased, paid and/or provided reimbursement for ACTOS and/or ACTO*plus* met in Alabama, California, Florida, Illinois, Indiana, Kentucky, New Jersey, Nevada, Washington and Wisconsin other than for re-sale, and indirectly purchased, paid and/or provided reimbursement for the generic versions of ACTOS and/or ACTO*plus* met other than for re-sale once they became available, at supracompetitive prices during the Class Period, and has thereby been injured.

26.     Plaintiff City of Providence, Rhode Island ("Providence") is a municipal corporation with a principal address of 25 Dorrance Street, Providence, Rhode Island.  Plaintiff Providence is a self-insured health and welfare plan.  Plaintiff Providence indirectly purchased, paid and/or provided reimbursement for ACTOS and/or ACTO*plus* met in Arkansas, Arizona, Connecticut, Florida, Hawaii, Maine, Massachusetts, Missouri, New Hampshire, Puerto Rico, Rhode Island and Virginia other than for resale, and indirectly purchased, paid and/or provided reimbursement for the generic versions of ACTOS and/or ACTO*plus* met other than for re-sale once they became available, at supracompetitive prices during the Class Periods, and was thereby injured.

27.     Painters District Council No. 30 Health & Welfare Fund ("Painters Fund") is an employee welfare benefit plan with its principal place of business in Aurora, Illinois.  Plaintiff Painters Fund indirectly purchased, paid and/or provided reimbursement for ACTOS and/or ACTO*plus* met in Florida, Illinois, Indiana, Pennsylvania and Wisconsin other than for resale, and indirectly purchased, paid and/or provided reimbursement for the generic versions of

ACTOS and/or ACTO*plus* met other than for re-sale once they became available, at supracompetitive prices during the Class Periods, and was thereby injured.

28.    Plaintiff Minnesota and North Dakota Bricklayers and Allied Craftworkers Health Fund ("Bricklayers and Allied Craftworkers Fund") is an employee welfare benefit plan, with its principal place of business in Mendota Heights, Minnesota. Plaintiff Bricklayers and Allied Craftworkers Fund indirectly purchased, paid and/or provided reimbursement for ACTOS and/or ACTO*plus* met in Arizona, Florida, Minnesota and Wisconsin other than for re-sale and indirectly purchased, paid and/or provided reimbursement for generic versions of ACTOS and/or ACTO*plus* met other than for re-sale once they became available, at supracompetitive prices during the Class Periods, and was thereby injured.

29.    Plaintiff New England Electrical Workers Benefits Fund ("NEEWBF") is an employee welfare benefit plan with its principal place of business in Wallingford, Connecticut. Plaintiff NEEWBF indirectly purchased, paid and/or provided reimbursement for ACTOS and/or ACTO*plus* met in California, Connecticut, Florida, Massachusetts, Maine, Minnesota, Mississippi, Nebraska, New Hampshire, New Mexico, New York, North Carolina, South Carolina, Tennessee, Texas and Vermont other than for resale and indirectly purchased, paid and/or provided reimbursement for generic versions of ACTOS and/or ACTO*plus* met other than for re-sale once they became available, at supracompetitive prices during the Class Periods, and was thereby injured.

30.    Plaintiff MAN-U Service Contract Trust Fund ("MAN-U") is a an employee health and welfare benefit plan trust with its principal place of business at 7130 Columbia Gateway Drive, Suite A, Columbia, MD 21046. Plaintiff MAN-U indirectly purchased and/or provided reimbursement for ACTOS and/or ACTO*plus* met in the District of Columbia, Florida,

Illinois, Maryland, Pennsylvania and Virginia other than for re-sale and indirectly purchased, paid and/or provided reimbursement for the generic versions of ACTOS and/or ACTO*plus* met other than for re-sale once they became available at supracompetitive prices, and has thereby been injured.

### B.    Defendants

31.    Defendant Takeda Pharmaceutical Company Limited is a Japanese company with its principal place of business at 1-1, Doshomachi 4-chome, Chuo-ku, Osaka 540-8645.

32.    Defendant Takeda America Holdings, Inc. is a wholly-owned subsidiary of Defendant Takeda Pharmaceutical Company Limited, and is the United States parent corporation of Defendants Takeda Pharmaceuticals U.S.A., Inc. and Takeda Development Center Americas, Inc.  Defendant Takeda America Holdings, Inc. is a corporation organized under the law of the State of New York with its principal place of business at 767 Third Avenue, New York, New York 10017.

33.    Defendant Takeda Pharmaceuticals U.S.A., Inc., formerly known as Takeda Pharmaceuticals North America, Inc., is a corporation organized under the laws of the State of Delaware with its principal place of business at One Takeda Parkway, Deerfield, Illinois 60015.

34.    Defendant Takeda Development Center Americas, Inc., formerly known as Takeda Global Research and Development Center, Inc., is a corporation organized under the laws of the State of Delaware with its principal place of business at One Takeda Parkway, Deerfield, Illinois 60015.

35.    The foregoing Defendants will collectively be referred to as "Takeda."

36.    Defendant Mylan, Inc., formerly known as Mylan Laboratories, Inc., is a corporation organized under the laws of the Commonwealth of Pennsylvania with its principal place of business at 1500 Corporate Drive, Canonsburg, Pennsylvania 15317.

37.    Defendant Mylan Pharmaceuticals, Inc. is a corporation organized under the laws of the State of West Virginia with its principal place of business at 781 Chestnut Ridge Road, Morgantown, West Virginia 26505.

38.    The foregoing "Mylan" Defendants will together be referred to as "Mylan."

39.    Defendant Actavis plc is incorporated under the laws of Ireland, with its principal place of business at 1 Grand Canal Square, Docklands Dublin 2, Ireland, and its United States place of business in Morris Corporate Center III, 400 Interpace Parkway, Parsippany, New Jersey 07054. Watson Pharmaceuticals, Inc. changed its name to Actavis, Inc. as a result of Watson Pharmaceuticals, Inc.'s acquisition of Swiss-based Actavis Group in or around October 2012. On or about October 1, 2013, Actavis, Inc. changed its name to Actavis plc.

40.    Defendant Watson Laboratories, Inc. was a Nevada corporation, having its principal place of business at 311 Bonnie Circle, Corona, California. Defendant Watson Laboratories, Inc. was a wholly-owned subsidiary of Watson Pharmaceuticals, Inc.

41.    The foregoing "Actavis" Defendants will together be referred to as "Actavis."

42.    Defendant Ranbaxy Laboratories, Ltd. is an international pharmaceutical company headquartered in Gurgaon, Haryana, India. Ranbaxy is a member of the Daiichi Sankyo Group, which is headquartered in Tokyo, Japan. Defendant Ranbaxy Laboratories, Ltd.'s principal place of business in the United States is at 600 College Road East, Suite 2100, Princeton, New Jersey 08540.

43.     Defendant Ranbaxy, Inc. is a wholly-owned subsidiary of Defendant Ranbaxy Laboratories, Ltd. and is its North American commercial arm.  Defendant Ranbaxy, Inc. also is the United States parent corporation of Defendant Ranbaxy Pharmaceuticals, Inc.  Defendant Ranbaxy, Inc. is a corporation organized under the laws of the State of Delaware with its principal place of business at 600 College Road East, Suite 2100, Princeton, New Jersey 08540.

44.     Defendant Ranbaxy Pharmaceuticals, Inc. is a wholly-owned subsidiary of Defendant Ranbaxy, Inc.  Defendant Ranbaxy Pharmaceuticals, Inc. is a corporation organized under the laws of the State of Delaware with its principal place of business at 600 College Road East, Suite 2100, Princeton, New Jersey 08540.

45.     The foregoing "Ranbaxy" Defendants will collectively be referred to as "Ranbaxy."

46.     Defendant Teva Pharmaceutical Industries, Ltd., one of the largest pharmaceutical companies in the world, is headquartered in Petah Tikva, Israel.

47.     Defendant Teva Pharmaceuticals USA, Inc. is an indirect, wholly-owned subsidiary of Teva Pharmaceutical Industries, Ltd.  Defendant Teva Pharmaceuticals USA, Inc. is a corporation organized under the laws of the State of Delaware with its principal place of business at 1090 Horsham Road, North Wales, Pennsylvania 19454.

48.     The foregoing "Teva" Defendants will together be referred to as "Teva."

49.     All of Defendants' wrongful actions described in this Complaint are part of, and in furtherance of, the anticompetitive scheme and anticompetitive agreements (as further described below), and were authorized, ordered, and/or executed by Defendants' various officers, agents, employees, and/or other representatives while actively engaged in the management of Defendants' affairs (or that of their predecessors-in-interest) within the course

13

and scope of their duties and employment, and/or with Defendants' actual, apparent, and/or ostensible authority.

## V.    INDUSTRY BACKGROUND

### A.    Characteristics of the Prescription Pharmaceutical Marketplace

50.    The marketplace for the sale of prescription pharmaceutical products in the United States suffers from a significant imperfection that branded drug manufacturers can exploit in order to obtain or maintain substantial market power in the sale of a particular pharmaceutical composition.  Markets function best when the person responsible for paying for a product is also the person who chooses which product to purchase.  When the same person has both the product choice and payment obligation, the price of the product plays an appropriate role in the person's choice and, consequently, manufacturers have an appropriate incentive to lower the prices of their products.

51.    The pharmaceutical marketplace, however, is characterized by a "disconnect" between product selection and the payment obligation.  State laws prohibit pharmacists from dispensing many pharmaceutical products, including ACTOS and ACTO*plus* met, to patients without a prescription written by a doctor.  The prohibition against dispensing certain products without a prescription creates the price disconnect.  A patient's doctor chooses which product the patient will buy while the patient (and in most cases his or her insurer) has the obligation to pay for the pharmaceutical product.

52.    Takeda and other branded drug manufacturers exploit this price disconnect by employing large sales forces who visit doctors' offices and persuade them to prescribe the branded drug manufacturers' products.  These sales representatives do not advise doctors of the cost of the branded pharmaceutical products.  Moreover, studies show that doctors typically are

14

not aware of the relative costs of brand pharmaceuticals and, even when they are aware of the relative costs, they are insensitive to price differences because they do not pay for the products. The result is a marketplace in which price plays a comparatively unimportant role in pharmaceutical product selection.

53.    The relative unimportance of price in the branded pharmaceutical marketplace reduces what economists call the price elasticity of demand—the extent to which unit sales go down when price goes up.    This reduced price elasticity, in turn, gives branded drug manufacturers the ability to raise prices substantially above marginal cost without losing so many sales as to make the price increase unprofitable.    The ability to profitably raise prices substantially above marginal costs is indicative of what economists and antitrust courts refer to as monopoly power.    The result of these pharmaceutical market imperfections and marketing practices is branded drug manufacturers gaining and maintaining market power and/or monopoly power with respect to many branded prescription pharmaceuticals.

**B.    The Regulatory Structure for Approval of Generic Drugs, Listing Patent Information in the Orange Book, and the Substitution of Generic Drugs for Brand Name Drugs**

54.    Under the Federal Food, Drug, and Cosmetic Act ("FDCA"), branded drug manufacturers must obtain FDA approval to sell a new drug product by filing a New Drug Application ("NDA").  21 U.S.C. §§ 301–392.  An NDA must include specific data concerning the safety and effectiveness of the drug, as well as any information on applicable patents.  21 U.S.C. § 355(a), (b).

55.    When the FDA approves a branded drug manufacturer's NDA, the manufacturer may list in the Orange Book any patents the manufacturer believes could reasonably be asserted against a generic manufacturer that makes, uses, or sells a generic version of the branded drug

before the expiration of the listed patents. The branded drug manufacturer may also list in the Orange Book any patents issued after the FDA approved the NDA within thirty days of their issuance. 21 U.S.C. § 355(b)(1) & (c)(2).

56.     The FDA relies completely on a branded drug manufacturer's truthfulness about patent validity and applicability because the FDA does not have the resources or authority to verify a branded drug manufacturer's patents and patent listings for accuracy or trustworthiness. In listing patents and use codes in the Orange Book, the FDA merely performs a ministerial act.

### 1.    The Hatch-Waxman Amendments

57.     The Hatch-Waxman Act, enacted in 1984, simplified the regulatory hurdles for prospective generic drug manufacturers by eliminating the need to file lengthy and costly NDAs. *See* Drug Price Competition and Patent Term Restoration Act, Pub. L. No. 98-417, 98 Stat. 1585 (1984). A manufacturer seeking approval to sell a generic version of a brand drug may instead file an ANDA. An ANDA relies on the scientific findings of safety and effectiveness included in a branded drug manufacturer's original NDA, but must further show that the generic drug (i) contains the same active ingredient(s), dosage form, route of administration, and strength as the brand drug, and (ii) is absorbed at the same rate and to the same extent as the brand drug—that is, that the generic drug is pharmaceutically equivalent and bioequivalent (together, "therapeutically equivalent") to the brand drug. The FDA assigns an "AB" rating to generic drugs that are therapeutically equivalent to their brand-name counterparts.

58.     The FDCA and Hatch-Waxman Act operate on the presumption that bioequivalent drug products containing identical amounts of the same active ingredients, having the same route of administration and dosage form, and meeting applicable standards of strength, quality, purity and identity, are therapeutically equivalent and may be substituted for one

another.  Bioequivalence means the active ingredient of the proposed generic drug would be present in the blood of a patient to the same extent and for the same amount of time as its branded counterpart.  21 U.S.C. § 355(j)(8)(B).

59.    Congress enacted the Hatch-Waxman Act to expedite the entry of legitimate (non-infringing) generic competitors, thereby reducing healthcare expenses nationwide.  Congress also sought to protect pharmaceutical manufacturers' incentives to create new and innovative products.

60.    The Hatch-Waxman Amendments achieved both goals, advancing substantially the rate of generic product launches and ushering in an era of historic high profit margins for branded drug manufacturers.  In 1983, before the Hatch-Waxman Act, only 35% of the top-selling branded drugs with expired patents had generic alternatives; by 1998, nearly all did.  In 1984, prescription drug revenue for branded and generic drugs totaled $21.6 billion; by 2009 total prescription drug revenue had soared to $300 billion.

## 2.    Requirements for Listing Patents in the Orange Book

61.    The regulatory structure created by the Hatch-Waxman Act includes a process for identifying and addressing patents that arguably apply to brand and generic drug products. This regulatory structure requires the holder of an NDA to submit information concerning its patents to the FDA, which incorporates the information into the Orange Book. Patent information is listed in the Orange Book for each NDA to which the patent may apply and can be reasonably asserted against potential infringers in patent litigation.  Then, when a generic company seeks to file an ANDA, it must submit patent certifications or statements, described more fully below, to each patent listed in the Orange Book for the NDA that is the reference listed drug for the ANDA.

62.     Under the Hatch-Waxman Act, the NDA holder must submit certain required information concerning "any patent which claims the drug for which the application was submitted or which claims a method of using such drug and with respect to which a claim of patent infringement could reasonably be asserted if a person not licensed by the owner engaged in the manufacture, use, or sale of the drug." 21 U.S.C. § 355(b)(1)(G).

63.     When Takeda listed the '584 Patent and '404 Patent in the Orange Book for ACTOS—1999 and 2003, respectively—the relevant statute required the NDA applicant to list "any patent which claims the drug for which the applicant submitted the application or which claims a method of using such drug and with respect to which a claim of patent infringement could reasonably be asserted if a person not licensed by the owner engaged in the manufacture, use, or sale of the drug." 21 U.S.C.A. § 355(b)(1) (1999) & (2002).

64.     The then-applicable regulations identified three types of patents that could properly be listed: "drug substance (ingredient) patents, drug product (formulation and composition) patents, and method of use patents." 21 C.F.R. § 314.53(b) (1999) & (2002). The regulations further provided that "[f]or patents that claim a drug substance or drug product, the [NDA] applicant shall submit information only on those patents that *claim a drug product that is the subject of a pending or approved application*, or that claim a drug substance that is a component of such a product." *Id.* (emphasis added). The NDA holder also could properly list a patent for a drug product only "with respect to which a claim of patent infringement could reasonably be asserted if a person not licensed by the owner of the patent engaged in the manufacture, use, or sale *of the drug product*." *Id.* (emphasis added). In short, to be properly listed as a drug product patent, the patent had to claim the FDA approved product that was the subject of the NDA; the patent's drug product claim could not just claim *some* drug product—it

18

had to claim the *relevant* drug product, *i.e.*, the FDA approved drug product as to which the NDA applicant listed the patent.

65.    NDA applicants were on their honor to properly list the "Type of patent, *i.e.*, drug, drug product, or method of use." 21 C.F.R. § 314.53(c)(2)(ii) (1999) & (2002). The FDA expressly refused to police the proper listing of patents, noting that it "does not have the resources or the expertise to review patent information for its accuracy and relevance to an NDA," and that it "believes that the declaration requirements under § 314.53(c) [requiring the applicant to declare "that Patent No. ____ covers the formulation, composition, and/or method of use of (name of drug product)"], as well as an applicant's potential liability if it submits an untrue statement of material fact, will help ensure that accurate patent information is submitted." *Abbreviated New Drug Application Regulations: Patent and Exclusivity Provisions*, 59 Fed. Reg. 50338, 50343-45 (Oct. 3, 1994).

66.    Important regulatory and competitive consequences flow from the distinction between patents listed in the Orange Book as containing drug product claims, and patents listed as containing method-of-use claims. If the patentee lists the patent as containing a drug product claim, an ANDA applicant desiring to market its generic product before the patent expires must file a Paragraph IV Certification, certifying that the patent is invalid, unenforceable, or would not be infringed by the generic product. 21 U.S.C. § 355(j)(2)(A)(vii)(IV); 21 C.F.R. § 314.94(a)(12)(i)(A)(4). The patentee and/or NDA holder then has the opportunity to obtain an automatic 30-month stay on generic competition by filing a patent infringement lawsuit against the ANDA applicant. In addition, and of particular importance here, the FDA is prohibited from approving a subsequent applicant's ANDA until 180 days after the first-filer has entered the market. 21 U.S.C. § 355(j)(5)(B)(iv). As discussed in detail below, this "180-day exclusivity"

19

creates an opportunity for the patentee to craft a "bottleneck" to delay *all* generic competition by paying the first-filer to delay its entry into the market.

67.     By contrast, if the patentee lists the patent on the basis of method-of-use claims, in certain circumstances an ANDA applicant can submit what is known as a "Section viii Statement."  21 U.S.C. § 355(j)(2)(A)(viii); 21 C.F.R. § 314.94(a)(12)(iii).  In a Section viii Statement, the ANDA applicant states it is not seeking approval for the particular use covered by the method-of-use patent.  If an ANDA applicant makes only a Section viii Statement, then the patentee or NDA holder *cannot* obtain an automatic 30-month stay on generic competition even if it sues the ANDA applicant for patent infringement.  The FDA can approve an ANDA containing only a Section viii Statement *without regard* to whether any other ANDA applicant is otherwise entitled to a 180-day exclusivity period.

68.     In short, listing a patent in the Orange Book as containing a drug product claim gives the patentee two key competitive advantages—an automatic 30-month stay on generic competition, and an ability to create a bottleneck delaying all generic competition by paying the first generic filer to delay entry into the market.

### 3.     Paragraph IV Certifications

69.     Where the NDA holder has listed any patent claiming a drug substance or drug product in the Orange Book, an ANDA applicant must certify that the generic drug will not infringe the patents listed in the Orange Book.  Under the Hatch-Waxman Act, a generic manufacturer's ANDA must contain one of four certifications:

i.      that no patent for the branded drug has been filed with the FDA (a "Paragraph I certification");

ii.     that the patent for the branded drug has expired (a "Paragraph II certification");

iii.    that the patent for the branded drug will expire on a particular date and the manufacturer does not seek to market its generic product before that date (a "Paragraph III certification"); or

iv.    that the patent for the branded drug is invalid or will not be infringed by the generic drug manufacturer's proposed product (a "Paragraph IV certification").

70.    If a generic drug manufacturer files a Paragraph IV Certification, a branded drug manufacturer can delay FDA approval of the ANDA simply by suing the ANDA applicant for patent infringement.  If the branded drug manufacturer initiates a patent infringement action against the generic drug manufacturer filer within forty-five days of receiving notification of the Paragraph IV certification ("Paragraph IV Litigation"), the FDA will not grant final approval to the ANDA until the earlier of (a) the passage of 30 months, or (b) the issuance of a decision by a court that the patent is invalid or not infringed by the generic drug manufacturer's ANDA.  Until one of those conditions occurs, the FDA may grant "tentative approval," but cannot authorize the generic drug manufacturer to market its product.  FDA may grant an ANDA tentative approval when it determines that the ANDA would otherwise be ready for final approval but for the 30-month stay.

71.    As an incentive to generic drug manufacturers to seek approval of generic alternatives to branded drugs, the first generic drug manufacturer to file an ANDA containing a Paragraph IV Certification typically receives a period of protection from competition from other generic versions of the drug.  For Paragraph IV Certifications made before December 8, 2003, the first generic drug manufacturer applicants received 180 days of market exclusivity, which could not be forfeited and was triggered only by commercial marketing of the generic product.  For Paragraph IV Certifications made after December 8, 2003, the first generic drug manufacturer applicant receives 180 days of market exclusivity (unless some forfeiture event,

like that discussed below, occurs).  This means the first approved generic drug is the only available generic drug for at least six months.

72.    Branded drug manufacturers can "game the system" by listing patents in the Orange Book (even if such patents are not eligible for listing) and suing any generic drug manufacturer competitor filing an ANDA with a Paragraph IV Certification (even if the competitor's product does not actually infringe the listed patents) in order to delay final FDA approval of an ANDA for up to 30 months.  That branded drug manufacturers often sue generic drug manufacturers under Hatch-Waxman simply to delay generic drug competition—as opposed to enforcing a valid patent that is actually infringed by the generic drug—is demonstrated by the fact that generic drug manufacturers have prevailed in Paragraph IV Litigation in cases involving 73% of the drug products studied—either by obtaining a judgment of invalidity or non-infringement or by the patent holder's voluntary dismissal of the suit.

73.    For Paragraph IV Certifications made before December 8, 2003, the first generic drug manufacturer applicant could help a branded drug manufacturer "game the system" by delaying not only its own market entry, but also the market entry of all other generic drug manufacturers. The first generic drug manufacturer applicant, by agreeing not to begin marketing its generic drug, thereby could delay the start of the 180-day period of generic market exclusivity, a tactic called exclusivity "parking."  This tactic created a "bottleneck" because later generic drug manufacturer applicants could not enter the market until the first generic drug manufacturer applicant's 180-day exclusivity had elapsed.

74.    On December 8, 2003, Congress enacted the Medicare Prescription Drug Improvement and Modernization Act of 2003 ("MMA") to make it more difficult for branded drug and generic drug manufacturers to conspire to delay the start of the first-filer's 180-day

period of generic market exclusivity.  The MMA outlines a number of conditions under which an ANDA applicant forfeits its eligibility for 180-day exclusivity, making way for other ANDA filers to launch their generic drug products.  For example, forfeiture occurs if the first ANDA applicant fails to obtain tentative approval within 30 months from filing, unless the failure is caused by a change in, or review of, the approval requirements.

75.    Under the "failure to market" provision, a first ANDA applicant forfeits 180-day exclusivity if it fails to market its generic drug by the later of: (a) the earlier of the date that is (i) 75 days after receiving final FDA approval; or (ii) 30 months after the date it submitted its ANDA; or (b) the date that is 75 days after the date as of which, as to each of the patents qualifying the first applicant for exclusivity (*i.e.*, as to each patent for which the first applicant submitted a Paragraph IV Certification), at least one of the following has occurred: (i) a final decision of invalidity or non-infringement; (ii) a settlement order entering final judgment including a finding the patent is invalid or not infringed; or (iii) the NDA holder delists the patent from the FDA Orange Book.

76.    Branded drug manufacturers and first-filing generic drug manufacturers can structure their settlements in order to intentionally skirt the failure-to-market provisions and keep the 180-day exclusivity bottleneck in place by, for example, settling their litigation before a final judgment of invalidity or non-infringement can be entered with respect to each of the patents for which the first applicant submitted a Paragraph IV Certification, or seeking a consent judgment that does not include a finding that all of the patents for which the first applicant submitted a Paragraph IV Certification were invalid or not infringed.  When that happens, in order to trigger forfeiture and gain access to the market, subsequent ANDA applicants are forced to obtain a judgment that all patents for which the first filing generic drug manufacturer filed Paragraph IV

Certifications are invalid or not infringed. This may require the subsequent ANDA applicant to initiate a declaratory judgment action concerning patents that the branded drug manufacturer did not assert against it in a Paragraph IV Litigation.

**C.    The Benefits of Generic Drugs**

77.    Generic versions of branded drugs contain the same active ingredient, and are determined by the FDA to be just as safe and effective as their branded counterparts. The only material difference between generic drugs and branded drugs is their price: generic drugs are usually at least 25% less expensive than their branded drug counterparts when there is a single generic drug competitor. The discount typically increases to 50% to 80% (or more) when there are multiple generic drug manufacturer competitors in the market for a given branded drug. The launch of a generic drug thus usually brings huge cost savings for all drug purchasers. The Federal Trade Commission ("FTC") estimates that about one year after market entry, a generic drug takes over 90% of the branded drug's unit sales at 15% of the price of the branded drug. As a result, competition from generic drugs is viewed by branded drug manufacturers, such as Takeda, as a grave threat to their bottom lines.

78.    Due to the price differentials between branded and generic drugs, and other institutional features of the pharmaceutical industry, pharmacists liberally and substantially substitute the generic drug when presented with a prescription for the branded drug. Since passage of the Hatch-Waxman Act, every state has adopted substitution laws requiring or permitting pharmacies to substitute generic drug equivalents for branded drug prescriptions (unless the prescribing physician specifically orders otherwise by writing "dispense as written" or similar language on the prescription).

79.    There is an incentive to choose the less expensive generic drug equivalent in every link in the prescription drug chain.  As a result of federal reimbursement rules and the industry pricing structure, pharmacies typically earn a higher markup on generic drugs than on branded drugs.  Private health insurers similarly offer direct incentives to pharmacies to substitute cheaper generic drugs for more expensive branded drugs.  Health insurers are contractually obligated to pay for the bulk of their insureds' prescriptions, whether filled with branded drugs or generic drugs, so they offer lower copays for generic drugs in order to encourage their use.

80.    Generic drug competition enables all putative Class members to (i) purchase generic versions of a drug at substantially lower prices; and/or (ii) purchase a branded drug at a reduced price.

81.    Until the generic version of a branded drug enters the market, however, there is no bioequivalent generic drug to substitute for, and compete with, the branded drug, and, therefore, the branded drug manufacturer can continue to profitably charge supracompetitive prices.  As a result, brand drug manufacturers, such as Takeda, which are well aware of the rapid erosion of branded drug sales by generic drugs, have a strong incentive to delay the introduction of generic drug competition into the market, including through tactics such as the improper patent listing and Exclusion Payment Agreements.

**D.    The Impact of Authorized Generics**

82.    The 180-day marketing exclusivity to which first-filer generic drug manufacturers may be entitled does not prevent a branded drug manufacturer from marketing its own generic drug alternative to the branded drug during the 180-day period.  Such an "authorized generic" is chemically identical to the branded drug, but is sold as a generic drug through either the branded

manufacturer's subsidiary (if it has one) or through a third-party generic drug manufacturer. Competition from an authorized generic drug during the 180-day exclusivity period substantially reduces the first-filer's revenue, and substantially reduces drug prices for consumers.

83.     In its recent study, *Authorized Generic Drugs: Short-term Effects and Long-Term Impact* (August 2011) (the "FTC Study"), the FTC found that authorized generic drugs capture a significant portion of sales, reducing the first-filer generic drug manufacturer's revenues by approximately half on average during the 180-day exclusivity period.  The first-filing generic drug manufacturer makes significantly less money when it faces competition from an authorized generic because (i) the authorized generic drug takes a large share of unit sales away from the first filer; and (ii) the presence of an additional generic drug in the market causes prices to decrease.

84.     Although first-filing generic drug manufacturers make significantly less money when they must compete with an authorized generic drug during the first 180 days, consumers and other drug purchasers, such as Plaintiffs and members of the putative End-Payor Classes, benefit from the lower prices caused by competition between the authorized generic drug manufacturer and the first-filing generic drug manufacturer.

85.     Given the significant negative impact of an authorized generic drug manufacturer on the first-filing generic drug manufacturer's revenues, a branded drug manufacturer's agreement not to launch an authorized generic drug has tremendous monetary value to the generic drug manufacturer.  Branded drug manufacturers have used such agreements as a way to pay the first-filer to delay entering the market.  Such non-competition agreements deprive consumers and other drug purchasers, such as Plaintiffs and members of the putative End-Payor

Classes, of the lower prices resulting from two forms of competition: (i) between the branded drug and the generic drug; and (ii) between the generic drugs.

## VI.    DEFENDANTS' ANTICOMPETITIVE CONDUCT

### A.    Takeda Improperly Lists the '584 Patent and '404 Patent.

86.    On January 15, 1999, Takeda submitted to the FDA NDA 21-073, seeking approval to manufacture, market, and sell ACTOS, which contains the active ingredient pioglitazone hydrochloride, and is used to improve glycemic control in adults with Type 2 diabetes when diet and exercise are not sufficient. On July 15, 1999, the FDA approved Takeda's NDA for the use of ACTOS to improve glycemic control in adults with Type 2 diabetes—either as monotherapy or in combination with a sulfonylurea, metformin, or insulin.

87.    Pursuant to the FDA's requirements, Takeda submitted the '777 Patent, entitled "Thiazolidinedione Derivatives, Useful As Antidiabetic Agents," for listing in the Orange Book as a drug substance patent covering ACTOS. The '777 Patent claims the active ingredient for ACTOS, pioglitazone hydrochloride, and was issued to inventors Kanji Meguro and Takeshi Fujita on August 18, 1987, and assigned to Takeda. The '777 Patent purports to claim the novel compound commonly known under the nonproprietary name "pioglitazone" and its pharmacologically acceptable salts. ACTOS and ACTO*plus* met are both covered by the '777 Patent, which expired on January 17, 2011.

88.    As stated previously, Takeda knew its blockbuster drug would suffer from generic competition upon expiration of the '777 Patent. In order to extend its patent monopoly beyond January 17, 2011, Takeda obtained and listed in the Orange Book ten additional patents for ACTOS.

27

89.    The '584 Patent, entitled "Pharmaceutical Composition," purports to claim a pharmaceutical composition comprising pioglitazone or salts thereof *in combination with* a biguanide (*e.g.*, metformin) and methods for treating diabetes which comprise administering a therapeutically effective amount of pioglitazone or salts thereof in combination with a biguanide (*e.g.*, metformin).  Takeda is the owner, by assignment, of the '584 Patent. ACTO*plus* met, not ACTOS, is the purported commercial embodiment of the '584 Patent, which expires on June 19, 2016.  Nevertheless, Takeda submitted the '584 Patent to the FDA for listing in the Orange Book as a drug product patent and a method-of-use patent *with respect to ACTOS.*

90.    The '404 Patent, entitled "Pharmaceutical Composition," purports to claim a pharmaceutical composition comprising pioglitazone or salts thereof *in combination with* an insulin secretion enhancer (*e.g.*, a sulfonylurea, such as glimepiride) and methods for treating diabetes which comprise administering a therapeutically effective amount of pioglitazone or salts thereof in combination with an insulin secretion enhancer.  Takeda is the owner, by assignment, of the '404 Patent.  Duetact, not ACTOS, is the purported commercial embodiment of the '404 Patent, which expires on June 19, 2016.  Nevertheless, Takeda submitted the '404 Patent to the FDA for listing in the Orange Book as a drug product patent and a method-of-use patent *with respect to ACTOS.*

91.    In addition to the '777 Patent, the '584 Patent, and the '404 Patent, Takeda submitted eight other patents to the FDA for listing in the Orange Book.   These patents (the "Method-of-Use Patents") claimed various methods of using ACTOS in combination with other drug products (such as biguanide or an insulin secretion enhancer) to treat various conditions or to reduce various side effects.  Takeda listed the Method-of-Use Patents in the Orange Book as method of use patents, not drug substance or drug product patents.

92.     Under both the Hatch-Waxman Act and the FDA's implementing regulations, the drug product claims for the '584 Patent and the '404 Patent do not form a permissible basis for listing the patents in the Orange Book in relation to the ACTOS NDA.

93.     *First*, the drug product claims in the patents could properly be listed in the Orange Book for the ACTOS NDA only if the patents in fact claimed the ACTOS drug product. The patents unequivocally do not do so. The *only* active ingredient in ACTOS is pioglitazone hydrochloride. By contrast, the drug product claims in the '584 Patent and the '404 Patent claim drug products containing *both* pioglitazone *and* certain additional active ingredients—biguanide or an insulin secretion enhancer, respectively.  Neither patent claims a drug product that contains pioglitazone as its sole active ingredient.  Thus, the patents do not claim the ACTOS drug product as a matter of law.

94.     *Second*, Takeda could not reasonably assert the drug product claims of the '584 Patent or the '404 Patent against generic drug manufacturers seeking to market ACTOS.  The patents claimed only drugs *other* than the ACTOS drug product. In fact, as noted in further detail below, although Takeda originally asserted those drug product claims against generic drug manufacturers of ACTOS, Takeda withdrew the claims before a court could rule on them—but only after the generic drug manufacturers had made their paragraph IV certifications against those two patents.

95.     Nevertheless, on or about November 5, 1999, Takeda directed the FDA to list the '584 Patent in the Orange Book as claiming both the "drug product" ACTOS and its "method of use."  Similarly, on or about January 3, 2003, Takeda directed the FDA to list the '404 Patent in the Orange Book as claiming both the "Drug Product" ACTOS and its "Method of Use."

96.    In response to a Citizens Petition submitted to the FDA by another generic drug manufacturer, Defendant Teva asserted that Takeda had improperly caused the FDA to list the '584 Patent and '404 Patent in the Orange Book as drug product patents for ACTOS.  In its Comment to the Citizens Petition, dated January 22, 2010, Takeda "confirm[ed] for FDA the listing of [the '584 Patent and '404 Patent] under the terms described in Takeda's original patent submissions."  Takeda further acknowledged that it "characterized them for FDA in the appropriate patent declarations as containing both 'Drug product' and 'Method of use' claims," and that "[s]ince the original submission of these patents to FDA, Takeda has continued to certify to the applicability of the patents to ACTOS under the original declarations…."

97.    In a ruling on the Citizens Petition, dated March 15, 2010, the FDA confirmed that Takeda's original demands for patent listing had indeed "stated that the patents claimed both the drug product and a method of use."  The FDA further concluded that "[i]n keeping with our practice of relying solely on the NDA sponsor's patent declaration describing relevant patent claims in Orange Book-listed patents, FDA will rely on Takeda's patent declarations submitted to FDA."  The FDA specifically noted that Takeda's January 22, 2010 Comment to the Citizens Petition had "reconfirm[ed]" the original listing.  Moreover, "FDA's role in listing patents and patent information in the Orange Book is ministerial," and "FDA relies on the NDA sponsors to provide an accurate patent submission."  Accordingly, the FDA concluded that, because Takeda had submitted the '584 Patent and '404 Patent as claiming the ACTOS drug product, all ANDA filers seeking approval to market generic ACTOS before the expiration of the patents were required to submit Paragraph IV Certifications, rather than Section viii Statements, with respect to them.

98.    But for Takeda's improper listing of the '584 Patent and '404 Patent in the Orange Book, and its subsequent reaffirmation of the listings in its January 22, 2010 Comment to the Citizens Petition, no ANDA filer would (or could) have submitted a Paragraph IV Certification for ACTOS with respect to the '584 Patent and '404 Patent. Consequently, no ANDA filer would have been entitled to claim the 180-day exclusivity with respect to generic ACTOS.

99.    Absent a claim to the 180-day exclusivity, the incentive of the generic drug manufacturers that filed the first ANDAs for generic ACTOS—Defendants Mylan, Ranbaxy, and Actavis—would have been to enter the market as soon as the '777 Patent expired on January 17, 2011. Moreover, absent the first-filers' claim to the 180-day exclusivity—a claim that existed because Takeda improperly listed the '584 Patent and '404 Patent in the Orange Book as claiming the ACTOS drug product—many more additional generic drug manufacturers would have also entered the market on or about January 17, 2011, because they would not have been subject to any 180-day exclusivity.

100.    In short, absent Takeda's improper listing of the '584 Patent and '404 Patent in the Orange Book as claiming the ACTOS drug product, massive generic entry, by ten or more manufacturers of generic ACTOS, would have occurred on or about January 17, 2011. Entry by this number of generic drug manufacturers would have quickly driven the price of ACTOS and its generic equivalents down to near marginal cost, delivering more than $2 billion in cost savings to American consumers.

**B.    Takeda Delays the Entry of Generic ACTOS.**

**1.    Takeda Files Paragraph IV Litigation Against Mylan, Ranbaxy, and Actavis**

101.    Generic drug manufacturers were eager to apply for FDA approval to market generic versions of ACTOS.  On July 15, 2003, three generic manufacturers, Mylan, Ranbaxy, and Actavis, each filed an ANDA seeking FDA approval to manufacture, market, and sell generic ACTOS. (Alphapharm was also a first ANDA filer for generic Actos, but Mylan acquired Alphapharm before generic ACTOS was launched).  The FDA ultimately concluded that Mylan, Ranbaxy, and Actavis were entitled to "shared" 180-day exclusivity with respect to generic ACTOS.

102.    On or about September 8, 2003, Mylan notified Takeda that Mylan had filed ANDA No. 76-801 seeking to manufacture, market, and sell a generic version of ACTOS.  As relevant here, Mylan's notice letter included a Paragraph IV Certification as to the '584 Patent and '404 Patent, and Section viii Statements as to the Method-of-Use Patents.

103.    On September 9, 2003, Actavis notified Takeda that Actavis had filed ANDA No. 76-798 seeking to manufacture, market, and sell a generic version of ACTOS.  As relevant here, Actavis' notice letter contained a Paragraph IV Certification as to the '584 Patent and '404 Patent, and Section viii Statements as to the Method-of-Use Patents.

104.    On September 18, 2003, Ranbaxy notified Takeda that Ranbaxy had filed ANDA No. 76-800 seeking to manufacture, market, and sell a generic version of ACTOS.  As relevant here, Ranbaxy's notice letter contained a Paragraph IV Certification as to the '584 Patent and '404 Patent, and Section viii Statements as to the Method-of-Use Patents.

105.    On October 17, 2003, Takeda filed three separate suits in the United States District Court for the Southern District of New York.  As relevant here, Takeda alleged that

Mylan's, Ranbaxy's, and Actavis' generic ACTOS products would infringe the drug product claims of the '584 Patent and '404 Patent, pursuant to 35 USC § 271(e)(2)(a), and induce infringement of the method-of-use claims of the '584 Patent and '404 Patent and certain of the Method-of-Use Patents, pursuant to 35 USC § 271(b).

106.    Takeda filed the patent infringement cases against Mylan, Actavis, and Ranbaxy without regard to the merits of the cases.  During the litigation, Mylan, Actavis, and Ranbaxy secured substantial evidence via discovery supporting a host of defenses focusing on the: (i) enforceability of the '584 Patent and '404 Patent; (ii) validity of the '584 Patent and '404 Patent; and (iii) strength of Takeda's infringement allegations regarding the Patents and the Method-of-Use Patents.  Indeed, before trial, Takeda withdrew its allegations that Mylan, Actavis, and Ranbaxy's generic ACTOS products infringed the drug product claims of the '584 Patent and '404 Patent.

107.    In view of the looming expiration of the '777 Patent in January 2011, the district court set a trial date for April 2010 (subsequently moved to June 2010) to determine whether these Generic Defendants' generic ACTOS products would infringe the '584 Patent or '404 Patent and/or induce infringement of the '584 Patent, '404 Patent, and/or the Method-of-Use Patents.

108.    To prevent generic entry using just the strength of its patents, Takeda would have had to defeat each of Mylan's, Ranbaxy's, and Actavis' arguments regarding direct and indirect infringement. Takeda instead decided to protect its monopoly by paying Mylan, Ranbaxy, and Actavis to withdraw their defenses to the patents and delay introducing their generic ACTOS products.

### 2. Takeda and Mylan, Ranbaxy, and Actavis Execute Exclusion Payment Agreements to Delay Generic ACTOS.

109. On or about March 15, 2010, Takeda entered into an Exclusion Payment Agreement with each of Mylan, Actavis, and Ranbaxy. The Exclusion Payment Agreements required Takeda to immediately dismiss its patent infringement litigation against Mylan, Actavis, and Ranbaxy, and for the Generic Defendants to, in turn, drop their challenges to the Takeda patents. In addition, Mylan, Ranbaxy, and Actavis also agreed to delay launching their generic ACTOS products until August 17, 2012, or earlier under certain circumstances.

110. As the *quid pro quo* for Mylan's, Actavis' and Ranbaxy's agreements to drop their challenges to the patents and delay entry, Takeda agreed to pay Mylan, Ranbaxy, and Actavis substantial sums. Takeda's payments to the Generic Defendants under the Exclusion Payment Agreements took several forms.

111. *First*, Takeda agreed that neither it, nor its affiliates, would launch an authorized generic version of ACTOS during Mylan's, Ranbaxy's and Actavis' first 180 days of marketing. This non-competition pledge provided substantial compensation to Mylan, Ranbaxy, and Actavis, each of which could expect higher unit sales, at a higher price, absent Takeda's authorized generic version of ACTOS in the market. This non-competition pledge was worth tens of millions of dollars and constitutes compensation to each of the Generic Defendants.

112. *Second*, Takeda agreed that it would not grant any other generic drug manufacturer a license to enter the market with generic ACTOS until 180 days after Mylan, Ranbaxy, and Actavis entered. In order to help eliminate Teva's threat to undermine the anticompetitive scheme, this no-license clause had an exception—it allowed Takeda to grant a license to Teva to enter at the same time as Mylan, Ranbaxy, and Actavis in the event that

Takeda succeeded, as it ultimately did (see below), in recruiting Teva into the anticompetitive pact. The no-license pledge was worth tens of millions to each of the Generic Defendants.

113. *Third*, Takeda agreed that, in the event any other generic ACTOS entered the market before August 17, 2012, the licensed entry dates for Mylan, Ranbaxy, and Actavis would be moved up correspondingly. As discussed in further detail below, the purpose and effect of these "acceleration clauses" was to deter any other generic drug manufacturer from entering the market before then. Takeda, Mylan, Ranbaxy, and Actavis specifically intended these clauses to deter Teva from undermining the anticompetitive Exclusion Payment Agreements. Eliminating the potential for Teva to enter the market before Mylan, Ranbaxy, and Actavis (all as described more fully below) was of enormous benefit to the Generic Defendants, and constituted a very substantial payment to each of them, worth hundreds of millions of dollars.

114. All of these benefits had substantial value to Mylan, Ranbaxy, and Actavis, and are compensation that they could not have otherwise obtained even if they had litigated and won the patent cases. These payments caused Mylan, Ranbaxy, and Actavis to stay out of the market longer than they otherwise would have. And Takeda made these payments to Mylan, Ranbaxy, and Actavis in exchange for their agreeing to delay entry with their generic ACTOS products. In short, Takeda made large, unjustified payments to Mylan, Ranbaxy, and Actavis to delay their entry into the market with generic ACTOS.

### 3.    The Bottleneck Delays Other Potential Generic Competitors.

115. Mylan, Ranbaxy, and Actavis filed their ANDAs for ACTOS before enactment of the 2003 MMA amendments. Under the law before the amendments, the first generic manufacturer(s) to file an ANDA with a Paragraph IV Certification could not forfeit the 180-day exclusivity by failing to market the drug. Therefore, the first generic drug manufacturer

applicant could agree with the branded drug manufacturer not to begin marketing the generic, while still safely retaining the 180-day exclusivity. By thus "parking" its 180-day exclusivity, the first filer could create a "bottleneck" that precluded *all* generic drug manufacturers from entering the market until 180 days after the first filer entered. The intended effect of Takeda's Exclusion Payment Agreements with each of Mylan, Ranbaxy, and Actavis was to delay entry into the market by them and all subsequent ANDA filers.

116.    At least seven other generic drug manufacturer competitors notified Takeda they had filed ANDAs seeking to market a generic version of ACTOS. Many of these competitors sent to Takeda notice letters including a Paragraph IV Certification with respect to the '584 Patent and '404 Patent.

117.    Takeda filed multiple patent infringement suits alleging that these manufacturers' generic ACTOS products would directly infringe the '584 Patent and '404 Patent, and indirectly infringe the Method-of-Use Patents.

118.    Takeda filed the patent infringement cases against these potential generic drug manufacturer competitors without regard to the merits of the cases. Simply by filing the cases, Takeda obtained automatic exclusion of these ANDA filers from the market for thirty months.

119.    In light of the bottleneck created by Takeda's Exclusion Payment Agreements with Mylan, Ranbaxy, and Actavis, beginning in 2010, all of the subsequent ANDA filers entered into joint stipulations of dismissal of their patent cases with Takeda. All of these potential competitors agreed to delay entry into the market until 180 days after Mylan, Ranbaxy, and Actavis entered. Absent the bottleneck created by Takeda's improper listing of the '584 Patent and '404 Patent in the Orange Book, and Takeda's subsequent execution of Exclusion

Payment Agreements with Mylan, Ranbaxy, and Actavis, many or most of these later ANDA filers would have entered the market much sooner than they did.

### C. Takeda Delays the Entry of Generic ACTO*plus* met.

#### 1. Takeda Files Paragraph IV Litigation Against Mylan.

120.    On October 27, 2004, Takeda submitted NDA 21-842, seeking FDA approval to manufacture, market, and sell a fixed single dose combination of pioglitazone hydrochloride and metformin hydrochloride designed to improve glycemic control in adults with Type 2 diabetes, which Takeda subsequently marketed as ACTO*plus* met. Takeda listed the '584 Patent in the Orange Book as a drug product patent for ACTO*plus* met, and listed several additional patents as applicable method-of-use patents.  The FDA approved Takeda's NDA for ACTO*plus* met on August 29, 2005.

121.    ACTO*plus* met quickly grew to become one of Takeda's most profitable drugs, delivering more than $413 million in annual sales by 2012.

122.    On or about June 23, 2008, Mylan notified Takeda that Mylan had filed ANDA No. 90-406, seeking to manufacture, market, and sell a generic version of ACTO*plus* met. Mylan's notice letter included a Paragraph IV Certification with respect to the '584 Patent and certain method-of-use patents.   Mylan was the first ANDA filer to submit a substantially complete ANDA with a Paragraph IV Certification to market generic ACTO*plus* met.

123.    On August 5, 2008, Takeda filed suit in the United States District Court for the Southern District of New York, alleging that Mylan's ANDA for generic ACTO*plus* met directly infringed, and would induce infringement of, the '584 Patent and the method-of-use patents.

124.    Takeda filed the patent infringement case against Mylan without regard to the merits of the case.  Simply by filing the lawsuit, Takeda obtained the automatic exclusion of

Mylan from the market for thirty months and the ability to create a 180-day exclusivity bottleneck.

125.    During the litigation, Mylan conducted discovery supporting a host of defenses focusing on the: (i) enforceability of the '584 Patent and the method-of-use patents: (ii) validity of the '584 Patent and the method-of-use patents: and (iii) strength of Takeda's indirect and contributory patent infringement allegations.

126.    To prevent generic entry using just the strength of its patents, Takeda would have had to defeat Mylan's arguments regarding direct and indirect infringement. Takeda instead decided to protect its supracompetitive profits by paying Mylan to withdraw its defenses to the patents and delay introducing generic ACTO*plus* met.

> ### 2.    Takeda And Mylan Enter Into an Exclusion Payment Agreement to Delay Generic ACTO*plus* met.

127.    On or about March 15, 2010, Takeda entered into an Exclusion Payment Agreement with Mylan.  Under the terms of the Exclusion Payment Agreement, Mylan agreed to drop its challenge to Takeda's patents.  Mylan also agreed to stay out of the market with generic ACTO*plus* met until August 17, 2012, or as late as December 14, 2012, under certain circumstances.

128.    As the *quid pro quo* for Mylan's agreement to drop its challenges to Takeda's patents and delay entry of generic ACTO*plus* met, Takeda agreed to pay Mylan substantial sums. Takeda's payments to Mylan under the Exclusion Payment Agreement took at least four forms.

129.    *First*, Takeda agreed that neither it, nor its affiliates, would launch an authorized generic version of ACTO*plus* met during Mylan's first 180 days of marketing.  This non-competition pledge provided substantial compensation to Mylan, which could expect higher unit sales, at a higher price, absent Takeda's authorized generic version of ACTO*plus* met in the

market.  The non-competition pledge was worth tens of millions and constitutes compensation to Mylan.

130.    *Second*, Takeda agreed that, with one exception discussed in detail below concerning Teva, it would not grant any other generic drug manufacturer a license to enter the market with generic ACTO*plus* met until 180 days after Mylan entered.  The no-license pledge was worth tens of millions to Mylan.

131.    *Third*, Takeda agreed that, in the event that any other generic ACTO*plus* met entered the market before the time specified for Mylan to enter, the licensed entry date for Mylan would be moved up correspondingly.  As discussed in further detail below, the purpose and effect of this "acceleration clause" was to deter any other generic drug manufacturer from entering before Mylan's scheduled entry date.

132.    *Fourth,* Takeda agreed to provide to Mylan all of the payments with respect to ACTOS discussed in detail above.  As noted in detail below, the payments and provisions were designed to, and did in fact, deter Teva from undermining the Exclusion Payment Agreement that Takeda and Mylan reached with respect to ACTOS.  The terms on which Takeda and Mylan agreed to settle the ACTOS lawsuit were contingent on the terms on which those parties agreed to settle the ACTO*plus* met lawsuit, and *vice versa*.  In exchange for all of the payments that Mylan received with respect to both lawsuits, including those successfully designed to deter Teva from undermining the ACTOS anticompetitive scheme, Mylan agreed to delay entry with ACTO*plus* met.

133.    All of these benefits had substantial value to Mylan, and are compensation that it could not have otherwise obtained even if it had litigated and won the ACTO*plus* met patent case.  These payments caused Mylan to stay out of the market with ACTO*plus* met longer than it

otherwise would have done. And Takeda made these payments to Mylan in exchange for its agreeing to delay entry with its generic ACTO*plus* met product. In short, Takeda made large, unjustified payments to Mylan to delay entry into the market with generic ACTO*plus* met.

### 3. The Bottleneck Delays Entry by Other Potential Generic Competitors.

134. As the first ANDA filer to submit a substantially complete ANDA with a Paragraph IV Certification with respect to ACTO*plus* met, Mylan secured the Hatch-Waxman 180-day exclusivity. Although Congress had sought in the 2003 MMA amendments to reduce the incidence of drug manufacturers entering into Exclusion Payment Agreements to create "bottlenecks," unscrupulous manufacturers could still structure such agreements to create very substantial obstacles to entry by later-filing generics. As noted in detail above, under the MMA, the generic first-filer retains its 180-day exclusivity if it enters into a consent judgment that does not include a finding that all of the patents for which the first applicant submitted a Paragraph IV Certification were invalid or not infringed. In order to trigger forfeiture and gain access to the market, subsequent ANDA applicants are then forced to obtain a judgment that all patents for which the first filing generic company filed Paragraph IV Certifications are invalid or not infringed.

135. Takeda and Mylan in fact "gamed the system" in just this way, entering into a voluntary dismissal without the requisite findings that would have resulted in a forfeiture of Mylan's 180-day exclusivity. Consequently, the Takeda/Mylan Exclusion Payment Agreement constructed very substantial barriers to entry by later-filing generic drug manufacturers.

136. At least four other generic drug manufacturer competitors notified Takeda that they had filed ANDAs seeking to manufacture, market and sell a generic version of ACTO*plus*

met.  Each of these notice letters included a Paragraph IV Certification with respect to the '584 Patent and the method-of-use patents.

137.    Takeda filed multiple patent infringement suits alleging the generic ACTO*plus* met products would directly infringe the '584 Patent and indirectly infringe the method-of-use patents. Takeda filed these patent infringement cases against the potential generic drug manufacturer competitors without regard to the merits of the cases.  Simply by filing the lawsuits, Takeda obtained automatic exclusion of these ANDA filers from the market for thirty months.

138.    In light of the bottleneck created by Takeda's Exclusion Payment Agreement with Mylan, beginning in April 2010, all of these subsequent ANDA filers entered into joint stipulations dismissing their patent cases with Takeda. All of these potential competitors agreed to delay entry into the market until 180 days after Mylan entered.  Absent the bottleneck created by Takeda's Exclusion Payment Agreement with Mylan, many or most of these later ANDA filers would have entered the market much sooner than they did.

**D.      Defendants Neutralize the Threat Teva Posed to Unravel the Anticompetitive Agreements.**

**1.      Teva Files Only Section viii Statements as to ACTOS.**

139.    With the execution of the Exclusion Payment Agreements for both ACTOS and ACTO*plus* met in March 2010, and the consequent bottlenecks that also delayed entry by later-filing generic drug manufacturers, Takeda and its generic co-conspirators—Mylan, Ranbaxy, and Actavis—had tamed almost all of the threats that could unleash competitive rivalry and bring lower prices to consumers before the dates specified in the Exclusion Payment Agreements.  But one significant threat remained, so Takeda and its generic coconspirators worked together to neutralize the potential competitor and bring it into the conspirators' non-competition pact.

41

140.    On or around July 14, 2004, Teva filed ANDA No. 77-210, seeking to manufacture, market and sell generic versions of ACTOS.  Teva refused, however, to submit Paragraph IV Certifications with respect to the '584 Patent and '404 Patent.  Instead, with respect to those patents as well as the Method-of-Use Patents, Teva included only Section viii Statements.  As permitted by applicable regulations, the Section viii Statements asserted that Teva's label for its generic ACTOS would "carve out" information regarding methods of using ACTOS in combination with a biguanide or an insulin secretion enhancer (the methods of use claimed by the '584 Patent and '404 Patent, respectively) or other uses covered by the Method-of-Use Patents.

141.    As noted in detail above, Teva's decision not to include Paragraph IV Certifications with respect to the '584 Patent and '404 Patent raised the possibility that the FDA could approve Teva's ANDA without regard to whether any other ANDA applicant was otherwise entitled to a 180-day exclusivity period with respect to ACTOS. Thus, it was possible for Teva to leap ahead of Mylan, Ranbaxy, and Actavis and launch a generic version of ACTOS once the '777 Patent expired in January 2011.  Takeda did not sue Teva with respect to its ANDA for ACTOS at that time, instead waiting to sue until Teva also sought approval to sell ACTO*plus* met.

142.    On April 14, 2009, Teva notified Takeda that Teva had filed ANDA No. 91-155, seeking to manufacture, market and sell generic versions of ACTO*plus* met.  Teva's notice letter included a Paragraph IV Certification that the '584 Patent and two additional Takeda patents were invalid and/or not infringed.

143.    On or about May 18, 2009, Takeda filed suit against Teva in the United States District Court for the Southern District of New York. Takeda alleged that Teva directly

42

infringed, intentionally induced infringement, and/or contributed to the infringement of the patents as to which Teva had submitted Paragraph IV Certifications.  In addition to these allegations regarding ACTO*plus* met, Takeda also alleged that Teva's ANDA for ACTOS intentionally induced infringement of the '584 Patent, '404 Patent, and the Method-of-Use Patents.  Takeda filed the lawsuit without regard to its merits.

144.    The lawsuit was scheduled for trial beginning in June 2010, in time for Teva to obtain a favorable ruling before the expiration of the ACTOS '777 Patent in January 2011.

145.    On March 15, 2010, while the lawsuit was pending, the FDA issued its decision on the Citizens Petition discussed in detail above, concluding that, in its purely ministerial role, the FDA had no ability to alter Takeda's listing of the '584 Patent and '404 Patent in the Orange Book as purported drug product patents covering ACTOS.  The FDA concluded, therefore, that it could not approve any ANDA that did not include a Paragraph IV Certification as to the '584 Patent and '404 Patent, which Teva's ANDA for ACTOS did not include.

146.    On March 30, 2010, Teva countered this development by filing a motion to amend its answer and add a counterclaim that Takeda had improperly caused the '584 Patent and '404 Patent to be listed as drug product patents in the Orange Book.  Had Teva succeeded on its counterclaim, Teva would not have been subject to the 180-day bottleneck that Takeda and Mylan, Ranbaxy, and Actavis constructed with their Exclusion Payment Agreements, and Teva could have entered the market with generic ACTOS as early as January 17, 2011.

147.    Shortly after Teva filed its motion regarding Takeda's improper listing of the '584 Patent and '404 Patent, Takeda and Teva began serious settlement negotiations.  At the parties' joint request, on April 14, 2010, the court adjourned the June 2010 trial date.

148.    During the settlement negotiations, Takeda used "carrots and sticks." The sticks included the acceleration clauses that Takeda and its other generic drug manufacturer co-conspirators had incorporated in the Exclusion Payment Agreements for both ACTOS and ACTO*plus* met.  As noted above, the acceleration clauses in Takeda's Exclusion Payment Agreement with each of Mylan, Ranbaxy, and Actavis provided that, in the event that any other manufacturer succeeded in entering the market with a generic ACTOS product before August 17, 2012, the licensed entry date for Mylan, Ranbaxy, and Actavis would be accelerated to the earlier date. The acceleration clauses thus ensured that no other generic drug manufacturer, no matter how much time and resources it spent in its litigation against Takeda, and no matter how successful the generic drug manufacturer was in the litigation, could enter the market before Mylan, Ranbaxy, and Actavis. The Exclusion Payment Agreement between Takeda and Mylan with respect to ACTO*plus* met had a similar acceleration clause.

149.    The purpose and effect of the acceleration clauses was to dramatically reduce Teva's incentive to enter the market before Mylan, Ranbaxy, and Actavis.  Absent the acceleration clauses, Teva had a significant possibility of entering the market with generic ACTOS before August 17, 2012, thereby enjoying a substantial period with the only generic ACTOS product on the market.  By eliminating this possibility, the acceleration clauses resulted in later generic entry in at least two ways: (i) the clauses directly reduced Teva's incentive to continue litigating in order to gain entry before Mylan, Ranbaxy, and Actavis, and (ii) by eliminating the threat to Mylan's, Ranbaxy's, and Actavis' 180-day exclusivity, the clauses compensated them for delaying their entry into the market.  In short, the acceleration clauses eliminated Teva's competitive threat to Mylan, Ranbaxy, and Actavis, in return for which they agreed to later entry.

150.    While keeping most of the terms in their Exclusion Payment Agreements confidential, Mylan, Ranbaxy, and Actavis agreed that Takeda could advise Teva of the existence of the acceleration clauses.  The purpose and effect of the disclosure was to dissuade Teva from entering the market before August 17, 2012.

151.    The "carrots" that Takeda offered to Teva to give up the patent fight were the payments that the parties included in their unlawful Exclusion Payment Agreement, discussed below.

**2.    Takeda and Teva Execute an Exclusion Payment Agreement to Delay Generic ACTOS and Generic ACTO*plus* met.**

152.    On December 22, 2010, Takeda and Teva entered into an Exclusion Payment Agreement pursuant to which Teva agreed to: (i) drop its challenges to Takeda's patents with respect to both ACTOS and ACTO*plus* met; (ii) drop its proposed counterclaim asserting that Takeda had improperly caused the FDA to list the '584 Patent and '404 Patent in the Orange Book as drug product patents covering ACTOS; and (iii) stay out of the market with generic ACTOS until August 17, 2012, and stay out of the market with generic ACTO*plus* met  until the date on which Mylan entered the market.

153.    As the *quid pro quo* for Teva's agreement to significantly delay competition, Takeda agreed to pay Teva substantial compensation.  Takeda's payments to Teva under the Exclusion Payment Agreement took at least the following forms.

154.    *First*, Takeda agreed that neither it, nor its affiliates, would launch an authorized generic version of ACTOS during Teva's first 180 days of marketing.  This non-competition pledge provided substantial compensation to Teva, which could expect higher unit sales, at a higher price, absent Takeda's authorized generic version of ACTOS in the market.  The no-competition pledge was worth tens of millions of dollars and constitutes compensation to Teva.

45

155.    *Second*, Takeda agreed that, with the exception of the licenses to which it had already agreed with Mylan, Ranbaxy, and Actavis, Takeda would not grant any other generic drug manufacturer a license to enter the market with generic ACTOS until 180 days after Teva entered the market.  The no-license pledge was worth tens of millions of dollars and constitutes compensation to Teva.

156.    *Third*, Takeda agreed that, in the event any other generic ACTOS entered the market before the time specified for Teva to enter the market, the licensed entry date for Teva would be accelerated correspondingly.  As discussed in detail above, the purpose and effect of this "acceleration clause" was to deter any other generic drug manufacturer from entering before Teva's scheduled entry date.

157.    *Fourth*, Takeda granted Teva a license to market generic ACTO*plus* met under Takeda's NDA beginning on the date that Mylan first entered the market with its generic ACTO*plus* met.  Anticipating that they would succeed in enticing Teva to join the non-competition pact, Takeda and Mylan had provided in their Exclusion Payment Agreement that Takeda could provide such a license to Teva with respect to ACTO*plus* met.

158.    *Fifth*, Takeda agreed that neither it, nor its affiliates, would launch an authorized generic version of ACTO*plus* met during Teva's first 180 days of marketing. This non-competition pledge provided substantial compensation to Teva, which could expect higher unit sales, at a higher price, absent Takeda's authorized generic version of ACTO*plus* met in the market.  The no-competition pledge was worth tens of millions of dollars and constitutes compensation to Teva.

159.    *Sixth*, Takeda agreed that, with the exception of the licenses already granted to Mylan, Takeda would not grant any other generic drug manufacturer a license to enter the market

46

with generic ACTO*plus* met until 180 days after Teva entered the market. The no-license pledge was worth tens of millions of dollars and constitutes compensation to Teva.

160.   *Seventh*, Takeda agreed that, in the event any other generic ACTO*plus* met entered the market before the time specified for Teva to enter the market, the licensed entry date for Teva would be accelerated correspondingly. As discussed in detail above, the purpose and effect of this "acceleration clause" was to deter any other generic drug manufacturer from entering before Teva's scheduled entry date.

161.   All of these benefits had substantial value to Teva, and are compensation that it could not have obtained even if it had litigated and won the patent case. These payments caused Teva to stay out of the market longer than it otherwise would have done. And Takeda made these payments to Mylan in exchange for its agreeing to delay entry with its generic ACTO*plus* met product. In short, Takeda made large, unjustified payments to Teva to delay entry into the market.

## VII.   ANTICOMPETITIVE EFFECTS OF THE SCHEME AND AGREEMENTS

162.   Defendants' conduct delayed and substantially diminished the sale of generic ACTOS and ACTO*plus* met in the United States. But for Defendants' illegal conduct, generic drug manufacturers would have entered the market unimpeded and competed on the merits against ACTOS and ACTO*plus* met. Generic drug manufacturers of ACTOS would have been able to compete as early as January 17, 2011. Generic drug manufacturers of ACTO*plus* met would have been able to compete as early as February 25, 2011. Defendants' conduct unlawfully delayed and diminished the savings that purchasers of ACTOS and ACTO*plus* met and their generic equivalents would have garnered from unimpaired generic competition.

163.    Defendants' conduct harmed Plaintiffs and the End-Payor Classes by depriving them of: (i) a marketplace in which manufacturers and distributors of generic drugs make their decisions about challenging patents and entering markets free from the influence of unlawful payments; and (ii) the most cost efficient means of distribution.  Contrary to the purpose of the Hatch-Waxman Act, Defendants' anticompetitive conduct enabled them to: (i) delay the entry of less expensive generic versions of ACTOS and ACTO*plus* met in the United States; (ii) fix, raise, maintain, or stabilize the price of ACTOS and ACTO*plus* met; and (iii) permit Takeda to maintain a monopoly in the United States market for ACTOS and its generic equivalents.

164.    As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and the End-Payor Classes have sustained (and will continue to sustain) substantial losses and damage to their business and property in the form of overcharges they paid for ACTOS and ACTO*plus* met and their generic equivalents, the exact amount of which will be proven at trial.

## VIII.  CLASS ACTION ALLEGATIONS

165.    Plaintiffs bring this action as two class actions, under FED. R. CIV. P. 23(a) and (b)(3), on behalf of themselves and the following similarly situated end-payors:

ACTOS Class:

> All persons or entities in the United States and its territories who indirectly purchased, paid and/or provided reimbursement for some or all of the purchase price for ACTOS and/or its AB-rated generic equivalents in any form, other than for resale, for consumption by themselves, their families, or their members, employees, insureds, participants, or beneficiaries (the "ACTOS Class"), from January 17, 2011 through and including the date that the anticompetitive effects of Defendants' unlawful conduct cease (the "ACTOS Class Period").

ACTO*plus* met Class:

All persons or entities in the United States and its territories who indirectly purchased, paid and/or provided reimbursement for some or all of the purchase price for ACTO*plus* met and/or its AB-rated generic equivalents in any form, other than for resale, for consumption by themselves, their families, or their members, employees, insureds, participants, or beneficiaries (the "ACTO*plus* met Class"), from February 25, 2011 through and including the date that the anticompetitive effects of Defendants' unlawful conduct cease (the "ACTO*plus* met Class Period").

166.    The following persons and entities are excluded from each of the above-described proposed Classes:

    a.      Defendants and their officers, directors, employees, parent corporations, subsidiaries, affiliates, representatives and/or agents;

    b.      All federal or state governmental entities, except cities, towns or municipalities with self-funded prescription drug plans;

    c.      All persons or entities that purchased ACTOS and/or ACTO*plus* met or the AB-rated generic equivalent for purposes of resale and/or directly from Defendants or their affiliates;

    d.      Fully insured health care plans (*i.e.*, health care plans that purchased insurance from a third-party payer covering 100% of a plan's reimbursement obligations to its members);

    e.      Any "flat co-pay" consumers whose purchases were paid, in part, by a third-party payor, and whose co-payment was the same regardless of the retail purchase price;

    f.      Pharmacy Benefit Managers; and

    g.      The Court, Court personnel and any members of their immediate families.

167.    Members of each of the End-Payor Classes are so numerous that joinder is impracticable.  On information and belief, each Class includes hundreds of thousands, if not millions, of consumers, and thousands of third-party payors.

168.    As to each of the Classes, Plaintiffs' claims are typical of those of each of the Class members.  As to each Class, Plaintiffs and Class members were damaged by the same

wrongful conduct of Defendants, *i.e.*, as a direct and proximate result of Defendants' wrongful conduct, they paid artificially inflated prices for ACTOS and/or ACTO*plus* met and were deprived of the benefits of earlier and robust competition from cheaper generic versions of the products.

169.    As to each of the Classes, Plaintiffs will fairly and adequately protect and represent the interests of the Class.  As to each of the Classes, Plaintiffs' interests are coincident with, and not antagonistic to, the interests of the Class members.

170.    Plaintiffs are represented by counsel with experience in prosecuting class action antitrust litigation, with particular experience in class action antitrust litigation involving pharmaceutical products.

171.    As to each of the Classes, questions of law and fact common to the Class members predominate over questions that may affect only individual Class members, because Defendants have acted on grounds generally applicable to the entire Class, thereby making the recovery of overcharge damages with respect to the Class as a whole appropriate.  Such generally applicable conduct is inherent in Defendants' wrongful conduct.

172.    As to the ACTOS Class, questions of law and fact common to the Class include, but are not limited to:

> a.    whether Defendants conspired to willfully maintain and/or enhance Takeda's monopoly power over ACTOS and its generic equivalents;
>
> b.    whether Takeda improperly listed the '584 Patent and '404 Patent in the Orange Book as purported drug product patents covering ACTOS;
>
> c.    whether Defendants conspired to suppress generic competition to ACTOS;
>
> d.    whether Takeda and Mylan, Teva, Ranbaxy and/or Actavis entered into unlawful agreements in restraint of trade;

e.      whether, pursuant to such agreements in restraint of trade, Mylan, Teva, Ranbaxy, and/or Actavis agreed to delay their entry into the market with generic ACTOS;

f.      whether, pursuant to such agreements in restraint of trade, Takeda paid Mylan, Teva, Ranbaxy, and/or Actavis;

g.      whether Takeda's payments to Mylan, Teva, Ranbaxy, and Actavis were for a purpose other than delayed entry of generic ACTOS;

h.      whether Takeda's payments to Mylan, Teva, Ranbaxy, and Actavis were necessary to yield a procompetitive benefit that is cognizable and non-pretextual;

i.      whether the agreements are unlawful under the rule of reason;

j.      whether Takeda possessed market power or monopoly power over pioglitazone hydrochloride;

k.      whether the law requires definition of a relevant market when direct proof of market power or monopoly power is available and, if so, the definition of the relevant market;

l.      whether Defendants' above-described conduct has substantially affected interstate and intrastate commerce;

m.      whether, and to what extent, Defendants' conduct caused antitrust injury (*i.e.*, overcharges) to Plaintiffs and Class members; and

n.      the quantum of aggregate overcharge damages to Plaintiffs and Class members.

173.    As to the ACTO*plus* met Class, questions of law and fact common to the Class include, but are not limited to:

a.      whether Takeda, Mylan, and/or Teva conspired to suppress generic competition to ACTO*plus* met;

b.      whether Takeda, Mylan, and/or Teva entered into unlawful agreements in restraint of trade;

c.      whether, pursuant to such agreements in restraint of trade, Mylan and/or Teva agreed to delay their entry into the market with generic ACTO*plus* met;

d.      whether, pursuant to such agreements in restraint of trade, Takeda paid Mylan and/or Teva;

e.      whether Takeda's payments to Mylan and/or Teva were for a purpose other than delayed entry of generic ACTO*plus* met;

f.      whether Takeda's payments to Mylan and/or Teva were necessary to yield a procompetitive benefit that is cognizable and non-pretextual;

g.      whether the agreements are unlawful under the rule of reason;

h.      whether Takeda possessed market power in the relevant market;

i.      whether the law requires definition of a relevant market when direct proof of market power is available and, if so, the definition of the relevant market;

j.      whether Defendants' above-described conduct has substantially affected interstate and intrastate commerce;

k.      whether, and to what extent, Defendants' conduct caused antitrust injury (*i.e.*, overcharges) to Plaintiffs and Class members; and

l.      the quantum of aggregate overcharge damages to Plaintiffs and Class members.

174.    As to each Class, class action treatment is the superior method for the fair and efficient adjudication of the controversy.  Such treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of evidence, effort, or expense that numerous individual actions would engender.  The benefits of proceeding as a class action, including providing injured persons or entities with a method for obtaining redress for claims that could not practicably be pursued individually, substantially outweigh potential difficulties in the management of this action as a class action.

175.    As to each Class, Plaintiffs know of no special difficulty that would be encountered in this action that would preclude its maintenance as a class action.

176.    As to each Class, certification of the Class is appropriate under FED. R. CIV. P. 23(b)(3) because the above common questions of law or fact predominate over any questions

affecting individual Class members, and a class action is superior to other available methods for the fair and efficient adjudication of this controversy.

177.    As to each Class, Defendants' wrongful actions are generally applicable to the Class members as a whole, for which Plaintiffs seek, *inter alia*, damages and equitable remedies.

178.    As to each Class, absent a class action, Defendants would retain the benefits of their wrongdoing despite their serious violations of the law and infliction of harm on Plaintiffs and Class members.

## IX.    INTERSTATE AND INTRASTATE COMMERCE

179.    At all relevant times, Takeda manufactured, promoted, distributed, and sold substantial amounts of ACTOS and ACTO*plus* met in a continuous and uninterrupted flow of commerce across state and national lines throughout the United States.

180.    At all material times, Defendants transmitted funds, as well as contracts, invoices and other forms of business communications and transactions, in a continuous and uninterrupted flow of commerce across state and national lines in connection with the sale of ACTOS and ACTO*plus* met and their generic equivalents.

181.    In furtherance of their efforts to monopolize and restrain competition, Defendants employed the United States mails and interstate and international telephone lines, as well as means of interstate and international travel.  Defendants' activities were within the flow of, and have substantially affected (and will continue to substantially effect), interstate commerce.

182.    Defendants' anticompetitive conduct also had substantial intrastate effects in that, *inter alia*, retailers within each state were foreclosed from offering cheaper generic ACTOS and ACTO*plus* met to end-payors inside each respective state. The complete foreclosure of generic

ACTOS and ACTO*plus* met directly impacted and disrupted commerce for end-payors within each state (and will continue to do so).

183.    During the relevant time period, ACTOS, ACTO*plus* met, and their generic equivalents were shipped into each state and were sold to or paid for by end-payors in each state. Defendants' conduct as set forth in this Complaint had substantial effects on intrastate commerce in each state because ACTOS, ACTO*plus* met, and their generic equivalents were sold to end-payors in each state at supracompetitive prices and Defendants entered into unlawful anticompetitive agreements that affected commerce in each state.

## X.    MONOPOLY POWER AND MARKET DEFINITION REGARDING ACTOS

184.    At all relevant times, Takeda had monopoly power and, at a minimum, market power, over ACTOS and its generic equivalents because it had the power to maintain the price of ACTOS at supracompetitive levels without losing so many sales as to make the supracompetitive price unprofitable.

185.    At all relevant times, a small, but significant, non-transitory price increase above the competitive level for ACTOS by Takeda would not have caused a loss of sales sufficient to make the price increase unprofitable.

186.    At all relevant times, at competitive price levels, ACTOS did not exhibit significant, positive cross-elasticity of demand with respect to price with any product other than AB-rated generic versions of ACTOS.  Other oral Type 2 diabetes medicines are not AB-rated to ACTOS, cannot be automatically substituted for ACTOS by pharmacists, do not exhibit substantial cross-price elasticity of demand with respect to ACTOS, and thus, are not economic substitutes for ACTOS.

187.    ACTOS is part of the Type 2 diabetes drug class called thiazolidinediones. Thiazolidinediones, like a few other antidiabetic classes of drugs, are often referred to as "insulin sensitivity enhancers" due to their ability to decrease the body's resistance to insulin.  Unique to thiazolidinediones, however, is that they increase certain levels of proteins—those that are more sensitive to insulin—and thus are the primary means by which a patient's blood sugar levels may be lowered.  Due to their differing effect within the body, thiazolidinediones are significantly unique in their efficacy, safety, and side effect profile.  These attributes play a critical role in doctors' selection of the most appropriate antidiabetic for a particular patient.

188.    Due to, among other reasons, doctors' perception of ACTOS's lower association with heart failure, death, and liver toxicity, ACTOS is significantly differentiated from other drugs in the thiazolidinedione class.  For these and other clinical reasons, substantial numbers of doctors prefer ACTOS to other thiazolidinedione drugs (*e.g.*, Avandia (rosiglitazone)).  For example, patients aged 65 and older who take Avandia (rosiglitazone) have a higher rate of death and a greater risk of heart failure when compared with similar patients taking ACTOS.

189.    At all relevant times, the existence of other products designed to treat adults with Type 2 diabetes did not significantly constrain Takeda's pricing of ACTOS.  At all relevant times, Takeda's price for ACTOS was at least 60% above its marginal cost of production and at least 40% above its marginal cost including marketing costs. Takeda never lowered the price of ACTOS in response to the pricing of other branded treatments for Type 2 diabetes (or the generic versions of such medications).

190.    Takeda needed to control only ACTOS and its AB-rated generic equivalents, and no other products, to profitably maintain the price of ACTOS at supracompetitive levels.  Only

the market entry of a competing, AB-rated generic version of ACTOS would have rendered Takeda unable to profitably maintain supracompetitive prices for ACTOS.

191.    Takeda knew that entry of a generic version of ACTOS would be a uniquely significant market event.  Takeda predicted that, unlike the entry of other branded treatments for Type 2 diabetes (or the generic versions of such medications), entry of generic ACTOS would take substantial unit sales from Takeda.  For example, ACTOS did not lose substantial sales when generic versions of other branded Type 2 diabetes drugs entered the market at low prices. But Takeda predicted that entry of generic ACTOS would immediately cause branded ACTOS to lose well more than half of its unit sales.  Likewise, Mylan, Ranbaxy, Actavis, and Teva estimated that their generic versions of ACTOS would take essentially all of their sales away from branded ACTOS and few, if any, sales from other branded Type 2 diabetes drugs (or generic versions of such medications).

192.    Takeda, Mylan, Teva, Ranbaxy, and Actavis predicted that the competitive impact of generic ACTOS products would be substantial.  Among other things, Defendants predicted that the availability of generic ACTOS would deliver well more than a billion dollars of savings to consumers.

193.    At all relevant times, Takeda sold ACTOS at prices well in excess of its marginal costs and the ACTOS competitive price, and enjoyed the resulting high profit margins and corresponding financial benefits—to the financial detriment of Plaintiffs and the ACTOS Class members.

194.    Takeda had, and exercised, the power to exclude and restrict competition to ACTOS and its AB-rated bioequivalents.

195.    Takeda, at all relevant times, enjoyed high barriers to entry with respect to competition in the relevant product market due to patent and other regulatory protections, as well as the high cost of entry and expansion.

196.    To the extent Plaintiffs are legally required to prove monopoly power circumstantially by first defining a relevant product market, Plaintiffs allege that the relevant product market is oral pioglitazone hydrochloride for the treatment of adults with Type 2 diabetes (*i.e.*, ACTOS and its AB-rated generic equivalents).   At all relevant times, Takeda profitably maintained the price of pioglitazone hydrochloride well above competitive levels.

197.    The relevant geographic market is the United States and its territories.

198.    At all relevant times, Takeda's market share in the relevant geographic market was 100%, confirming its monopoly power.

## XI.    MARKET POWER AND MARKET DEFINITION REGARDING ACTO*PLUS* MET

199.    At all relevant times, Takeda had market power over ACTO*plus* met and its generic equivalents because it had the power to maintain the price of ACTO*plus* met at supracompetitive levels without losing so many sales as to make the supracompetitive price unprofitable.

200.    At all relevant times, a small, but significant, non-transitory price increase above the competitive level for ACTO*plus* met by Takeda would not have caused a loss of sales sufficient to make the price increase unprofitable.

201.    At all relevant times, at competitive price levels ACTO*plus* met did not exhibit significant, positive cross-elasticity of demand with respect to price with any product other than AB-rated generic versions of ACTO*plus* met.   Other oral Type 2 diabetes medicines are not AB-rated to ACTO*plus* met, cannot be automatically substituted for ACTO*plus* met by pharmacists,

do not exhibit substantial cross-price elasticity of demand with respect to ACTO*plus* met, and thus, are not economic substitutes for ACTO*plus* met.

202.    For clinical reasons, ACTO*plus* met is sufficiently unique from other Type 2 diabetes drugs as it is specifically targeted to, and taken by, patients who have not sufficiently improved their blood sugar levels by taking either metformin or pioglitazone alone.

203.    At all relevant times, the existence of other products designed to treat adults with Type 2 diabetes did not significantly constrain Takeda's pricing of ACTO*plus* met.  At all relevant times, Takeda's price for ACTO*plus* met was at least 60% above its marginal cost of production and at least 40% above its marginal cost, including marketing costs. Takeda never lowered the price of ACTO*plus* met in response to the pricing of other branded treatments for Type 2 diabetes (or the generic versions of such medications).

204.    Takeda needed to control only ACTO*plus* met and its AB-rated generic equivalents, and no other products, to profitably maintain the price of ACTO*plus* met at supracompetitive levels.  Only the market entry of a competing, AB-rated generic version of ACTO*plus* met would have rendered Takeda unable to profitably maintain supracompetitive prices for ACTO*plus* met.

205.    Takeda knew that entry of a generic version of ACTO*plus* met would be a uniquely significant market event.  Takeda predicted that unlike the entry of other branded treatments for Type 2 diabetes (or the generic versions of such medications), entry of generic ACTO*plus* met would take substantial unit sales from Takeda.  For example, ACTO*plus* met did not lose substantial sales when generic versions of other branded type 2 diabetes drugs entered the market at low prices.  But Takeda predicted that entry of generic ACTO*plus* met would immediately cause branded ACTO*plus* met to lose well more than half of its unit sales.

58

Likewise, Mylan and Teva estimated that their generic versions of ACTO*plus* met would take essentially all of their sales away from branded ACTO*plus* met and few, if any, sales from other branded Type 2 diabetes drugs (or generic versions of such medications).

206.    Takeda, Mylan, and Teva predicted the competitive impact of generic ACTO*plus* met products would be substantial.   Among other things, Defendants predicted that the availability of generic ACTO*plus* met would deliver hundreds of millions of dollars of savings to consumers.

207.    At all relevant times, Takeda sold ACTO*plus* met at prices well in excess of its marginal costs and ACTO*plus* met's competitive price, and enjoyed the resulting high profit margins and corresponding financial benefits—to the financial detriment of Plaintiffs and the ACTO*plus* met Class members.

208.    Takeda had, and exercised, the power to exclude and restrict competition to ACTO*plus* met and its AB-rated bioequivalents.

209.    Takeda, at all relevant times, enjoyed high barriers to entry with respect to competition in the relevant product market due to patent and other regulatory protections, as well as the high cost of entry and expansion.

210.    To the extent Plaintiffs are legally required to prove market power circumstantially by first defining a relevant product market, Plaintiffs allege that the relevant product market is a fixed unit dose of oral pioglitazone hydrochloride and biguanide for the treatment of adults with Type 2 diabetes (*i.e.*, ACTO*plus* met and its AB-rated generic equivalents).   During all relevant times, Takeda profitably maintained the price of ACTO*plus* met well above competitive levels.

211.    The relevant geographic market is the United States and its territories.

212. At all relevant times, Takeda's market share in the relevant geographic market was 100%, confirming its market power.

## XII.  MARKET EFFECTS AND DAMAGES TO THE CLASSES

213. But for the anticompetitive conduct alleged above, generic competition for ACTOS would have begun as early as January 17, 2011, and generic competition for ACTO*plus* met would have begun as early as February 25, 2011.

214. Defendants' anticompetitive conduct had the purpose and effect of restraining competition unreasonably and injuring competition by protecting ACTOS and ACTO*plus* met from generic competition. Defendants' unlawful actions allowed Takeda to maintain a monopoly and exclude competition in the market for ACTOS and its generic equivalents, and maintain supracompetitive prices for ACTO*plus* met, to the detriment of Plaintiffs and the members of the Classes. Defendants' anticompetitive conduct delayed and impaired generic competition and unlawfully enabled Takeda to sell ACTOS and ACTO*plus* met without timely generic competition.

215. Typically, generic drugs are initially priced significantly below the corresponding branded drug to which they are AB-rated. As a result, upon generic entry, end-payors rapidly substitute generic versions of a branded drug for some or all of their purchases. As more generic drug manufacturers enter the market, prices for generic versions of a branded drug predictably plunge even further due to competition between the generic drug manufacturers, and, correspondingly, the branded drug loses even more of its market share. This price competition enables purchasers to (i) purchase generic versions of a branded drug at substantially lower prices, and (ii) purchase the branded drug at a reduced price. Consequently, branded drug

manufacturers have a keen financial interest in delaying and impairing generic drug competition, which, in turn causes purchasers to experience substantial increases in costs.

216.    But for Defendants' anticompetitive conduct, end-payors, such as Plaintiffs and Class members, would have paid less by (i) substituting less-expensive AB-rated generic ACTOS and/or ACTO*plus* met for the more expensive branded ACTOS and/or ACTO*plus* met, (ii) paying reduced prices on their remaining branded ACTOS and/or ACTOplus met purchases, and/or (iii) purchasing generic ACTOS and/or ACTO*plus* met at lower prices sooner.

217.    Moreover, due to Defendants' anticompetitive conduct, other generic drug manufacturers were discouraged from and/or delayed in (i) developing and marketing generic versions of ACTOS and/or ACTO*plus* met, and/or (ii) challenging the validity or infringement of Takeda's patents in court.

218.    At all relevant times during the Class Period, Plaintiffs and the End-Payor Class members indirectly purchased substantial amounts of ACTOS and/or ACTO*plus* met.  As a direct and proximate result of Defendants' illegal conduct, Plaintiffs and the Class members were compelled to pay, and did pay, artificially inflated prices for ACTOS and/or ACTO*plus* met and their generic equivalents.  Plaintiffs and the Class members paid prices substantially greater than the prices they otherwise would have paid absent Defendants' illegal conduct because Class members: (i) were deprived of the opportunity to purchase lower-priced generic ACTOS and/or ACTO*plus* met instead of expensive branded ACTOS and/or ACTO*plus* met, and (ii) paid artificially inflated prices for ACTOS and/or ACTO*plus* met and their generic equivalents.

219.    As a direct and proximate result of Defendants' unlawful anticompetitive scheme and wrongful conduct, Plaintiffs and Class members have sustained (and will continue to sustain) substantial losses and damage to their business and property in the form of overcharges they paid

for ACTOS and/or ACTO*plus* met and their generic equivalents, the exact amount of which will be proven at trial.

220.    Defendants' unlawful conduct deprived Plaintiffs and Class members of the benefits of competition that the antitrust laws were designed to ensure.

### XIII.   ANTITRUST IMPACT

221.    Overcharges for pharmaceuticals at a higher level of distribution generally result in higher prices at every level below.

222.    Wholesalers and retailers passed on the inflated prices of branded ACTOS and ACTO*plus* met and AB-rated generic ACTOS and ACTO*plus* met to Plaintiffs and Class members.

223.    Defendants' anticompetitive conduct enabled them to indirectly charge consumers and third-party payors prices in excess of what Defendants otherwise would have been able to charge absent Defendants' anticompetitive conduct.

224.    The inflated prices paid by Plaintiffs and Class members are traceable to, and the direct, proximate and foreseeable result of, Defendants' overcharges.

225.    General economic theory recognizes that any overcharge at a higher level of distribution in the chain of distribution for ACTOS and ACTO*plus* met results in higher prices at every level below.   Herbert Hovenkamp, *FEDERAL ANTITRUST POLICY, THE LAW OF COMPETITION AND ITS PRACTICE* p. 624 (1994).  Professor Herbert Hovenkamp goes on to state that "[e]very person at every stage in the chain will be poorer as a result of the monopoly price at the top."  He also acknowledges that "[t]heoretically, one can calculate the percentage of any overcharge that a firm at one distribution level will pass on to those at the next level."

226.    Defendants' anticompetitive conduct enabled them to charge consumers indirectly and third-party payors prices in excess of what Defendants otherwise would have been able to charge absent Defendants' anticompetitive conduct.

227.    The prices were inflated as a direct and foreseeable result of Defendants' anticompetitive conduct.

228.    The inflated prices the members of the Classes paid are traceable to, and the foreseeable result of, the overcharges by Defendants.

## XIV.   CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF
**Monopolization and Monopolistic Scheme Under State Law**
**(Asserted by Plaintiffs and the ACTOS Class Against Takeda)**

229.    Plaintiffs hereby incorporate each preceding and succeeding paragraph as though fully set forth herein.

230.    At all relevant times, Takeda possessed substantial market power (*i.e.*, monopoly power) with respect to ACTOS and its generic equivalents.  Takeda possessed the power to control prices in, prevent prices from falling in, and exclude competitors from the sale of ACTOS and its generic equivalents.

231.    Through the overarching anticompetitive scheme, as alleged extensively above, Takeda willfully maintained its monopoly power with respect to ACTOS and its generic equivalents, using restrictive or exclusionary conduct, rather than by means of greater business acumen, and injured Plaintiffs and the ACTOS Class members thereby.  Takeda's exclusionary conduct pursuant to this anticompetitive scheme included (i) improperly listing the '584 Patent and '404 Patent in the Orange Book as drug product patents for ACTOS, (ii) entering into the Exclusion Payment Agreements with Mylan, Ranbaxy, and Actavis, with respect to ACTOS, (iii) intentionally creating a "bottleneck" to prevent later-filing generic manufacturers from entering

63

the market before August 17, 2011, (iv) including the "acceleration clauses" in the agreements

with Mylan, Ranbaxy, and Actavis with the purpose and effect of deterring Teva from unraveling

the anticompetitive agreements, and (v) paying off Teva with the same purpose and effect.

232.    It was Takeda's conscious objective to further its dominance of the sale of

ACTOS and its generic equivalents by and through the overarching anticompetitive scheme.

233.    Takeda's scheme harmed competition as alleged in detail above.

234.    As a direct and proximate result of Takeda's illegal and monopolistic conduct, as

alleged herein, Plaintiffs and ACTOS Class members were injured.

235.    By engaging in the foregoing wrongful conduct, Takeda intentionally and

wrongfully maintained monopoly power over the sale of ACTOS and its generic equivalents, in

violation of the following state laws:

    a.    Arizona Rev. Stat. §§ 44-1403, *et seq.*, with respect to purchases of ACTOS in Arizona by members of the ACTOS Class.

    b.    Cal. Bus. & Prof Code §§ 17200, *et seq.*, and California common law with respect to purchases of ACTOS in California by members of the ACTOS Class.

    c.    D.C. Code §§ 28-4503, *et seq.*, with respect to purchases of ACTOS in the District of Columbia by members of the ACTOS Class.

    d.    Fla. Stat. §§ 542.15, *et seq.* and §§ 501.201, *et seq.*, with respect to purchases of ACTOS in Florida by members of the ACTOS Class.

    e.    Hawaii Code §480, *et seq.*, with respect to purchases of ACTOS in Hawaii by members of the ACTOS Class.

    f.    740 Ill. Comp. Stat. 10/3, *et seq.*, with respect to purchases of ACTOS in Illinois by members of the ACTOS Class.

    g.    Iowa Code §§ 553.5, *et seq.*, with respect to purchases of ACTOS in Iowa by members of the ACTOS Class.

    h.    Kansas Stat. Ann § 50-161(b), *et seq.*, with respect to purchases of ACTOS in Kansas by members of the ACTOS Class.

i.      Me. Rev. Stat. Ann. 10, §§ 1102, *et seq.*, with respect to purchases of ACTOS in Maine by members of the ACTOS Class.

j.      Mich. Comp. Laws Ann. §§ 445.773, *et seq.*, with respect to purchases of ACTOS in Michigan by members of the ACTOS Class.

k.      Minn. Stat. §§ 325D.49, *et seq.*, and Minn. Stat. § 8.31, with respect to purchases of ACTOS in Minnesota by members of the ACTOS Class.

l.      Miss. Code Ann. §§ 75-21-3, *et seq.*, with respect to purchases of ACTOS in Mississippi by members of the ACTOS Class.

m.     Neb. Code Ann. §§ 59-802, *et seq.*, with respect to purchases of ACTOS in Nebraska by members of the ACTOS Class.

n.      Nev. Rev. Stat. Ann. §§ 598A.060, *et seq.*, with respect to purchases of ACTOS in Nevada by members of the ACTOS Class.

o.      N.H. Rev. Stat. Ann. §§ 356.11, with respect to purchases of ACTOS in New Hampshire by members of the ACTOS Class.

p.      N.M. Stat. Ann. §§ 57-1-2, *et seq.*, with respect to purchases of ACTOS in New Mexico by members of the ACTOS Class.

q.      N.Y, Gen. Bus. Law §340, *et seq.*, ("The Donnelly Act"), with respect to purchases of ACTOS in New York by members of the ACTOS Class.

r.      N.C. Gen. Stat. §§ 75-2.1, *et seq.*, with respect to purchases of ACTOS in North Carolina by members of the ACTOS Class.

s.      N.D. Cent. Code §§ 51-08.1-03, *et seq.*, with respect to purchases of ACTOS in North Dakota by members of the ACTOS Class.

t.      Or. Rev. Stat. §§ 646.705, *et seq.*, with respect to purchases of ACTOS in Oregon by members of the ACTOS Class.

u.      10 L.P.R.A. §§ 260, *et seq.*, with respect to purchases of ACTOS in Puerto Rico by members of the ACTOS Class.

v.      R.I. Gen. Laws §§ 6-36-5, *et seq.*, with respect to purchases in Rhode Island by members of the ACTOS Class.

w.     S.D. Codified Laws §§ 37-1-3.2, *et seq.*, with respect to purchases of ACTOS in South Dakota by members of the ACTOS Class.

x.      Tenn. Code Ann §§ 47-25-101, *et seq.,* with respect to purchases of ACTOS in Tennessee by members of the ACTOS Class.

y.      Utah Code Ann. §§ 76-10-911, *et seq.*, with respect to purchases of ACTOS in Utah by members of the ACTOS Class who reside in Utah.

z.      Vt. Stat. Ann. tit. 9, §§ 2453, *et seq.*, with respect to purchases of ACTOS in Vermont by members of the ACTOS Class.

aa.     W.Va. Code §§ 47-18-4, *et seq.*, with respect to purchases of ACTOS in West Virginia by members of the ACTOS Class.

bb.     Wis. Stat. §§ 133.03, *et seq.*, with respect to purchases of ACTOS in Wisconsin by members of the ACTOS Class.

236.    Plaintiffs and ACTOS Class members have been (and will continue to be) injured in their business or property by reason of Takeda's antitrust violations, in that Plaintiffs and ACTOS Class members (i) were denied the opportunity to purchase lower-priced generic ACTOS, and (ii) paid higher prices for branded ACTOS than they would have paid in the absence of the unlawful conduct. These injuries are of the type the laws of the above States, the District of Columbia and Puerto Rico were designed to prevent, and flow from that which makes the conduct unlawful.

237.    Plaintiffs and ACTOS Class members seek damages and multiple damages as permitted by law for their injuries.

## SECOND CLAIM FOR RELIEF
### Attempted Monopolization Under State Law
### (Asserted by Plaintiffs and the ACTOS Class Against Takeda)

238.    Plaintiffs hereby incorporate each preceding and succeeding paragraph as though fully set forth herein.

239.    Takeda, through its overarching anticompetitive scheme, specifically intended to maintain monopoly power in the relevant market. It was Takeda's conscious objective to control prices and/or to exclude competition in the relevant market.

66

240.    The natural, intended, and foreseeable consequence of Takeda's overarching anticompetitive scheme was to control prices and exclude competition in the relevant market, to the extent it did not succeed.

241.    There was a substantial and real chance, a reasonable likelihood, and/or a dangerous probability that Takeda would succeed in and achieve its goal of maintaining monopoly power in the relevant market.

242.    As a direct and proximate result of Takeda's illegal and monopolistic conduct, Plaintiffs and the ACTOS Class members were harmed as alleged in detail above.

243.    By engaging in the foregoing conduct, Takeda intentionally and wrongfully attempted to monopolize the relevant market in violation of the following state laws:

    a.    Arizona Rev. Stat. §§ 44-1403, *et seq.*, with respect to purchases of ACTOS in Arizona by members of the ACTOS Class.

    b.    Cal. Bus. & Prof Code §§ 17200, *et seq.*, and California common law with respect to purchases of ACTOS in California by members of the ACTOS Class.

    c.    D.C. Code §§ 28-4503, *et seq.*, with respect to purchases of ACTOS in the District of Columbia by members of the ACTOS Class.

    d.    Fla. Stat. §§ 542.15, *et seq*. and §§ 501.201, *et seq.*, with respect to purchases of ACTOS in Florida by members of the ACTOS Class.

    e.    Hawaii Code §480, *et seq.*, with respect to purchases of ACTOS in Hawaii by members of the ACTOS Class.

    f.    740 Ill. Comp. Stat. 10/3, *et seq.*, with respect to purchases of ACTOS in Illinois by members of the ACTOS Class.

    g.    Iowa Code §§ 553.5 *et seq.*, with respect to purchases of ACTOS in Iowa by members of the ACTOS Class.

    h.    Me. Rev. Stat. Ann. 10, §§ 1102, *et seq.*, with respect to purchases of ACTOS in Maine by members of the ACTOS Class.

67

i.      Mich. Comp. Laws Ann. §§ 445.773, *et seq.*, with respect to purchases of ACTOS in Michigan by members of the ACTOS Class.

j.      Minn. Stat. §§ 325D.49, *et seq.*, and Minn. Stat. § 8.31, with respect to purchases of ACTOS in Minnesota by members of the ACTOS Class.

k.      Miss. Code Ann. §§ 75-21-3, *et seq.*, with respect to purchases of ACTOS in Mississippi by members of the ACTOS Class.

l.      Neb. Code Ann. §§ 59-802, *et seq.*, with respect to purchases of ACTOS in Nebraska by members of the ACTOS Class.

m.      Nev. Rev. Stat. Ann. §§ 598A.060, *et seq.*, with respect to purchases of ACTOS in Nevada by members of the ACTOS Class.

n.      N.H. Rev. Stat. Ann. §§ 356.11, et *seq.*, with respect to purchases of ACTOS in New Hampshire by members of the ACTOS Class.

o.      N.M. Stat. Ann. §§ 57-1-2, *et seq.*, with respect to purchases of ACTOS in New Mexico by members of the ACTOS Class.

p.      N.C. Gen. Stat. §§ 75-2.1, *et seq.*, with respect to purchases of ACTOS in North Carolina by members of the ACTOS Class.

q.      N.D. Cent. Code §§ 51-08.1-03, *et seq.*, with respect to purchases of ACTOS in North Dakota by members of the ACTOS Class.

r.      Or. Rev. Stat. §§ 646.705, *et seq.*, with respect to purchases of ACTOS in Oregon by members of the ACTOS Class.

s.      10 L.P.R.A. §§ 260, *et seq.*, with respect to purchases of ACTOS in Puerto Rico by members of the ACTOS Class.

t.      R.I. Gen. Laws §§ 6-36-5 *et seq.,* with respect to purchases in Rhode Island by members of the ACTOS Class.

u.      S.D. Codified Laws §§ 37-1-3.2, *et seq.*, with respect to purchases of ACTOS in South Dakota by members of the ACTOS Class.

v.      Tenn. Code Ann §§ 47-25-101, *et seq.,* with respect to purchases of ACTOS in Tennessee by members of the ACTOS Class.

w.      Utah Code Ann. §§ 76-10-911, *et seq.*, with respect to purchases of ACTOS in Utah by members of the ACTOS Class who reside in Utah.

x.      Vt. Stat. Ann. tit. 9, §§ 2453, *et seq.*, with respect to purchases of ACTOS in Vermont by members of the ACTOS Class.

y.      W.Va. Code §§ 47-18-4, *et seq.*, with respect to purchases of ACTOS in West Virginia by members of the ACTOS Class.

z.      Wis. Stat. §§ 133.03, *et seq.*, with respect to purchases of ACTOS in Wisconsin by members of the ACTOS Class.

244.    Plaintiffs and ACTOS Class members have been (and will continue to be) injured in their business or property by reason of Takeda's antitrust violations, in that Plaintiffs and ACTOS Class members (i) were denied the opportunity to purchase lower-priced generic ACTOS, and (ii) paid higher prices for branded ACTOS than they would have paid in the absence of the unlawful conduct. These injuries are of the type the laws of the above States, the District of Columbia and Puerto Rico were designed to prevent, and flow from that which makes the conduct unlawful.

245.    Plaintiffs and ACTOS Class members seek damages and multiple damages as permitted by law for their injuries.

### THIRD CLAIM FOR RELIEF
**Conspiracy and Combination in Restraint of Trade Under State Law**
**(Asserted by Plaintiffs and the ACTOS Class Against Takeda and Mylan)**

246.    Plaintiffs hereby incorporate each preceding and succeeding paragraph as though fully set forth herein.

247.    The Exclusion Payment Agreement between Takeda and Mylan regarding ACTOS involves (i) large and unjustified payments from Takeda to Mylan, and (ii) an agreement by Mylan to delay marketing its generic ACTOS. The payments from Takeda to Mylan under the Agreement were the *quid pro quo* for Mylan's agreement to delay marketing its generic versions of ACTOS. Absent the payments, Mylan would not have agreed to delay marketing its generic versions of ACTOS and would have entered the market sooner than it did.

69

248.    The purpose and effect of the payments flowing from Takeda to Mylan under the agreement was to delay generic competition to ACTOS.  There is and was no legitimate, non-pretextual, procompetitive business justification for the payments that outweighs their harmful effect.  Even if there were some such conceivable justification, the payments were not necessary to achieve such a purpose.

249.    The purpose and effect of the unlawful Exclusion Payment Agreement between Takeda and Mylan was to allocate 100% of the market for ACTOS and its generic equivalents in the United States to Takeda, delay the sale of generic ACTOS products, and fix the price at which consumers and other end-payors would pay for ACTOS and its generic equivalents at the higher, branded price.

250.    The Exclusion Payment Agreement harmed competition.

251.    As a direct and proximate result of Takeda's and Mylan's unlawful restraint of trade, Plaintiffs and ACTOS Class members paid artificially inflated prices for ACTOS and its generic equivalents as described herein, and were harmed as a result.

252.    By engaging in the foregoing conduct, Takeda and Mylan intentionally and wrongfully engaged in a contract, combination, or conspiracy in restraint of trade in violation of:

    a.    Arizona Rev. Stat. §§ 44-102, *et seq.*, with respect to purchases of ACTOS in Arizona by members of the ACTOS Class.

    b.    Cal. Bus. Code §§ 16700, *et seq.*, and Code §§ 17200, *et seq.*, with respect to purchases of ACTOS in California by members of the ACTOS Class.

    c.    D.C. Code Ann. §§ 28-4502, *et seq.*, with respect to purchases of ACTOS in the District of Columbia by members of the ACTOS Class.

    d.    Fla. Stat. §§ 542.15, *et seq.* and §§ 501.201, *et seq.*, with respect to purchases of ACTOS in Florida by members of the ACTOS Class.

e.      Hawaii Code § 480, *et seq.*, with respect to purchases of ACTOS in Hawaii by members of the ACTOS Class.

f.      740 Ill. Comp. Stat. 10/3, *et seq.*, with respect to purchases of ACTOS in Illinois by members of the ACTOS Class.

g.      Iowa Code § 553, *et seq.*, with respect to purchases of ACTOS in Iowa by members of the ACTOS Class.

h.      Kan. Stat. Ann. §§ 50-101, *et seq.*, with respect to purchases of ACTOS in Kansas by members of the ACTOS Class.

i.      Me. Rev. Stat. Ann. 10, § 1101, *et seq.*, with respect to purchases of ACTOS in Maine by members of the ACTOS Class.

j.      Mich. Comp. Laws Ann. §§ 445.771, *et seq.*, with respect to purchases of ACTOS in Michigan by members of the ACTOS Class.

k.      Minn. Stat. §§ 325D.52, *et seq.*, with respect to purchases of ACTOS Minnesota by members of the ACTOS Class.

l.      Miss. Code Ann. §§ 75-21-1, *et seq.*, with respect to purchases of ACTOS in Mississippi by members of the ACTOS Class.

m.      Neb. Code Ann. §§ 59-801, *et seq.*, with respect to purchases of ACTOS in Nebraska by members of the ACTOS Class.

n.      Nev. Rev. Stat. Ann. § 598A, *et seq.*, with respect to purchases of ACTOS in Nevada by members of the ACTOS Class.

o.      N.M. Stat. Ann. §§ 57-1-1, *et seq.*, with respect to purchases of ACTOS in New Mexico by members of the ACTOS Class.

p.      New York General Business Law § 340, *et seq.*, with respect to purchases of ACTOS in New York by members of the ACTOS Class.

q.      N.C. Gen. Stat. §§ 75-1, *et seq.*, with respect to purchases of ACTOS in North Carolina by members of the ACTOS Class.

r.      N.D. Cent. Code § 51-08.1-01, *et seq.*, with respect to purchases of ACTOS in North Dakota by members of the ACTOS Class.

s.      Or. Rev. Stat. §§ 646.705, *et seq.,* with respect to purchases of ACTOS in Oregon by members of the ACTOS Class.

t.    10 L.P.R.A. § 258 with respect to purchases of ACTOS in the Commonwealth of Puerto Rico by members of the ACTOS Class.

u.    R.I. Gen. Laws §§ 6-36-5, *et seq.*, with respect to purchases of ACTOS in Rhode Island by members of the ACTOS Class.

v.    S.D. Codified Laws Ann. § 37-1, *et seq.*, with respect to purchases of ACTOS in South Dakota by members of the ACTOS Class.

w.    Tenn. Code Ann. §§ 47-25-101, *et seq.*, with respect to purchases of ACTOS in Tennessee by members of the ACTOS Class.

x.    Utah Code Ann. §§ 76-10-911, *et seq.*, with respect to purchases of ACTOS in Utah by members of the ACTOS Class who reside in Utah.

y.    Vt. Stat. Ann. tit. 9, § 2453, *et seq.*, with respect to purchases of ACTOS in Vermont by members of the ACTOS Class.

z.    W.Va. Code §§ 47-18-1, *et seq.*, with respect to purchases of ACTOS in West Virginia by members of the ACTOS Class.

aa.    Wis. Stat. § 133.01, *et seq.*, with respect to purchases of ACTOS in Wisconsin by members of the ACTOS Class.

253.    Plaintiffs and ACTOS Class members have been (and will continue to be) injured in their business or property by reason of Takeda's and Mylan's antitrust violations, in that Plaintiffs and ACTOS Class members (i) were denied the opportunity to purchase lower-priced generic ACTOS, and (ii) paid higher prices for branded ACTOS than they would have paid in the absence of the unlawful conduct. These injuries are of the type the laws of the above States, the District of Columbia and Puerto Rico were designed to prevent, and flow from that which makes the conduct unlawful.

254.    Plaintiffs and ACTOS Class members seek damages and multiple damages as permitted by law for their injuries.

**FOURTH CLAIM FOR RELIEF**
**Conspiracy and Combination in Restraint of Trade Under State Law**
**(Asserted by Plaintiffs and the ACTOS Class Against Takeda and Ranbaxy)**

255.    Plaintiffs hereby incorporate each preceding and succeeding paragraph as though fully set forth herein.

256.    The Exclusion Payment Agreement between Takeda and Ranbaxy regarding ACTOS involves (i) large and unjustified payments from Takeda to Ranbaxy, and (ii) an agreement by Ranbaxy to delay marketing its generic versions of ACTOS. The payments from Takeda to Ranbaxy under the Agreement were the *quid pro quo* for Ranbaxy's agreement to delay marketing its generic versions of ACTOS.  Absent the payments, Ranbaxy would not have agreed to delay marketing its generic versions of ACTOS, and would have entered the market sooner than it did.

257.    The purpose and effect of the payments flowing from Takeda to Ranbaxy under the Exclusion Payment Agreement was to delay generic competition to ACTOS.  There is and was no legitimate, non-pretextual, procompetitive business justification for the payments that outweighs their harmful effect.  Even if there were some such conceivable justification, the payments were not necessary to achieve such a purpose.

258.    The purpose and effect of the unlawful Exclusion Payment Agreement between Takeda and Ranbaxy was to allocate 100% of the market for ACTOS and its generic equivalents in the United States to Takeda, delay the sales of generic ACTOS products, and fix the price at which consumers and other end-payors pay for ACTOS and its generic equivalents at the higher, branded price.

259.    The Exclusion Payment Agreement harmed competition.

73

260.    As a direct and proximate result of Takeda's and Ranbaxy's unlawful restraint of trade, Plaintiffs and ACTOS Class members paid artificially inflated prices for ACTOS and its generic equivalents as described herein, and were harmed as a result.

261.    By engaging in the foregoing conduct, Takeda and Ranbaxy intentionally and wrongfully engaged in a contract, combination, or conspiracy in restraint of trade in violation of:

a.    Arizona Rev. Stat. §§ 44-102, e*t seq.*, with respect to purchases of ACTOS in Arizona by members of the ACTOS Class.

b.    Cal. Bus. Code §§ 16700, *et seq.*, and Code §§ 17200, *et seq.*, with respect to purchases of ACTOS in California by members of the ACTOS Class.

c.    D.C. Code Ann. §§ 28-4502, *et seq.*, with respect to purchases of ACTOS in the District of Columbia by members of the ACTOS Class.

d.    Fla. Stat. §§ 542.15, *et seq.* and §§ 501.201, *et seq.*, with respect to purchases of ACTOS in Florida by members of the ACTOS Class.

e.    Hawaii Code § 480, *et seq.*, with respect to purchases of ACTOS in Hawaii by members of the ACTOS Class.

f.    740 Ill. Comp. Stat. 10/3, *et seq.*, with respect to purchases of ACTOS in Illinois by members of the ACTOS Class.

g.    Iowa Code § 553, *et seq.*, with respect to purchases of ACTOS in Iowa by members of the ACTOS Class.

h.    Kan. Stat. Ann. §§ 50-101, *et seq.*, with respect to purchases of ACTOS in Kansas by members of the ACTOS Class.

i.    Me. Rev. Stat. Ann. 10, § 1101, *et seq.*, with respect to purchases of ACTOS in Maine by members of the ACTOS Class.

j.    Mich. Comp. Laws Ann. §§ 445.771, *et seq.*, with respect to purchases of ACTOS in Michigan by members of the ACTOS Class.

k.    Minn. Stat. §§ 325D.52, *et seq.*, with respect to purchases of ACTOS Minnesota by members of the ACTOS Class.

l.    Miss. Code Ann. §§ 75-21-1, *et seq.*, with respect to purchases of ACTOS in Mississippi by members of the ACTOS Class.

m.      Neb. Code Ann. §§ 59-801, *et seq.*, with respect to purchases of ACTOS in Nebraska by members of the ACTOS Class.

n.      Nev. Rev. Stat. Ann. § 598A, *et seq.*, with respect to purchases of ACTOS in Nevada by members of the ACTOS Class.

o.      N.M. Stat. Ann. §§ 57-1-1, *et seq.*, with respect to purchases of ACTOS in New Mexico by members of the ACTOS Class.

p.      New York General Business Law § 340, *et seq.*, with respect to purchases of ACTOS in New York by members of the ACTOS Class.

q.      N.C. Gen. Stat. §§ 75-1, *et seq.*, with respect to purchases of ACTOS in North Carolina by members of the ACTOS Class.

r.      N.D. Cent. Code § 51-08.1-01, *et seq.*, with respect to purchases of ACTOS in North Dakota by members of the ACTOS Class.

s.      Or. Rev. Stat. §§ 646.705, *et seq.,* with respect to purchases of ACTOS in Oregon by members of the ACTOS Class.

t.      10 L.P.R.A. § 258 with respect to purchases of ACTOS in the Commonwealth of Puerto Rico by members of the ACTOS Class.

u.      R.I. Gen. Laws §§ 6-36-5, *et seq.* with respect to purchases of ACTOS in Rhode Island by members of the ACTOS Class.

v.      S.D. Codified Laws Ann. § 37-1, *et seq.*, with respect to purchases of ACTOS in South Dakota by members of the ACTOS Class.

w.      Tenn. Code Ann. §§ 47-25-101, *et seq.*, with respect to purchases of ACTOS in Tennessee by members of the ACTOS Class.

x.      Utah Code Ann. §§ 76-10-911, *et seq.*, with respect to purchases of ACTOS in Utah by residents of Utah who are members of the ACTOS Class.

y.      Vt. Stat. Ann. tit. 9, § 2453, *et seq.*, with respect to purchases of ACTOS in Vermont by members of the ACTOS Class.

z.      W.Va. Code §§ 47-18-1, *et seq.*, with respect to purchases of ACTOS in West Virginia by members of the ACTOS Class.

aa.     Wis. Stat. § 133.01, *et seq.*, with respect to purchases of ACTOS in Wisconsin by members of the ACTOS Class.

262.    Plaintiffs and ACTOS Class members have been (and will continue to be) injured in their business or property by reason of Takeda's and Ranbaxy's antitrust violations, in that Plaintiffs and ACTOS Class members (i) were denied the opportunity to purchase lower-priced generic ACTOS, and (ii) paid higher prices for branded ACTOS than they would have paid in the absence of the unlawful conduct. These injuries are of the type the laws of the above States, the District of Columbia and Puerto Rico were designed to prevent, and flow from that which makes the conduct unlawful.

263.    Plaintiffs and ACTOS Class members seek damages and multiple damages as permitted by law for their injuries.

**FIFTH CLAIM FOR RELIEF**
**Conspiracy and Combination in Restraint of Trade Under State Law**
**(Asserted by Plaintiffs and the ACTOS Class Against Takeda and Actavis)**

264.    Plaintiffs hereby incorporate each preceding and succeeding paragraph as though fully set forth herein.

265.    The Exclusion Payment Agreement between Takeda and Actavis regarding ACTOS involves (i) large and unjustified payments from Takeda to Actavis, and (ii) an agreement by Actavis to delay marketing its generic versions ACTOS. The payments from Takeda to Actavis under the Agreement were the *quid pro quo* for Actavis's agreement to delay marketing its generic versions of ACTOS. Absent the payments, Actavis would not have agreed to delay marketing its generic versions of ACTOS, and would have entered the market sooner than it did.

266.    The purpose and effect of the payments flowing from Takeda to Actavis under the Exclusion Payment Agreement was to delay generic competition to ACTOS. There is and was no legitimate, non-pretextual, procompetitive business justification for the payments that outweighs

their harmful effect. Even if there were some such conceivable justification, the payments were not necessary to achieve such a purpose.

267.    The purpose and effect of the unlawful Exclusion Payment Agreement between Takeda and Actavis was to allocate 100% of the market for ACTOS and its generic equivalents in the United States to Takeda, delay the sales of generic ACTOS products, and fix the price at which consumers and other end-payors pay for ACTOS and its generic equivalents at the higher, branded price.

268.    The Exclusion Payment Agreement harmed competition.

269.    As a direct and proximate result of Takeda's and Actavis's unlawful restraint of trade, Plaintiffs and ACTOS Class members paid artificially inflated prices for ACTOS and its generic equivalents as described herein, and were harmed as a result.

270.    By engaging in the foregoing conduct, Takeda and Actavis intentionally and wrongfully engaged in a contract, combination, or conspiracy in restraint of trade in violation of:

      a.    Arizona Rev. Stat. §§ 44-102, *et seq.*, with respect to purchases of ACTOS in Arizona by members of the ACTOS Class.

      b.    Cal. Bus. Code §§ 16700, *et seq.*, and Code §§ 17200, *et seq.*, with respect to purchases of ACTOS in California by members of the ACTOS Class.

      c.    D.C. Code Ann. §§ 28-4502, *et seq.*, with respect to purchases of ACTOS in the District of Columbia by members of the ACTOS Class.

      d.    Fla. Stat. §§ 542.15, *et seq.* and §§ 501.201, *et seq.*, with respect to purchases of ACTOS in Florida by members of the ACTOS Class.

      e.    Hawaii Code § 480, *et seq.*, with respect to purchases of ACTOS in Hawaii by members of the ACTOS Class.

      f.    740 Ill. Comp. Stat. 10/3, *et seq.*, with respect to purchases of ACTOS in Illinois by members of the ACTOS Class.

g.     Iowa Code § 553, *et seq.*, with respect to purchases of ACTOS in Iowa by members of the ACTOS Class.

h.     Kan. Stat. Ann. §§ 50-101, *et seq.*, with respect to purchases of ACTOS in Kansas by members of the ACTOS Class.

i.     Me. Rev. Stat. Ann. 10, § 1101, *et seq.*, with respect to purchases of ACTOS in Maine by members of the ACTOS Class.

j.     Mich. Comp. Laws Ann. §§ 445.771, *et seq.*, with respect to purchases of ACTOS in Michigan by members of the ACTOS Class.

k.     Minn. Stat. §§ 325D.52, *et seq.*, with respect to purchases of ACTOS Minnesota by members of the ACTOS Class.

l.     Miss. Code Ann. §§ 75-21-1, *et seq.*, with respect to purchases of ACTOS in Mississippi by members of the ACTOS Class.

m.     Neb. Code Ann. §§ 59-801, *et seq.*, with respect to purchases of ACTOS in Nebraska by members of the ACTOS Class.

n.     Nev. Rev. Stat. Ann. § 598A, *et seq.*, with respect to purchases of ACTOS in Nevada by members of the ACTOS Class.

o.     N.M. Stat. Ann. §§ 57-1-1, *et seq.*, with respect to purchases of ACTOS in New Mexico by members of the ACTOS Class.

p.     New York General Business Law § 340, *et seq.*, with respect to purchases of ACTOS in New York by members of the ACTOS Class.

q.     N.C. Gen. Stat. §§ 75-1, *et seq.*, with respect to purchases of ACTOS in North Carolina by members of the ACTOS Class.

r.     N.D. Cent. Code § 51-08.1-01, *et seq.*, with respect to purchases of ACTOS in North Dakota by members of the ACTOS Class.

s.     Or. Rev. Stat. §§ 646.705, *et seq.,* with respect to purchases of ACTOS in Oregon by members of the ACTOS Class.

t.     10 L.P.R.A. § 258 with respect to purchases of ACTOS in the Commonwealth of Puerto Rico by members of the ACTOS Class.

u.     R.I. Gen. Laws §§ 6-36-5, *et seq.* with respect to purchases of ACTOS in Rhode Island by members of the ACTOS Class.

78

v.     S.D. Codified Laws Ann. § 37-1, *et seq.*, with respect to purchases of ACTOS in South Dakota by members of the ACTOS Class.

w.    Tenn. Code Ann. §§ 47-25-101, *et seq.*, with respect to purchases of ACTOS in Tennessee by members of the ACTOS Class.

x.     Utah Code Ann. §§ 76-10-911, *et seq.*, with respect to purchases of ACTOS in Utah by residents of Utah who are members of the ACTOS Class.

y.     Vt. Stat. Ann. tit. 9, § 2453, *et seq.*, with respect to purchases of ACTOS in Vermont by members of the ACTOS Class.

z.     W.Va. Code §§ 47-18-1, *et seq.*, with respect to purchases of ACTOS in West Virginia by members of the ACTOS Class.

aa.   Wis. Stat. § 133.01, *et seq.*, with respect to purchases of ACTOS in Wisconsin by members of the ACTOS Class.

271.   Plaintiffs and ACTOS Class members have been (and will continue to be) injured in their business or property by reason of Takeda's and Actavis's antitrust violations, in that Plaintiffs and ACTOS Class members (i) were denied the opportunity to purchase lower-priced generic ACTOS, and (ii) paid higher prices for branded ACTOS than they would have paid in the absence of the unlawful conduct. These injuries are of the type the laws of the above States, the District of Columbia and Puerto Rico were designed to prevent, and flow from that which makes the conduct unlawful.

272.   Plaintiffs and ACTOS Class members seek damages and multiple damages as permitted by law for their injuries.

**SIXTH CLAIM FOR RELIEF**
**Conspiracy and Combination in Restraint of Trade Under State Law**
**(Asserted by Plaintiffs and the ACTOS Class Against Takeda and Teva)**

273.   Plaintiffs hereby incorporate each preceding and succeeding paragraph as though fully set forth herein.

274.    The Exclusion Payment Agreement between Takeda and Teva involves (i) large and unjustified payments from Takeda to Teva, and (ii) an agreement by Teva to delay marketing its generic versions of ACTOS. The payments from Takeda to Teva under the Agreement were the *quid pro quo* for Teva's agreement to delay marketing its generic versions of ACTOS. Absent the payments, Teva would not have agreed to delay marketing its generic versions of ACTOS, and would have entered the market sooner than it did.

275.    The purpose and effect of the payments flowing from Takeda to Teva under the Exclusion Payment Agreement was to delay generic competition to ACTOS. There is and was no legitimate, non-pretextual, procompetitive business justification for the payments that outweighs their harmful effect. Even if there were some such conceivable justification, the payments were not necessary to achieve such a purpose.

276.    The purpose and effect of the unlawful Exclusion Payment Agreement between Takeda and Teva was to allocate 100% of the market for ACTOS and its generic equivalents in the United States to Takeda, delay the sales of generic ACTOS products, and fix the price at which consumers and other end-payors pay for ACTOS and its generic equivalents at the higher, branded price.

277.    The Exclusion Payment Agreement harmed competition.

278.    As a direct and proximate result of Takeda's and Teva's unlawful restraint of trade, Plaintiffs and ACTOS Class members paid artificially inflated prices for ACTOS and its generic equivalents as described herein, and were harmed as a result.

279.    By engaging in the foregoing conduct, Takeda and Teva intentionally and wrongfully engaged in a contract, combination, or conspiracy in restraint of trade in violation of:

      a.    Arizona Rev. Stat. §§ 44-102, *et seq.*, with respect to purchases of ACTOS in Arizona by members of the ACTOS Class.

b.      Cal. Bus. Code §§ 16700, *et seq.*, and Code §§ 17200, *et seq.*, with respect to purchases of ACTOS in California by members of the ACTOS Class.

c.      D.C. Code Ann. §§ 28-4502, *et seq.*, with respect to purchases of ACTOS in the District of Columbia by members of the ACTOS Class.

d.      Fla. Stat. §§ 542.15, *et seq.* and §§ 501.201, *et seq.*, with respect to purchases of ACTOS in Florida by members of the ACTOS Class.

e.      Hawaii Code § 480, et seq., with respect to purchases of ACTOS in Hawaii by members of the ACTOS Class.

f.      740 Ill. Comp. Stat. 10/3, *et seq.*, with respect to purchases of ACTOS in Illinois by members of the ACTOS Class.

g.      Iowa Code § 553, et seq., with respect to purchases of ACTOS in Iowa by members of the ACTOS Class.

h.      Kan. Stat. Ann. §§ 50-101, *et seq.*, with respect to purchases of ACTOS in Kansas by members of the ACTOS Class.

i.      Me. Rev. Stat. Ann. 10, § 1101, *et seq.*, with respect to purchases of ACTOS in Maine by members of the ACTOS Class.

j.      Mich. Comp. Laws Ann. §§ 445.771, *et seq.*, with respect to purchases of ACTOS in Michigan by members of the ACTOS Class.

k.      Minn. Stat. §§ 325D.52, *et seq.*, with respect to purchases of ACTOS Minnesota by members of the ACTOS Class.

l.      Miss. Code Ann. §§ 75-21-1, *et seq.*, with respect to purchases of ACTOS in Mississippi by members of the ACTOS Class.

m.      Neb. Code Ann. §§ 59-801, *et seq.*, with respect to purchases of ACTOS in Nebraska by members of the ACTOS Class.

n.      Nev. Rev. Stat. Ann. § 598A, *et seq.*, with respect to purchases of ACTOS in Nevada by members of the ACTOS Class.

o.      N.M. Stat. Ann. §§ 57-1-1, *et seq.*, with respect to purchases of ACTOS in New Mexico by members of the ACTOS Class.

p.      New York General Business Law § 340, *et seq.*, with respect to purchases of ACTOS in New York by members of the ACTOS Class.

q.  N.C. Gen. Stat. §§ 75-1, *et seq.*, with respect to purchases of ACTOS in North Carolina by members of the ACTOS Class.

r.  N.D. Cent. Code § 51-08.1-01, *et seq.*, with respect to purchases of ACTOS in North Dakota by members of the ACTOS Class.

s.  Or. Rev. Stat. §§ 646.705, *et seq.*, with respect to purchases of ACTOS in Oregon by members of the ACTOS Class.

t.  10 L.P.R.A. § 258 with respect to purchases of ACTOS in the Commonwealth of Puerto Rico by members of the ACTOS Class.

u.  R.I. Gen. Laws §§ 6-36-5, *et seq.*, with respect to purchases of ACTOS in Rhode Island by members of the ACTOS Class.

v.  S.D. Codified Laws Ann. § 37-1, *et seq.*, with respect to purchases of ACTOS in South Dakota by members of the ACTOS Class.

w.  Tenn. Code Ann. §§ 47-25-101, *et seq.*, with respect to purchases of ACTOS in Tennessee by members of the ACTOS Class.

x.  Utah Code Ann. §§ 76-10-911, *et seq.*, with respect to purchases of ACTOS in Utah by residents of Utah who are members of the ACTOS Class.

y.  Vt. Stat. Ann. tit. 9, § 2453, *et seq.*, with respect to purchases of ACTOS in Vermont by members of the ACTOS Class.

z.  W.Va. Code §§ 47-18-1, *et seq.*, with respect to purchases of ACTOS in West Virginia by members of the ACTOS Class.

aa.  Wis. Stat. § 133.01, *et seq.*, with respect to purchases of ACTOS in Wisconsin by members of the ACTOS Class.

280.    Plaintiffs and ACTOS Class members have been (and will continue to be) injured in their business or property by reason of Takeda's and Teva's antitrust violations, in that Plaintiffs and ACTOS Class members (i) were denied the opportunity to purchase lower-priced generic ACTOS, and (ii) paid higher prices for branded ACTOS than they would have paid in the absence of the unlawful conduct. These injuries are of the type the laws of the above States, the District of Columbia and Puerto Rico were designed to prevent, and flow from that which makes the conduct unlawful.

281.    Plaintiffs and ACTOS Class members seek damages and multiple damages as permitted by law for their injuries.

## SEVENTH CLAIM FOR RELIEF
### Conspiracy and Combination in Restraint of Trade Under State Law
### (Asserted by Plaintiffs and the ACTOS Class Against All Defendants)

282.    Plaintiffs hereby incorporate each preceding and succeeding paragraph as though fully set forth herein.

283.    Through an overarching anticompetitive scheme, including the Exclusion Payment Agreements between Takeda and each of Mylan, Ranbaxy, Actavis, and Teva, all Defendants conspired to block and delay the entry into the market of generic ACTOS. The purpose and effect of the conspiracy was to allocate 100% of the market for ACTOS and its generic equivalents in the United States to Takeda, delay the sale of generic ACTOS products, and fix the price at which consumers and other end-payors would pay for ACTOS and its generic equivalents at the higher, branded price. Absent the conspiracy, generic versions of ACTOS would have entered the market sooner than they did.

284.    There is and was no legitimate, non-pretextual, procompetitive business justification for the conspiracy that outweighs its harmful effect. Even if there were some such conceivable justification, the unlawful Exclusion Payment Agreements between and among the Defendants were not necessary to achieve such a purpose.

285.    Each Defendant committed at least one overt act in furtherance of the conspiracy. Among other things, (i) each Defendant agreed to the same entry date, (ii) each Defendant agreed to pay or accept an exclusion payment in order to agree to the same entry date, (iii) Mylan, Ranbaxy, and Actavis agreed that Takeda could advise the other Defendants of the market entry date to which Defendants had agreed, (iv) Mylan, Ranbaxy, and Actavis agreed

with Takeda to include an acceleration clause in their respective Exclusion Payment Agreements, (v) Mylan, Ranbaxy, and Actavis agreed with Takeda that it could advise the other Defendants of the existence of the acceleration clauses, and (vi) Mylan and Takeda agreed to permit Takeda to grant a license to Teva to market ACTO*plus* met beginning on the date Mylan began selling ACTO*plus* met, with the purpose and effect of enticing Teva to drop its challenge to the ACTOS patents and to Takeda's unlawful listing of the '584 Patent and '404 Patent.

286.    The unlawful conspiracy harmed competition.

287.    As a direct and proximate result of Defendants' unlawful restraint of trade, Plaintiffs and ACTOS Class members paid artificially inflated prices for ACTOS and its generic equivalents as described herein, and were harmed as a result.

288.    By engaging in the foregoing conduct, Defendants intentionally and wrongfully engaged in a contract, combination, or conspiracy in restraint of trade in violation of:

a.    Arizona Rev. Stat. §§ 44-102, *et seq.*, with respect to purchases of ACTOS in Arizona by members of the ACTOS Class.

b.    Cal. Bus. Code §§ 16700, *et seq.*, and Code §§ 17200, *et seq.*, with respect to purchases of ACTOS in California by members of the ACTOS Class.

c.    D.C. Code Ann. §§ 28-4502, *et seq.*, with respect to purchases of ACTOS in the District of Columbia by members of the ACTOS Class.

d.    Fla. Stat. §§ 542.15, *et seq.* and §§ 501.201, *et seq.*, with respect to purchases of ACTOS in Florida by members of the ACTOS Class.

e.    Hawaii Code § 480, et seq., with respect to purchases of ACTOS in Hawaii by members of the ACTOS Class.

f.    740 Ill. Comp. Stat. 10/3, *et seq.*, with respect to purchases of ACTOS in Illinois by members of the ACTOS Class.

g.    Iowa Code § 553, et seq., with respect to purchases of ACTOS in Iowa by members of the ACTOS Class.

h.  Kan. Stat. Ann. §§ 50-101, *et seq.*, with respect to purchases of ACTOS in Kansas by members of the ACTOS Class.

i.  Me. Rev. Stat. Ann. 10, § 1101, *et seq.*, with respect to purchases of ACTOS in Maine by members of the ACTOS Class.

j.  Mich. Comp. Laws Ann. §§ 445.771, *et seq.*, with respect to purchases of ACTOS in Michigan by members of the ACTOS Class.

k.  Minn. Stat. §§ 325D.52, *et seq.*, with respect to purchases of ACTOS Minnesota by members of the ACTOS Class.

l.  Miss. Code Ann. §§ 75-21-1, *et seq.*, with respect to purchases of ACTOS in Mississippi by members of the ACTOS Class.

m.  Neb. Code Ann. §§ 59-801, *et seq.*, with respect to purchases of ACTOS in Nebraska by members of the ACTOS Class.

n.  Nev. Rev. Stat. Ann. § 598A, *et seq.*, with respect to purchases of ACTOS in Nevada by members of the ACTOS Class.

o.  N.M. Stat. Ann. §§ 57-1-1, *et seq.*, with respect to purchases of ACTOS in New Mexico by members of the ACTOS Class.

p.  New York General Business Law § 340, *et seq.*, with respect to purchases of ACTOS in New York by members of the ACTOS Class.

q.  N.C. Gen. Stat. §§ 75-1, *et seq.*, with respect to purchases of ACTOS in North Carolina by members of the ACTOS Class.

r.  N.D. Cent. Code § 51-08.1-01, *et seq.*, with respect to purchases of ACTOS in North Dakota by members of the ACTOS Class.

s.  Or. Rev. Stat. §§ 646.705, *et seq.*, with respect to purchases of ACTOS in Oregon by members of the ACTOS Class.

t.  10 L.P.R.A. § 258 with respect to purchases of ACTOS in the Commonwealth of Puerto Rico by members of the ACTOS Class.

u.  R.I. Gen. Laws §§ 6-36-5, *et seq.*, with respect to purchases of ACTOS in Rhode Island by members of the ACTOS Class.

v.  S.D. Codified Laws Ann. § 37-1, *et seq.*, with respect to purchases of ACTOS in South Dakota by members of the ACTOS Class.

w.   Tenn. Code Ann. §§ 47-25-101, *et seq.*, with respect to purchases of ACTOS in Tennessee by members of the ACTOS Class.

x.   Utah Code Ann. §§ 76-10-911, *et seq.*, with respect to purchases of ACTOS in Utah by residents of Utah who are members of the ACTOS Class.

y.   Vt. Stat. Ann. tit. 9, § 2453, *et seq.*, with respect to purchases of ACTOS in Vermont by members of the ACTOS Class.

z.   W.Va. Code §§ 47-18-1, *et seq.*, with respect to purchases of ACTOS in West Virginia by members of the ACTOS Class.

aa.  Wis. Stat. § 133.01, *et seq.*, with respect to purchases of ACTOS in Wisconsin by members of the ACTOS Class.

289.    Plaintiffs and ACTOS Class members have been (and will continue to be) injured in their business or property by reason of Defendants' antitrust violations, in that Plaintiffs and the ACTOS Class (i) were denied the opportunity to purchase lower-priced generic ACTOS, and (ii) paid higher prices for branded ACTOS than they would have paid in the absence of the unlawful conduct. These injuries are of the type the laws of the above States, the District of Columbia and Puerto Rico were designed to prevent, and flow from that which makes the conduct unlawful.

290.    Plaintiffs and ACTOS Class members seek damages and multiple damages as permitted by law for their injuries.

### EIGHTH CLAIM FOR RELIEF
**Conspiracy and Combination in Restraint of Trade Under State Law**
**(Asserted by Plaintiffs and the ACTO*plus* met Class Against Takeda and Mylan)**

291.    Plaintiffs hereby incorporate each preceding and succeeding paragraph as though fully set forth herein.

292.    The Exclusion Payment Agreement between Takeda and Mylan regarding ACTO*plus* met involves (i) large and unjustified payments from Takeda to Mylan, and (ii) an agreement by Mylan to delay marketing its generic versions of ACTO*plus* met. The payments

86

from Takeda to Mylan under the Exclusion Payment Agreement were the *quid pro quo* for Mylan's agreement to delay marketing its generic versions of ACTO*plus* met. Absent the payments, Mylan would not have agreed to delay marketing its generic versions of ACTO*plus* met and would have entered the market sooner than it did.

293.    The purpose and effect of the payments flowing from Takeda to Mylan under the Exclusion Payment Agreement was to delay generic competition to ACTO*plus* met. There is and was no legitimate, non-pretextual, procompetitive business justification for the payments that outweighs their harmful effect. Even if there were some such conceivable justification, the payments were not necessary to achieve such a purpose.

294.    The purpose and effect of the unlawful Exclusion Payment Agreement between Takeda and Mylan was to allocate 100% of the market for ACTO*plus* met and its generic equivalents in the United States to Takeda, delay the sale of generic ACTO*plus* met products, and fix the price at which consumers and other end-payors pay for ACTO*plus* met and its generic equivalents at the higher, branded price.

295.    The Exclusion Payment Agreement harmed competition.

296.    As a direct and proximate result of Takeda's and Mylan's unlawful restraint of trade, Plaintiffs and ACTO*plus* met Class members paid artificially inflated prices for ACTO*plus* met and its generic equivalents as described herein, and were harmed as a result.

297.    By engaging in the foregoing conduct, Takeda and Mylan intentionally and wrongfully engaged in a contract, combination, or conspiracy in restraint of trade in violation of:.

     a.     Arizona Rev. Stat. §§ 44-102, *et seq.*, with respect to purchases of ACTO*plus* met in Arizona by members of the ACTO*plus* met Class.

     b.     Cal. Bus. Code §§ 16700, *et seq.*, and Code §§ 17200, *et seq.*, with respect to purchases of ACTO*plus* met in California by members of the ACTO*plus* met Class.

87

c.      D.C. Code Ann. §§ 28-4502, *et seq.*, with respect to purchases of ACTO*plus* met in the District of Columbia by members of the ACTO*plus* met Class.

d.      Fla. Stat. §§ 542.15, *et seq.* and §§ 501.201, *et seq.*, with respect to purchases of ACTO*plus* met in Florida by members of the ACTO*plus* met Class, and this conduct constitutes a predicate act under the Florida Deceptive and Unfair Trade Practices Act.

e.      Hawaii Code § 480, et seq., with respect to purchases of ACTO*plus* met in Hawaii by members of the ACTO*plus* met Class.

f.      740 Ill. Comp. Stat. 10/3, *et seq.*, with respect to purchases of ACTO*plus* met in Illinois by members of the ACTO*plus* met Class.

g.      Iowa Code § 553, et seq., with respect to purchases of ACTO*plus* met in Iowa by members of the ACTO*plus* met Class.

h.      Kan. Stat. Ann. §§ 50-101, *et seq.*, with respect to purchases of ACTO*plus* met in Kansas by members of the ACTO*plus* met Class.

i.      Me. Rev. Stat. Ann. 10, § 1101, *et seq.*, with respect to purchases of ACTO*plus* met in Maine by members of the ACTO*plus* met Class.

j.      Mich. Comp. Laws Ann. §§ 445.771, *et seq.*, with respect to purchases of ACTO*plus* met in Michigan by members of the ACTO*plus* met Class.

k.      Minn. Stat. §§ 325D.52, *et seq.*, with respect to purchases of ACTO*plus* met Minnesota by members of the ACTO*plus* met Class.

l.      Miss. Code Ann. §§ 75-21-1, *et seq.*, with respect to purchases of ACTO*plus* met in Mississippi by members of the ACTO*plus* met Class.

m.      Neb. Code Ann. §§ 59-801, *et seq.*, with respect to purchases of ACTO*plus* met in Nebraska by members of the ACTO*plus* met Class.

n.      Nev. Rev. Stat. Ann. § 598A, *et seq.*, with respect to purchases of ACTO*plus* met in Nevada by members of the ACTO*plus* met Class.

o.      N.M. Stat. Ann. §§ 57-1-1, *et seq.*, with respect to purchases of ACTO*plus* met in New Mexico by members of the ACTO*plus* met Class.

p.      New York General Business Law § 340, *et seq.*, with respect to purchases of ACTO*plus* met in New York by members of the ACTO*plus* met Class.

q.      N.C. Gen. Stat. §§ 75-1, *et seq.*, with respect to purchases of ACTO*plus* met in North Carolina by members of the ACTO*plus* met Class.

r.      N.D. Cent. Code § 51-08.1-01, *et seq.*, with respect to purchases of ACTO*plus* met in North Dakota by members of the ACTO*plus* met Class.

s.      Or. Rev. Stat. §§ 646.705, *et seq.*, with respect to purchases of ACTO*plus* met in Oregon by members of the ACTO*plus* met Class.

t.      10 L.P.R.A. § 258 with respect to purchases of ACTO*plus* met in the Commonwealth of Puerto Rico by members of the ACTO*plus* met Class.

u.      R.I. Gen. Laws §§ 6-36-5, *et seq.*, with respect to purchases of ACTO*plus* met in Rhode Island by members of the ACTO*plus* met Class.

v.      S.D. Codified Laws Ann. § 37-1, *et seq.*, with respect to purchases of ACTO*plus* met in South Dakota by members of the ACTO*plus* met Class.

w.      Tenn. Code Ann. §§ 47-25-101, *et seq.*, with respect to purchases of ACTO*plus* met in Tennessee by members of the ACTO*plus* met Class.

x.      Utah Code Ann. §§ 76-10-911, *et seq.*, with respect to purchases of ACTO*plus* met in Utah by residents of Utah who are members of the ACTO*plus* met Class.

y.      Vt. Stat. Ann. tit. 9, § 2453, *et seq.*, with respect to purchases of ACTO*plus* met in Vermont by members of the ACTO*plus* met Class.

z.      W.Va. Code §§ 47-18-1, *et seq.*, with respect to purchases of ACTO*plus* met in West Virginia by members of the ACTO*plus* met Class.

      aa.    Wis. Stat. § 133.01, *et seq.*, with respect to purchases of ACTO*plus* met in Wisconsin by members of the ACTO*plus* met Class.

298.    Plaintiffs and ACTO*plus* met Class members have been (and will continue to be) injured in their business or property by reason of Takeda's and Mylan's antitrust violations, in that Plaintiffs and ACTO*plus* met Class members (i) were denied the opportunity to purchase lower-priced generic ACTO*plus* met, and (ii) paid higher prices for branded ACTO*plus* met than they would have paid in the absence of the unlawful conduct. These injuries are of the type the laws of the above States, the District of Columbia and Puerto Rico were designed to prevent, and flow from that which makes the conduct unlawful.

299.    Plaintiffs and ACTO*plus* met Class members seek damages and multiple damages as permitted by law for their injuries.

**NINTH CLAIM FOR RELIEF**
**Conspiracy and Combination in Restraint of Trade Under State Law**
**(Asserted by Plaintiffs and the ACTO*plus* met Class Against Takeda and Teva)**

300.    Plaintiffs hereby incorporate each preceding and succeeding paragraph as though fully set forth herein.

301.    The Exclusion Payment Agreement between Takeda and Teva regarding ACTO*plus* met involves (i) large and unjustified payments from Takeda to Teva, and (ii) an agreement by Teva to delay marketing its generic versions of ACTO*plus* met. The payments from Takeda to Teva under the Exclusion Payment Agreement were the *quid pro quo* for Teva's agreement to delay marketing its generic versions of ACTO*plus* met. Absent the payments, Teva would not have agreed to delay marketing its generic versions of ACTO*plus* met, and would have entered the market sooner than it did.

302.    The purpose and effect of the payments flowing from Takeda to Teva under the Exclusion Payment Agreement was to delay generic competition to ACTO*plus* met. There is and

was no legitimate, non-pretextual, procompetitive business justification for the payments that outweighs their harmful effect. Even if there were some such conceivable justification, the payments were not necessary to achieve such a purpose.

303.    The purpose and effect of the unlawful Exclusion Payment Agreement between Takeda and Teva was to allocate 100% of the market for ACTO*plus* met and its generic equivalents in the United States to Takeda, delay the sale of generic ACTO*plus* met products, and fix the price at which consumers and other end-payors pay for ACTO*plus* met and its generic equivalents at the higher, branded price.

304.    The Exclusion Payment Agreement harmed competition.

305.    As a direct and proximate result of Takeda's and Teva's unlawful restraint of trade, Plaintiffs and ACTO*plus* met Class members paid artificially inflated prices for ACTO*plus* met and its generic equivalents as described herein, and were harmed as a result.

306.    By engaging in the foregoing conduct, Takeda and Teva intentionally and wrongfully engaged in a contract, combination, or conspiracy in restraint of trade in violation of:

    a.    Arizona Rev. Stat. §§ 44-102, *et seq.*, with respect to purchases of ACTO*plus* met in Arizona by members of the ACTO*plus* met Class.

    b.    Cal. Bus. Code §§ 16700, *et seq.*, and Code §§ 17200, *et seq.*, with respect to purchases of ACTO*plus* met in California by members of the ACTO*plus* met Class.

    c.    D.C. Code Ann. §§ 28-4502, *et seq.*, with respect to purchases of ACTO*plus* met in the District of Columbia by members of the ACTO*plus* met Class.

    d.    Fla. Stat. §§ 542.15, *et seq.* and §§ 501.201, *et seq.*, with respect to purchases of ACTO*plus* met in Florida by members of the ACTO*plus* met Class, and this conduct constitutes a predicate act under the Florida Deceptive and Unfair Trade Practices Act.

e.   Hawaii Code § 480, et seq., with respect to purchases of ACTO*plus* met in Hawaii by members of the ACTO*plus* met Class.

f.   740 Ill. Comp. Stat. 10/3, *et seq.*, with respect to purchases of ACTO*plus* met in Illinois by members of the ACTO*plus* met Class.

g.   Iowa Code § 553, et seq., with respect to purchases of ACTO*plus* met in Iowa by members of the ACTO*plus* met Class.

h.   Kan. Stat. Ann. §§ 50-101, *et seq.*, with respect to purchases of ACTO*plus* met in Kansas by members of the ACTO*plus* met Class.

i.   Me. Rev. Stat. Ann. 10, § 1101, *et seq.*, with respect to purchases of ACTO*plus* met in Maine by members of the ACTO*plus* met Class.

j.   Mich. Comp. Laws Ann. §§ 445.771, *et seq.*, with respect to purchases of ACTO*plus* met in Michigan by members of the ACTO*plus* met Class.

k.   Minn. Stat. §§ 325D.52, *et seq.*, with respect to purchases of ACTO*plus* met Minnesota by members of the ACTO*plus* met Class.

l.   Miss. Code Ann. §§ 75-21-1, *et seq.*, with respect to purchases of ACTO*plus* met in Mississippi by members of the ACTO*plus* met Class.

m.   Neb. Code Ann. §§ 59-801, *et seq.*, with respect to purchases of ACTO*plus* met in Nebraska by members of the ACTO*plus* met Class.

n.   Nev. Rev. Stat. Ann. § 598A, *et seq.*, with respect to purchases of ACTO*plus* met in Nevada by members of the ACTO*plus* met Class.

o.   N.M. Stat. Ann. §§ 57-1-1, *et seq.*, with respect to purchases of ACTO*plus* met in New Mexico by members of the ACTO*plus* met Class.

p.   New York General Business Law § 340, *et seq.*, with respect to purchases of ACTO*plus* met in New York by members of the ACTO*plus* met Class.

q.  N.C. Gen. Stat. §§ 75-1, *et seq.*, with respect to purchases of ACTO*plus* met in North Carolina by members of the ACTO*plus* met Class.

r.  N.D. Cent. Code § 51-08.1-01, *et seq.*, with respect to purchases of ACTO*plus* met in North Dakota by members of the ACTO*plus* met Class.

s.  Or. Rev. Stat. §§ 646.705, *et seq.,* with respect to purchases of ACTO*plus* met in Oregon by members of the ACTO*plus* met Class.

t.  10 L.P.R.A. § 258 with respect to purchases of ACTO*plus* met in the Commonwealth of Puerto Rico by members of the ACTO*plus* met Class.

u.  R.I. Gen. Laws §§ 6-36-5, *et seq.* with respect to purchases of ACTO*plus* met in Rhode Island by members of the ACTO*plus* met Class.

v.  S.D. Codified Laws Ann. § 37-1, *et seq.*, with respect to purchases of ACTO*plus* met in South Dakota by members of the ACTO*plus* met Class.

w.  Tenn. Code Ann. §§ 47-25-101, *et seq.*, with respect to purchases of ACTO*plus* met in Tennessee by members of the ACTO*plus* met Class.

x.  Utah Code Ann. §§ 76-10-911, *et seq.*, with respect to purchases of ACTO*plus* met in Utah by residents of Utah who are members of the ACTO*plus* met Class.

y.  Vt. Stat. Ann. tit. 9, § 2453, *et seq.*, with respect to purchases of ACTO*plus* met in Vermont by members of the ACTO*plus* met Class.

z.  W.Va. Code §§ 47-18-1, *et seq.*, with respect to purchases of ACTO*plus* met in West Virginia by members of the ACTO*plus* met Class.

aa.  Wis. Stat. § 133.01, *et seq.*, with respect to purchases of ACTO*plus* met in Wisconsin by members of the ACTO*plus* met Class.

307.  Plaintiffs and ACTO*plus* met Class members have been (and will continue to be) injured in their business or property by reason of Takeda's and Teva's antitrust violations, in that

Plaintiffs and ACTO*plus* met Class members (i) were denied the opportunity to purchase lower-priced generic ACTO*plus* met, and (ii) paid higher prices for branded ACTO*plus* met than they would have paid in the absence of the unlawful conduct. These injuries are of the type the laws of the above States, the District of Columbia and Puerto Rico were designed to prevent, and flow from that which makes the conduct unlawful.

308.    Plaintiffs and ACTO*plus* met Class members seek damages and multiple damages as permitted by law for their injuries.

**TENTH CLAIM FOR RELIEF**
**State Consumer Protection Violations**
**(Asserted by Plaintiffs and the ACTOS Class Against All**
**Defendants)**

309.    Plaintiffs hereby incorporate each preceding and succeeding paragraph as though fully set forth herein.

310.    Defendants engaged in unfair competition or unfair, unconscionable, deceptive or fraudulent acts or practices in violation of the state consumer protection statutes listed below. As a direct and proximate result of Defendants' anticompetitive, deceptive, unfair, unconscionable, and fraudulent conduct, Plaintiffs and ACTOS Class members were deprived of the opportunity to purchase a generic equivalent of ACTOS and forced to pay higher prices for their ACTOS requirements.

311.    For years, there was a gross disparity between the price that Plaintiffs and the Class members paid for the brand product when compared to the less expensive generic products, which should have been available.

312.    By engaging in the foregoing conduct, Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of the following state unfair and deceptive trade practices and consumer protection statutes:

a.      Defendants have engaged in unfair or unconscionable acts or practices in violation of Ariz. Rev. Stat. §§ 44-1522, *et seq.*

b.      Defendants have engaged in unfair or unconscionable acts or practices in violation of Cal. Bus. & Prof. Code §§ 17200, *et seq.*

c.      Defendants have engaged in unfair or unconscionable acts or practices or made false representations in violation of D.C. Code §§ 28-3901, *et seq.*

d.      Defendants have engaged in unfair or unconscionable acts or practices in violation of Fla. Stat. §§ 501.201, *et seq.*

e.      Defendants have engaged in unfair or unconscionable acts or practices in violation of Haw. Rev. Stat §§ 480, *et seq.*

f.      Defendants have engaged in unfair or unconscionable acts or practices in violation of Idaho Code Am1 §§ 48-601, *et seq.*

g.      Defendants have engaged in unfair or unconscionable acts or practices in violation of 815 Ill. Comp. Stat. Ann. §§ 505/1, *et seq.*

h.      Defendants have engaged in unfair or unconscionable acts or practices in violation of Iowa Code section §§ 714.16, *et seq.*

i.      Defendants have engaged in unfair or unconscionable acts or practices in violation of Kan. Stat. Ann, §§ 50-623, *et seq.*

j.      Defendants have engaged in unfair or unconscionable acts or practices in violation of Me. Rev. Stat. tit. 5 §§ 207; *et seq.*

k.      Defendants have engaged in unfair or unconscionable acts or practices in violation of Mass. Gen. Laws Ch. 93A, *et seq.*

l.      Defendants have engaged in deceptive or fraudulent acts or practices in violation of Minn. Stat. §§ 83l, 325D.44, subd. 1(5), (7) and (13) and 325F.69, subd. *1.*

m.      Defendants have engaged in unfair or unconscionable acts or practices in violation of Mo. Ann. Stat. §§ 407.010, *et seq.*

n.      Defendants have engaged in unfair or unconscionable acts or practices in violation of Neb. Rev. Stat. §§ 59.1601, *et seq.*

o.      Defendants have engaged in unfair or unconscionable acts or

practices in violation of N.H. Rev. Stat. Ann. §§ 358-A:l, *et seq.*

    p.        Defendants have engaged in unfair or unconscionable acts or practices in violation of N.M. Stat. Ann. §§ 57-12-1, *et seq.*

    q.        Defendants have engaged in unfair or unconscionable acts or practices in violation of N.Y. Gen. Bus. Law §§ 349, *et seq.* Plaintiffs seek single damages under this statute.

    r.        Defendants have engaged in unfair or unconscionable acts or practices in violation of N.C. Gen. Stat. §§ 75-l.l, *et seq.*

    s.        Defendants have engaged in deceptive or fraudulent acts or practices in violation of N.D. Cent. Code §§ 51-15-01, *et seq.*

    t.        Defendants have engaged in unfair or unconscionable acts or practices in violation of 73 Pa. State. Ann. §§ 201-1, *et seq.*

    u.        Defendants have engaged in unfair or unconscionable acts or practices in violation of R.I. Gen. Laws §§ 6-13.1-1, *et seq.*

    v.        Defendants have engaged in deceptive or fraudulent acts or practices in violation of S.D, Codified Laws §§ 37-24-1, *et seq.*

    w.        Defendants have engaged in unfair or unconscionable acts or practices in violation of Vt. Stat. Ann. tit. 9 §§ 2451, *et seq.*

    x.        Defendants have engaged in unfair or unconscionable acts or practices in violation of W. Va. Code §§ 46A-6-101 *et seq.*

313.    Plaintiffs and the ACTOS Class have been injured in their business and property by reason of Defendants' unfair or unconscionable acts or practices alleged herein. Their injury consists of paying higher prices for ACTOS than they would have paid in the absence of such violations.  This injury is of the type the state consumer protection statutes were designed to prevent and directly results from Defendants' unlawful conduct.

**ELEVENTH CLAIM FOR RELIEF**
**State Consumer Protection Violations**
**(Asserted by Plaintiffs and the ACTO*plus* met Class Against**
**Defendants Takeda, Mylan, and Teva)**

314.    Plaintiffs hereby incorporate each preceding and succeeding paragraph as though fully set forth herein.

315.    Defendants engaged in unfair competition or unfair, unconscionable, deceptive or fraudulent acts or practices in violation of the state consumer protection statutes listed below. As a direct and proximate result of Defendants' anticompetitive, deceptive, unfair, unconscionable, and fraudulent conduct, Plaintiffs and ACTO*plus* met Class members were deprived of the opportunity to purchase a generic equivalent of ACTO*plus* met and forced to pay higher prices for their ACTO*plus* met requirements.

316.    For years, there was a gross disparity between the price that Plaintiffs and the Class members paid for the brand product when compared to the less expensive generic products, which should have been available.

317.    By engaging in the foregoing conduct, Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of the following state unfair and deceptive trade practices and consumer fraud laws:

a.    Defendants have engaged in unfair or unconscionable acts or practices in violation of Cal. Bus. & Prof. Code §§ 17200, *et seq.*

b.    Defendants have engaged in unfair or unconscionable acts or practices or made false representations in violation of D.C. Code §§ 28-3901, *et seq.*

c.    Defendants have engaged in unfair or unconscionable acts or practices in violation of Fla. Stat. §§ 501.201, *et seq.*

d.    Defendants have engaged in unfair or unconscionable acts or practices in violation of Haw. Rev. Stat §§ 480, *et seq.*

e.    Defendants have engaged in unfair or unconscionable acts or practices in violation of Idaho Code Am1 §§ 48-601, *et seq.*

f.    Defendants have engaged in unfair or unconscionable acts or practices in violation of 815 Ill. Comp. Stat. Ann. §§ 505/1, *et seq.*

g.    Defendants have engaged in unfair or unconscionable acts or practices in violation of Iowa Code section §§ 714.16, *et seq.*

h.    Defendants have engaged in unfair or unconscionable acts or practices in violation of Kan. Stat. Ann, §§ 50-623, *et seq.*

i.    Defendants have engaged in unfair or unconscionable acts or practices in violation of Me. Rev. Stat. tit. 5 §§ 207; *et seq.*

j.    Defendants have engaged in unfair or unconscionable acts or practices in violation of Mass. Gen. Laws Ch. 93A, *et seq.*

k.    Defendants have engaged in deceptive or fraudulent acts or practices in violation of Minn. Stat. §§ 83l, 325D.44, subd. 1(5), (7) and (13) and 325F.69, subd. 1.

l.    Defendants have engaged in unfair or unconscionable acts or practices in violation of Mo. Ann. Stat. §§ 407.010, *et seq.*

m.    Defendants have engaged in unfair or unconscionable acts or practices in violation of Neb. Rev. Stat. §§ 59.1601, *et seq.*

n.    Defendants have engaged in unfair or unconscionable acts or practices in violation of N.H. Rev. Stat. Ann. §§ 358-A:l, *et seq.*

o.    Defendants have engaged in unfair or unconscionable acts or practices in violation of N.M. Stat. Ann. §§ 57-12-1, *et seq.*

p.    Defendants have engaged in unfair or unconscionable acts or practices in violation of N.Y. Gen. Bus. Law §§ 349, *et seq.*

q.    Defendants have engaged in unfair or unconscionable acts or practices in violation of N.C. Gen. Stat. §§ 75-l.l, *et seq.*

r.    Defendants have engaged in deceptive or fraudulent acts or practices in violation of N.D. Cent. Code §§ 51-15-0l, *et seq.*

s.    Defendants have engaged in unfair or unconscionable acts or practices in violation of 73 Pa. State. Ann. §§ 201-1, *et seq.*

       t.       Defendants have engaged in unfair or unconscionable acts or practices in violation of R.I. Gen. Laws §§ 6-13.1-1, *et seq.*

       u.       Defendants have engaged in deceptive or fraudulent acts or practices in violation of S.D, Codified Laws §§ 37-24-1, *et seq.*

       v.       Defendants have engaged in unfair or unconscionable acts or practices in violation of Vt. Stat. Ann. tit. 9 §§ 2451, *et seq.*

       w.      Defendants have engaged in unfair or unconscionable acts or practices in violation of W. Va. Code §§ 46A-6-101 *et seq.*

318.    Plaintiffs and the ACTO*plus* met Class have been injured in their business and property by reason of Defendants' unfair or unconscionable acts or practices alleged herein. Their injury consists of paying higher prices for ACTO*plus* met than they would have paid in the absence of such violations.  This injury is of the type the state consumer protection statutes were designed to prevent and directly results from Defendants' unlawful conduct.

### **TWELFTH CLAIM FOR RELIEF**
**Unjust Enrichment Regarding ACTOS**
**(Asserted by Plaintiffs and the ACTOS Class Against All Defendants)**

319.    Plaintiffs hereby incorporate each preceding and succeeding paragraph as though fully set forth herein.

320.    Defendants have benefited from splitting the supracompetitive profits on Takeda's ACTOS sales resulting from the unlawful and inequitable acts alleged herein.

321.    Defendants' financial benefits resulting from their unlawful and inequitable conduct are traceable to overpayments for ACTOS by Plaintiffs and ACTOS Class members.

322.    Plaintiffs and ACTOS Class members have conferred upon Defendants an economic benefit in the nature of profits resulting from unlawful overcharges and supracompetitive profits—to the economic detriment of Plaintiffs and ACTOS Class members.

323.    It would be futile for Plaintiffs and ACTOS Class members to seek a remedy from any party with whom they had privity of contract.  Defendants have paid no consideration to anyone for any benefits received indirectly from Plaintiffs and ACTOS Class members.

324.    It also would be futile for Plaintiffs and ACTOS Class members to exhaust any remedy they might have against any immediate intermediary in the chain of distribution from which they indirectly purchased ACTOS.  Any such intermediaries are not liable and would not compensate Plaintiffs and ACTOS Class members for harm caused by Defendants.

325.    The economic benefit in the form of overcharges and unlawful profits derived by Defendants through charging supracompetitive and artificially inflated prices for ACTOS is a direct and proximate result of Defendants' unlawful practices.

326.    The financial benefits derived by Defendants rightfully belong to Plaintiffs and ACTOS Class members because they paid anticompetitive and supracompetitive prices during the ACTOS Class Period that wrongfully inured to the benefit of Defendants.

327.    It would be inequitable under the laws of all states and jurisdictions within the United States, except for Indiana and Ohio, for Defendants to retain any of the overcharges for ACTOS derived from Defendants' unfair and unconscionable methods, acts, and trade practices alleged herein.

328.    Defendants should be compelled to disgorge in a common fund for the benefit of Plaintiffs and ACTOS Class members all unlawful or inequitable proceeds received by them.

329.    A constructive trust should be imposed upon all unlawful or inequitable sums received by Defendants traceable to Plaintiffs and ACTOS Class members.

330.    Plaintiffs and ACTOS Class members have no adequate remedy at law.

## THIRTEENTH CLAIM FOR RELIEF
### Unjust Enrichment Regarding ACTO*plus* met
### (Asserted by Plaintiffs and the ACTO*plus* met Class Against Takeda, Mylan, and Teva)

331.    Plaintiffs hereby incorporate each preceding and succeeding paragraph as though fully set forth herein.

332.    Takeda, Mylan, and Teva benefited from splitting the supracompetitive profits on Takeda's ACTO*plus* met sales resulting from the unlawful and inequitable acts alleged herein.

333.    Takeda's, Mylan's, and Teva's financial benefits resulting from their unlawful and inequitable conduct are traceable to overpayments for ACTO*plus* met by Plaintiffs and ACTOS Class members.

334.    Plaintiffs and ACTO*plus* met Class members have conferred upon Takeda, Mylan, and Teva an economic benefit in the nature of profits resulting from unlawful overcharges and supracompetitive profits—to the economic detriment of Plaintiffs and ACTO*plus* met Class members.

335.    It would be futile for Plaintiffs and ACTO*plus* met Class members to seek a remedy from any party with whom they had privity of contract.  Takeda, Mylan, and Teva have paid no consideration to anyone for any benefits received indirectly from Plaintiffs and ACTO*plus* met Class members.

336.    It also would be futile for Plaintiffs and ACTO*plus* met Class members to exhaust any remedy against any immediate intermediary in the chain of distribution from which they indirectly purchased ACTO*plus* met.  Any such intermediaries are not liable and would not compensate Plaintiffs and ACTO*plus* met Class members for harm caused by Takeda, Mylan, and Teva.

337.    The economic benefit of in the form of overcharges and unlawful profits derived by Takeda, Mylan, and Teva through charging supracompetitive and artificially inflated prices

101

for ACTO*plus* met is a direct and proximate result of Takeda's, Mylan's, and Teva's unlawful practices.

338.    The financial benefits derived by Takeda, Mylan, and Teva rightfully belong to Plaintiffs and ACTO*plus* met Class members because Plaintiffs and ACTO*plus* met Class members paid anticompetitive and supracompetitive prices during the ACTO*plus* met Class Period that wrongfully inured to the benefit of Takeda, Mylan, and Teva.

339.    It would be inequitable under the laws of all states and jurisdictions within the United States, except for Indiana and Ohio, for the Takeda, Mylan, and Teva to retain any of the overcharges for ACTO*plus* met derived from Takeda, Mylan, and Teva's unfair and unconscionable methods, acts, and trade practices alleged herein.

340.    Takeda, Mylan, and Teva should be compelled to disgorge in a common fund for the benefit of Plaintiffs and ACTO*plus* met Class members all unlawful or inequitable proceeds received by them.

341.    A constructive trust should be imposed upon all unlawful or inequitable sums received by Takeda, Mylan, and Teva traceable to Plaintiffs and ACTO*plus* met Class members.

342.    Plaintiffs and the ACTO*plus* met Class have no adequate remedy at law.

## XV.    DEMAND FOR JUDGMENT

WHEREFORE, Plaintiffs, individually and on behalf of both Classes, respectfully demand judgment for the following relief:

A.    Certification of this action as a class action, pursuant to Fed. R. Civ. P. 23(a), 23 (b)(2) and (b)(3), direction of reasonable Class notice, pursuant to by Fed. R. Civ. P. 23(c)(2), appointment of Plaintiffs as representatives of the Classes, and appointment of Plaintiffs' counsel as Class Counsel;

B.      A finding that Defendants' wrongful conduct alleged herein violated the statutes set forth above, and constitutes unjust enrichment under the common law of all states and jurisdictions within the United States, except Indiana and Ohio;

C.      Joint and several judgments against Defendants in favor of Plaintiffs and the Classes;

D.      Equitable relief in the nature of disgorgement, restitution, and the creation of a construction trust to remedy Defendants' unjust enrichment;

E.      Plaintiffs' and Class members' damages and, where applicable, treble, multiple, punitive, and/or other damages, in an amount to be determined at trial, including interest;

F.      Attorneys' fees, litigation expenses, and costs of suit; and

G.      Such other and further relief as necessary to correct the anticompetitive market effects caused by Defendants' unlawful conduct, and as the Court deems just.

## XVI.   JURY DEMAND

Pursuant to Fed. Civ. P. 38, Plaintiffs, individually and on behalf of the proposed Classes, respectfully demand a trial by jury on all issues so triable.

Dated: May 20, 2014                                   Respectfully Submitted,

                                                      /s/Karen M. Leser-Grenon (KL9934)
                                                      Laurie Rubinow*
                                                      Karen M. Leser-Grenon (KL9934)
                                                      Kolin Tang
                                                      **SHEPHERD, FINKELMAN, MILLER &
                                                      SHAH, LLP**
                                                      875 Third Ave., Suite 800
                                                      New York, NY 10022
                                                      Telephone: (212) 419-0156
                                                      klcser@sfmslaw.com
                                                      ktang@sfmslaw.com
                                                      *Interim Liaison Counsel

                                                      Steve D. Shadowen*
                                                      Matthew C. Weiner
                                                      **HILLIARD & SHADOWEN LLP**
                                                      39 W. Main Street
                                                      Mechanicsburg, PA 17055
                                                      Telephone: (855) 344-3298
                                                      Facsimile: (512) 233-2824
                                                      steve@hilliardshadowenlaw.com
                                                      matt@hilliardshadowenlaw.com
                                                      *Interim Co-Lead Counsel

                                                      Jayne A. Goldstein *
                                                      **POMERANTZ LLP**
                                                      1792 Bell Tower Lane, Suite 203
                                                      Weston, FL 33326
                                                      Telephone: (954) 315-3454
                                                      jagoldstein@pomlaw.com
                                                      *Interim Co-Lead Counsel

                                                      Kenneth A. Wexler*
                                                      Kara A. Elgersma
                                                      **WEXLER WALLACE LLP**
                                                      55 W. Monroe Street, Suite 3300
                                                      Chicago, IL 60603
                                                      Telephone: (312) 346-2222
                                                      Facsimile: (312) 346-0022
                                                      kaw@wexlerwallace.com
                                                      kae@wexlerwallace.com
                                                      * Interim Co-Lead Counsel

Donald A. Migliori
Michael M. Buchman*
John A Ioannou
Alex R. Straus
**MOTLEY RICE LLC**
600 Third Avenue, 21st Floor
New York, New York 10016
Telephone: (212) 577-0040
Facsimile: (212) 577-0054
DMigliori@motleyrice.com
MBuchman@motleyrice.com
JIoannou@motleyrice.com
AStraus@motleyrice.com
*Interim Co-Lead Counsel

David W. Mitchell*
Brian O. O'Mara
Lonnie A. Browne
**ROBBINS GELLER RUDMAN
& DOWD LLP**
655 West Broadway, Suite 1900
San Diego, CA  92101
Telephone: (619) 231-1058
Facsimile: (619) 231-7423
*Executive Committee

Marvin A. Miller*
Lori A. Fanning
**MILLER LAW LLC**
115 South LaSalle Street, Suite 2910
Chicago, IL 60603
Telephone: (312) 332-3400
MMiller@millerlawllc.com
LFanning@Millerlawllc.com
*Executive Committee

J. Douglas Richards*
Sharon K. Robertson
**COHEN MILSTEIN SELLERS
& TOLL PLLC**
88 Pine Street, 14th Floor
New York, New York 10005
Telephone: (212) 758-3042
Facsimile: (212) 838-7745
*Executive Committee

Brian P. Murray
Gregory B. Linkh
Lee Albert*
**GLANCY BINKOW & GOLDBERG**
**LLP**
122 East 42nd Street, Suite 2920
New York, NY 10168
Telephone: (212) 682-5340
Facsimile: (212) 884-0988
bmurray@glancylaw.com
glinkh@glancylaw.com
lalbert@glancylaw.com
*Executive Committee

Stewart L. Cohen
Michael Coren
Jacob A. Goldberg*
**COHEN PLACITELLA**
**& ROTH, P.C.**
Two Commerce Square, Suite 2900
2001 Market Street
Philadelphia, PA  19103
Telephone:  (215) 567-3500
Facsimile:  (215) 567-6019
slc@cprlaw.com
mcoren@cprlaw.com
jgoldberg@cprlaw.com
*Executive Committee

Elizabeth G. Arthur
**HILLIARD & SHADOWEN LLP**
919 Congress Ave., Suite 1325
Austin, TX  78701
Telephone: (512) 851-8992
Facsimile: (512) 233-2824
elizabeth@hilliardshadowenlaw.com

Natalie Finkelman Bennett
James C. Shah
Eric L. Young
**SHEPHERD, FINKELMAN, MILLER &**
**SHAH, LLP**
35 East Main Street
Media, PA 19063
Telephone: (610) 891-9880
nfinkelman@sfmslaw.com

jshah@sfmslaw.com
elyoung@sfmslaw.com

Richard L. Coffman
**THE COFFMAN LAW FIRM**
First City Building
505 Orleans Street, Suite 505
Beaumont, TX  77701
Telephone: (409) 833-7700
Facsimile: (866) 835-8250
rcoffman@coffmanlawfinn.com
Adam Giffords Kurtz
**POMERANTZ LLP**
600 Third Ave., 20th Floor
New York, NY, 10016
Telephone: (212) 661-1100
Facsimile: (212) 661-8665
AGKurtz@pomlaw.com

Mark B. Goldstein
**POMERANTZ LLP**
10 South LaSalle Street, Suite 3505
Chicago, IL 60603
Telephone: (312) 377-1181
Facsimile: (312) 377-1184
mbgoldstein@pomlaw.com

Daniel E. Gustafson
Karla Gluek
**GUSTAFSON GLUEK PLLC**
Canadian Pacific Plaza
120 S. 6th St., Suite 2600
Minneapolis, MN 55402
Telephone: (612) 333-8844
Facsimile: (612) 339-6622
dgustafson@gustafsongluek.com
kgluek@gustafsongluek.com

Peter Safirstein
Domenico Minerva
**MORGAN & MORGAN**
28 West 44th Street, Suite 2001
New York, NY 10036
Telephone: (212) 564-1637
psafirstein@forthepeople.com
dminerva@forthepeople.com

John A. Kehoe
**GIRARD GIBBS LLP**
711 Third Ave, 20th Floor
New York, NY 10017
Telephone: (212) 798-0159
Facsimile: (212) 867-1767
jak@girardgibbs.com

Daniel C. Girard
Dena C. Sharp
Lesley V. Tepper
**GIRARD GIBBS LLP**
601 California Street, 14th Floor
San Francisco, CA 94108
Telephone: (415) 981-4800
Facsimile: (415) 981-4846
dcg@girardgibbs.com
chc@girardgibbs.com
smg@girardgibbs.com

Samuel Howard Rudman
**ROBBINS GELLER RUDMAN
& DOWD LLP**
58 South Service Road, Suite 200
Melville, NY 11747
Telephone: (631) 367-7100
Facsimile: (631) 367-1173
srudman@rgrdlaw.com
Patrick J. O'Hara
**CAVANAGH  & O'HARA**
407 East Adams Street
Springfield, IL  62701
Telephone: (217) 544-1771
Facsimile: (217) 544-9894

Gary B. Friedman
Tracey Kitzman
**FRIEDMAN LAW GROUP LLP**
270 Lafayette Street, 14th Floor
New York, NY  10012
Telephone:  (212) 680-5150
Facsimile:  (646) 277-1151
gfriedman@flgllp.com
tkitzman@flgllp.com

Vincent J. Esades
Renae D. Steiner
David Woodward
**HEINS MILLS & OLSON, P.L.C.**
310 Clifton Avenue
Minneapolis, MN 55403
Telephone: (612) 338-4605
Facsimile: (612) 338-4692
vesades@heinsmills.com
dwoodward@heinsmills.com
rsteiner@heinsmills.com

Douglas A. Millen
**FREED KANNER LONDON &
MILLEN, LLC**
2201 Waukegan Road, Suite 130
Bannockburn, IL 60015
Telephone: (224) 632-4500
Facsimile: (224) 632-4521
dmillen@fklmlaw.com

Mitchell M. Breit
Andrea Bierstein
**HANLY CONROY BIERSTEIN
SHERIDAN FISHER & HAYES LLP**
112 Madison Avenue
New York, NY 10016
Telephone: (212) 784-6400
mbreit@hanlyconroy.com
abierstein@hanlyconroy.com

Chris Casper
**JAMES, HOYER, NEWCOMER &
SMILJANICH, P A**
4830 W. Kennedy Blvd
Tampa, Florida 33609
Telephone: (813) 397-2300

Derek Y. Brandt
**SIMMONS BROWDER GIANARIS
ANGELIDES & BARNERD LLC**
One Court Street
Alton, Illinois 62002
Telephone: (618) 259-2222
Facsimile: (618) 259-2251
dbrandt@simmonsfirm.com

109

Brian J. Robbins
Kevin A. Seely
Gregory E. Del Gaizo
**ROBBINS ARROYO, LLP**
600 B Street, Suite 1900
San Diego, CA 92101
Telephone: (619) 525-3990
Facsimile: (619) 535-3991
brobbins@robbinsarroyo.com
kseely@robbinsarroyo.com
gdelgaizo@robbinsarroyo.com

Joseph M. Burns
Tiffany R. Reeves
**JACOBS BURNS ORLOVE &
HERNANDEZ**
150 North Michigan Avenue, Suite 1000
Chicago, IL 60601
Telephone: (312) 372-1646
JBurns@jbosh.com
TReeves@jbosh.com

Carol V. Gilden
**COHEN MILSTEIN SELLERS
& TOLL, PLLC**
190 South LaSalle Street Suite 1705
Chicago, Illinois
Telephone: (312) 357-0370
Facsimile: (312) 357-0369
cgilden@cohenmilstein.com

Frank R. Schirripa
Michael A. Rose
**HACH ROSE SCHIRRIPA
& CHEVERIE, LLP**
185 Madison Avenue, 14th Floor
New York, New York 10016
Telephone: (212) 213-8311
Facsimile: (212) 779-0028
Michael D. Donovan
Noah Axler
**DONOVAN AXLER**
1845 Walnut Street, Suite 1100
Philadelphia, PA  19103
Telephone: (215) 732-6067

mdonovan@donovanaxler.com
naxler@donovanaxler.com

Stephen C. Richman
**MARKOWITZ & RICHMAN**
123 South Broad Street
Philadelphia, PA 19109
Telephone: (267) 528-0121
srichman@markowitzandrichman.com

Robert D. Klausner
Stuart A. Kaufman
**KLAUSNER KAUFMAN JENSEN &**
**LEVINSON**
10059 Northwest 1st Court
Plantation, FL 33324
Telephone: (954) 916-1202
Bob@robertdklausner.com
Stu@robertdklausner.com

Daniel R. Karon
GOLDMAN SCARLATO KARON &
PENNY, P.C.
700 W. St. Clair Avenue, Suite 200
Cleveland, OH 44113
Telephone: (216) 622-1851

Garrett Blanchfield
REINHARDT,WENDORF              &
BLANCHFIELD
E-1250 First National Bank Bldg.
332 Minnesota St.
St. Paul, MN 55101
Telephone: (651) 287-2100

## CERTIFICATE OF SERVICE

I hereby certify that on May 20, 2014, a copy of the foregoing was filed electronically and served by mail on anyone unable to accept electronic filing.  Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing.  Parties may access this filing through the Court's CM/ECF System.

Dated: May 20, 2014                              Respectfully Submitted,

                                                 /s/Karen M. Leser-Grenon (KL9934)
                                                 **SHEPHERD, FINKELMAN, MILLER & SHAH, LLP**
                                                 875 Third Ave., Suite 800
                                                 New York, NY 10022
                                                 Telephone: (212) 419-0156
                                                 klcser@sfmslaw.com